## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

PETER GOODCHILD, ELIEZER SOTO
CONCEPCION, JOAN ABREU-FELIZ and
MICHAEL WINANS, individually and on behalf
of all others similarly situated,

    *Petitioners,*

v.

DAVID E. ORTIZ, in his capacity as Warden of the
Federal Correctional Institution, Fort Dix, and
MICHAEL CARVAJAL, in his capacity as Director
of the Bureau of Prisons, DR. NICOLLETTA
TURNER-FOSTER, in her capacity as Medical
Director of the Federal Correction Institution, Fort
Dix, Jointly and severally,

    *Respondents.*

Case No._____ CV _____

COMPLAINT-CLASS ACTION

PETITION FOR WRIT OF HABEAS
CORPUS PURSUANT TO 28 USC 2

AND REQUEST FOR AN EMERGE
ORDER OF ENLARGEMENT,
INJUNCTIVE AND/OR DECLARAT
RELIEF

RECEIVED

JAN 15 2021

AT 8:30_____M
WILLIAM T. WALSH
CLERK

## INTRODUCTION

We have been left to die.

It is not hyperbole, dramatic, or an exaggeration to write these words. The aforementioned Petitioners housed at the Fort Dix Minimum Security Camp (the "Camp") and the putative members of the class they wish to represent are being restrained in a total abrogation of their health, safety, and welfare in a clear violation of their Eighth Amendment rights against cruel and unusual punishment. The Respondents and the staff at Fort Dix have acted with deliberate indifference to human life and if the Petitioners are not immediately granted the Injunctive and Declaratory relief sought herein, there is a very real chance that the Respondents' actions and omissions will rise to the level of depraved indifference.

**THE NEED FOR IMMEDIATE ACTION**

As a result of the current circumstances, this Petition will be as brief as possible since speed is of the essence.

This Petition seeks to represent all inmates of the Camp in the care of the Bureau of Prisons (the "BoP"). There are currently 136 men assigned to the Camp, 37 of whom are currently housed in a separate quarantine facility as a result of the deliberate indifference of the staff of the Camp.

**PARTIES**

Petitioner Peter Goodchild, BoP Register No. 76304-066, is a 58 year old man who, at all relevant times herein has been in the custody of the BoP at the Camp and is currently housed there. Mr. Goodchild is a smoker of more than 40 years who suffers from poorly controlled Hypertension for which he has been prescribed immune suppressing medicines. He has been classified as a Chronic Care inmate.

Shortly after self-surrendering to the Camp, and prior to the advent of the Coronavirus pandemic, Mr. Goodchild presented at the medical office with symptoms consistent with Congestive Heart Failure, for which he has a significant family history. Dr. Sceusa, the physician in charge of the Camp at the time, ordered Mr. Goodchild to see a series of specialists, including a Cardiologist. To date, almost a year later, none of those consultations has been performed and Mr. Goodchild has no idea of his true diagnoses.

Mr. Goodchild is serving a 102 month sentence for a non-violent, white collar crime. This is his first experience with the criminal justice system.

Petitioner Eliezer Soto-Concepcion, BoP Register No. 72850-067, is a 38 year old man suffering from Coronary Artery Disease, Atherosclerosis, Hypertension, Obesity (BMI >30), and Hyperlipidemia. He suffered his first Heart Attack at the age of 20, because of severe Atherosclerotic Heart Disease and continues to have diminished heart function with an ejection fraction of only 45% as demonstrated by anterior and apical left ventricular hypokinesis, according to the doctors who evaluated him at the BoP. Mr. Soto-Concepcion currently takes 20 mg of Atorvastatin, 2.5 mg Amlodipine, 81 mg Aspirin and 125 mg Hydrochlorothiazide in an attempt to lessen the effects of his various ailments. These drugs put him in an immuno-compromised state. Given the severity of Mr. Soto-Concepcion's underlying conditions, he is justifiably concerned that if he contracts Covid-19 he will not survive.

The care system at the Camp requires the submission of a sick call form during 'Sick Call' at 6:15-6:30 am. After submission of the form, an untrained Physician's Assistant (there is no Licensed Nurse or Doctor assigned to the Camp) determines whether the medical situation rises to the level necessary to see a nurse on the one or two days the nurse is present at the Camp. A

nurse may schedule a doctor's exam. It is not uncommon for men requiring urgent care to wait weeks or even months.

Mr. Soto Concepcion has served more than half of his statutory sentence of 144 months, His drug distribution crime, while serious, was non-violent and his first violation of the law.

Petitioner Joan Abreu-Feliz, BoP Register No. 72036-066, is a 38 year old smoker of 15 years who suffers from Obesity (BMI of 35), Hypertension, and Meningioma, a Brain Tumor. Mr. Abreu-Feliz was first diagnosed by the BoP in 2019 and his blood pressure is currently poorly controlled. On his most recent visit to Sick Call, his blood pressure was 162/70. The Physician's Assistant refused to make note of it and instructed Mr. Abreu-Feliz to "drink lots of water and do cardio." His brain tumor was first noted in 2001 and it has been almost two years since they have ordered a scan.

Petitioner Michael Winans, BoP Register No. 47697-038, is a 38 year old man who has suffered from severe, debilitating allergies since childhood. He has served 65% of his statutory sentence for wire fraud, his first offense.

Respondent David Ortiz is the Warden of FCI Fort Dix and, as such, has oversight responsibility for all units at the FCI Fort Dix facility, both the Low Security prison and the Camp. As Warden of FCI Fort Dix, Respondent Ortiz is responsible for and oversees all day to day activity at Fort Dix and all aspects of the operation and functioning of FCI Fort Dix. His responsibilities include ensuring the safety of all in the institution and ensuring the orderly running of the institution. Respondent Ortiz is aware of the harms of Covid-19, but has adopted, and enforced, a policy that leaves Petitioners, and those similarly situated, exposed to an infection that results in severe illness and, as we have seen in 185 BoP cases, death, due to Covid-19. Respondent Ortiz is the immediate physical custodian responsible for the detention of the Petitioners at FCI Fort Dix. He is being sued in his official capacity only.

Respondent Michael Carvajal is the Director of the Federal Bureau of Prisons, and, in that capacity, is responsible for the safety and security of all persons, including Petitioners and all Class Members serving federal sentences at BoP facilities, including the Camp. He is being sued in his official capacity only.

Respondent Dr. Nicoletta Turner-Foster is the Clinical Director of FCI Fort Dix and has direct control of all medical facilities at FCI Fort Dix, including the Camp. She has been made aware of the seriousness of potential complications including severe illness and even death that may result from Covid-19, but has pursued a course of arbitrary and capricious actions and omissions in total abrogation of CDC protocols which has placed Petitioners and all Class Members exposed for untenable durations to the ravages of the disease with deliberate indifference to human life. She is being sued in her official capacity only.

## JURISDICTION AND VENUE

Petitioners bring this putative class action pursuant to 28 USC 2241 for relief from detention that violates their Eighth Amendment rights under the United States Constitution and pursuant to 28 USC 1331 for relief from conditions of confinement that violate the Eighth Amendment and the Rehabilitative Act, 29 USC 794.

This Court has subject matter jurisdiction over these claims pursuant to 28 USC 2241 (habeas corpus), 28 1331 (federal question), 28 USC 1651 (All Writs Act), and Article I, section 9 , cl. 2 of the United States Constitution (suspension clause). In addition, the Court has jurisdiction to grant Declaratory and injunctive relief pursuant to the Declaratory Judgment Act 28 USC 2201.

Venue in this judicial district is correct, pursuant to 28 USC 2241 (d) because the Petitioners and all other Class Members are in custody in this judicial district, and, pursuant to 28 USC 1391 (b)(2), because a substantial part of the events and omission giving rise to Petitioners claims occurred, and continue to occur, in this district.

## CLASS ACTION ALLEGATIONS

Petitioners bring this representative habeas action pursuant to 28 USC 2241, and as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure, on their own and on behalf of all persons similarly situated.

Petitioners seek to represent a class consisting of all individuals currently in custody at the Camp, or who will be in custody at the Camp during the course of the Covid-19 pandemic (the "Class").

Petitioners also seek to represent a subclass (the "Subclass") consisting of all individuals in custody at the Camp, or who will be in custody of the Camp during the Covid-19 pandemic, who are aged 50 or over and/or have serious underlying medical conditions that put them at particular risk of serious harm or death from Covid-19, including but not limited to people of any age with: Cancer; Chronic Kidney Disease; COPD; an immuno-compromised state due to organ transplant, blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or immune weakening medicines, or any other reason; Obesity (Body Mass Index ("BMI") of 30 or higher); Serious Heart Conditions; Sickle Cell Disease; Type 1 or 2 Diabetes Mellitus; Cerebrovascular Disease; Cystic Fibrosis; Hypertension or high blood pressure; Neurologic conditions; Liver Disease; Pulmonary Fibrosis; Smoking; Thalassemia; and people with any other condition specifically identified by the Centers for Disease Control and Prevention (the "CDC"), currently or in the future, as increasing their risk of contracting , having severe illness, and/or dying from Covid-19. See CDC List of People Who Need to Take Extra Precautions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-risk.html.

The people of the Class and Subclass are too numerous to be joined in one action and their joinder is impracticable. Upon information and belief, the proposed class exceeds 100 individuals.

Common questions of law and fact exist as to all Class and Subclass members and predominate over questions that affect only the individual members. These common questions of fact and law include but are not limited to: (1) whether the conditions of confinement described in this Petition amount to Constitutional violations; (2) what measures Respondents took in response to the Covid-19 crisis; (3) whether Respondents failed to implement an adequate emergency plan during the Covid-19 crisis; (4) whether Respondents practices during the Covid-19 crisis exposed people at the Camp to substantial risk of serious harm; (5) whether Respondents knew of and disregarded a substantial risk of serious harm to the safety and health of the Class; and (6) what relief should be awarded to redress the harms threatened to members of the Class as a result of these conditions.

Absent class certification, individuals detained at the Camp during the Covid-19 pandemic would face a series of barriers in accessing the relief sought. FCI Fort Dix has suspended visitation and Camp prisoners have limited access to communication with the outside world, impeding their abilities to obtain legal representation and to pursue legal and equitable remedies. A large portion of the Class and Subclass has limited educational backgrounds. For some, English is not their first language.

Respondents' practices and the claims alleged in this Petition are common to all members of the Class and Subclass.

The claims of Petitioners are typical of those of the Class and Subclass. Petitioners are subjected to inhumane conditions of confinement at the Camp.

The legal claims of Petitioners are the same, or similar, to those of all Class and Subclass members and the harms suffered by them are typical of those suffered by all other Class members.

Petitioners will fairly and adequately protect the interests of the Class and Subclass. The interests of Petitioners as class representatives are consistent with those of the Class and Subclass members.

Prosecuting separate actions by individual petitioners would create a risk of inconsistent or varying adjudications that could establish incompatible and inconsistent standards of conduct for the party opposing the Class.

Respondents have acted and refused to act on grounds generally applicable to the Class, such that final injunctive and declaratory relief is appropriate to the Class as a whole.

Use of the class action mechanism is superior to all other methods for it will result in consistent, fair, and efficient adjudication of the claims and will prevent the imposition of undue financial, administrative, and procedural burdens on the parties and on this Court.

This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all Class and Subclass members is impracticable.

## STATEMENT OF FACTS

### 1. Petitioners Are Members of the Population Particularly Vulnerable to Covid-19

Petitioners, currently detained at the Camp, are individuals particularly vulnerable to serious illness or death if infected by Covid-19.

Due to the emergent conditions at the Camp, and the limited availability of medical records from staff, it is impractical and dangerous to wait to secure the medical records of each Petitioner. Generally, the wait to speak to a Licensed Health Care Provider is approximately one week, followed by at least a two week wait for requested records to be generated. Respondents can more easily secure the medical records of the Petitioners. They have immediate access to all records and all Pre-Sentencing Reports of Petitioners and all members of the proposed Subclass and Class.

Each and every Petitioner suffers from conditions recognized by the CDC as being "at increased risk for severe illness from Covid-19." The Department of Justice has "direct[ed] the United States to concede extraordinary and compelling reasons exist when defendants present certain health conditions, including those in the Centers for Disease Control and Prevention's high risk groups." United States v. Adeyemi, 2020 WL 3642478, at *10, n. 121 (ED PA July 6, 2020).

Each and every Petitioner and member of the Subclass has been condemned to serve their sentence at substantial risk of serious illness or death. For most of the Petitioners, they have spent the last eight months living in fear that as a result of the virus, they will not make it out of Fort Dix alive or will become terribly ill.

Throughout the BoP, Camps are used to incarcerate persons who are least likely to recidivate, have less than 120 months left on their sentences, have no acts of violence in their current crime of conviction, are Minimum Security Classification, have a Prisoner Assessment Tool Targeting Estimated Risk and Needs ("PATTERN") Score of Low or Minimum and generally have a 'Community' Custody Level. Most Camps have no fences and permit their inmates to have work details in community settings. Every member of the Class meets the specified criteria.

Not a single one of the men currently incarcerated at Fort Dix Minimum Security Camp should be facing the daily threat of death or serious illness.

6

It is true that members of the general public are also living a very different life than they were a year ago. However, the threat to petitioners and the members of the Class, as noted by the Attorney General of the United States, is a world apart from citizens in the general public. A person in the general population of the US can, for the most part, control their exposure to the virus and can take steps to socially distance themselves from others. Everyone knows at least some people who have completely avoided contracting the virus by hyper-vigilance and staying at home.

People throughout the United States frequently liken their current circumstances to being in prison. Petitioners, however, are subject to the actions and omissions of the staff of those prisons and the realities of a congregate environment.

It has been reported that incarcerated individuals are being infected at a rate more than 6.5 times higher than the general population and are dying at a rate three times higher. See Federal Defenders of New York, BoP-Reported Positive Tests for Covid-19 Nationwide, https://federaldefendersny.org.

## 2. The Physical Layout at Fort Dix Gives Rise to an Urgent Need for Social Distancing

FCI Fort Dix is the largest federal prison in the United States in terms of capacity, capable of housing 5,000 inmates. As of December 30, 2020, there were 2,749 inmates housed in the 13 buildings that make up the Low Security prison. The Camp is completely separate from the Low Security Prison and comprises a single building.

While the Low Security Prison is comprised of housing units of three floors consisting of 12-man rooms and a smaller number of 2-man rooms, the Camp has two open-air dormitories, each holding 104 bunks or 208 beds. The layout of the two dormitories, known as the A and B Wings is such that each bunk is separated physically from its neighboring bunk by the storage lockers used by the inmates assigned to the two beds, a width of only 36 inches. Furthermore, while some bunks line the outer walls of the main room, most bunks are arranged two deep so that mean are sleeping head-to-head, no more than 12 inches apart. If the room were at capacity, most men would be sleeping within 6 feet of 11 other men. See Exhibit A.

Both dormitories have communal bathrooms with 6 urinals, ten toilets, 16 sinks, and eight showers. All of these are directly adjacent to the next. Many of these are no longer functioning, further eliminating social distancing.

The common areas of the unit are in the center of the building and comprise a recreational area, two TV/Computer rooms, a Chapel, two laundry rooms, and the Cafeteria/Kitchen. The recreation room is furnished with stationary bicycles, a pool table, a table hockey game, two treadmills, and three TVs. The TV/Computer rooms are approximately 25 feet square and have cramped seating for 30 men to watch the three TVs and 8 computers for email, which are within feet of one another.

The administrative area of the building, colloquially known as 'Staff Alley,' has six offices for the Unit Team Manager, Case managers, Counselors, and the Unit Secretary. There is a small two room medical office no more than 12 feet square. The medical office is staffed by a physician's assistant. She does nothing more than accept sick call requests during morning 'sick call' from 6:15-6:30 am. She dispenses pills at the same time and at 2:45-3:00 pm. A Nurse Practitioner comes to the Camp usually twice a week, and a doctor visitation is a rarity. It is not uncommon to wait weeks to see a medical care professional even for emergent issues. Emergencies require convincing a Correctional Officer to call the Lieutenant on Duty to make the trip to the Camp to evaluate the situation. It is only at that time that an ambulance may be called. There are no psychologists available to incarcerated persons at the Camp.

All maintenance for the physical plant was performed, prior to the pandemic, by the Facilities Crew of Fort Dix, which comprised inmates and supervising staff. Upon information and belief, the Facilities Staff refuses to enter the Camp during the pandemic. As a result, many of the facilities are deteriorating. Ten of the twelve washing machines no longer work. Doors have fallen off three of the available showers. More than half the sinks are inoperable, and most of the others run non-stop. Several toilets and urinals have their water turned off to avoid flooding. The roof has holes in it, especially in the dining hall. There are vermin in the dormitories and the kitchen, including an opossum that now lives in a wall near the food storage closet.

### 3. The Covid-19 Outbreak at Fort Dix

There is currently a third wave of the Coronavirus pummeling FCI Fort Dix, and the second to affect the Camp

#### A. The First Wave - The Camp (March 13, 2020 - September 27, 2020)

The first time Covid-19 passed through the Camp, 58 of the 230 incarcerated persons in the Camp tested positive. Even though testing was spotty and certainly under-represented the number of sick inmates, 25% of the population of the Camp were found to be positive.

Staff of Fort Dix Camp convened two 'Town Hall' meetings on March 13, 2020, one each for the A-Wing and the B-Wing. At that time there were approximately 230 inmates at the Camp. The staff gathered about 115 inmates at a time, along with more than 20 staff in a room with a maximum capacity of 150 to explain that a highly contagious virus was going to affect operations.

Present at the meeting were: Ms. Bridges, the Camp Administrator, and highest ranking member of the staff involved in the operation of the camp, who has since left that post on November 27, which post has not been filled; Mr. Brinson, the Unit Team Manager for the Camp and the highest ranking staff member with an office at the Camp; Mr. Silver, the Counselor in charge of day-to-day operations of the Camp, who took early retirement two weeks later, the day it became apparent the Camp was infected; two Case Managers, Ms.

8

Wright and Ms. McCollum, Ms. McCollum left on extended leave in May and has not yet returned, her position was not filled until November; Ms. Henderson, the triage nurse at the Camp, who went out on leave the day after that meeting, who has not returned to the Camp; Ms. Cifelli, the Education Director for the camp, and; various Correction Officers and Security staff.

Not present at the meeting was Respondent, Warden David Ortiz, who has not been at the Camp for a single minute since February of 2020.

The meeting was called to inform us that education and programs would be suspended and that visitations would be cancelled immediately. In order to counter the inconveniences, our phone minutes would be increased and be provided free of charge. During the meeting, senior staff was asked why they were not wearing gloves or masks to prevent intrusion of the virus into the Camp. The response was that staff was monitoring themselves and temperatures would be taken if any staff member appeared ill.

The first man reported himself to sick call on March 29, 2020. Since it was a weekend, he was told to return to his bunk until Monday.

The next Town hall occurred on April 3, 2020, on the outdoor basketball court. Once again, the prisoners were shoulder to shoulder as they heard the news from Dr. Turner-Foster, Clinical Director of Fort Dix, that the first patient had been tested but his results were not back. Dr. Turner-Foster has since submitted a declaration as noted in Wragg v. Ortiz, 20-CV-05496 (D NJ), in which she states that the results of that first test were received on that day. All staff at the meeting were wearing full PPE: masks, gloves, face shields, and gowns. Earlier in the day they were still not even wearing masks. When asked if the medically vulnerable prisoners would receive masks, Ms. Bridges told the Camp that acquiring masks was a near impossibility even for people in the general population.

On April 6, disposable masks were distributed to all inmates with the caveat that we would only be receiving one mask per week. Incarcerated individuals at the Camp would receive a total of 4 disposable masks and 5 cloth masks from that day until the new year. Additional census counts were instituted, men were now required to be at their bunks 9 times a day to be counted.

Also on that day, the second inmate was removed from the Camp with a temperature of 103 degrees. That inmate worked as a Line Server in Food Service and came in contact with every inmate and their breakfast and lunch. That inmate struggled with Covid-19 and was subsequently released from medical care at Fort Dix directly by ambulance to a hospital near his home. He stated in his declaration in Wragg v. Ortiz that he felt lucky he was released and that if it had not been for the fast action of his attorney and his family, that he would have died at Fort Dix. See Declaration of Rodolfo Quiambao, Wragg v. Ortiz.

The door to 'Staff Alley' was locked and commissary was suspended so prisoners would not have the opportunity to buy soap, over-the-counter medications, or hygiene items again until

April 22 with a $30 limit and next on May 11 with a $50 limit. All hand-washing, shaving, showering, and shampooing had to be done with two 4 ounce bottles of liquid soap per month.

All work was suspended, and education and programming ceased. Activity was now restricted to indoor recreation in the gym or watching television. Inmates were informed that the first inmate had tested positive but were not given any information on his whereabouts or treatment.

On April 8, 2020, the Camp was reorganized. On information and belief, a list was provided to staff that showed those who may be eligible for release based criteria set forth in the recent memoranda from Attorney General William Barr. As a result, the potentially eligible sixty two inmates were moved to the B-Wing and the balance were moved to A-Wing. The reasoning behind the decision as to whom was moved was a mystery to the men at the Camp, there was no logical reasoning behind who was deemed 'eligible.' Age, crime of conviction, medical status, violence: none of those seemed to be considered.

The A-Wing, with a maximum capacity of 208, was now home to 170 men. No generalized testing was done, even as more men turned themselves in to Medical with Coronavirus-like symptoms. When the 'eligible' men were subsequently moved out of the Camp to two separate buildings, a reasonable question arose: why didn't staff move the men to those buildings on April 8? The buildings were available and certainly the Respondents knew they existed. Why overcrowd a single dorm during a highly contagious pandemic for weeks when it could have been avoided? We know now that at least 58 men got sick as a result of that decision. It was only the intervention of good fortune that prevented a death.

On April 11, Warden Ortiz posted a notice on the internal electronic Bulletin Board on the TRU-Links system. It read in part that "social distancing is not possible in this environment." That admission was one of less than a dozen communications from either the Warden or the Medical Staff during the entirety of the pandemic. Most of the bulletins exhorted us to perform vigilant hygiene and socially distance even as the authors knew those things were not available to us. Three small posters in English and Spanish explained how important hand washing was and that "staying home" was important. In late November, in preparation for a visit from Regional supervisors, social distancing stickers were stuck to the floor in various strategic areas and new posters were hastily taped to the walls. One of the most 'instructive' was a small sign that tells us "Wearing a Mask is Required" / "Le Port du Masque Est Obligatoire." There are no men at the Camp for whom French is their primary language.

On April 10, one of the men in the B-Wing was removed and subsequently tested positive for Covid-19. As a result, on April 22, prior to moving to 'pre-release quarantine' in the Chapel outside of the Camp, the men in B-Wing were tested for the virus. Twenty one of them tested positive for Coronavirus. Those 21 were moved to Building 5851 in the West compound where they would spend the next 63 days in a revolving door quarantine that reset every time an inmate tested positive. The 40 other men were moved to the Chapel.

On the same day, the ACLU filed a class action lawsuit on behalf of the entire population of the Low and Camp at Fort Dix against Warden Ortiz for cruel and unusual punishment, seeking to have the incarceration of older and medically vulnerable people enlarged, essentially asking to have them removed from the path of the virus and creating more space for the remaining men to socially distance. As of that day, Fort Dix had released exactly zero people through the Respondents' actions related to compassionate release.

After the B-Wing was moved, the A-Wing was redistributed alphabetically. There were still approximately 80 men per dorm, and socially distancing was still impossible. The A-Wing men were only sleeping within six feet of 4 men as opposed to ten. An alternating side lockdown schedule was instituted, in which common area use was rotated between the two wings and the doors to the dorms were locked. It took 5 days before any additional mass-testing was done.

Four hand soap dispensers were installed in each dorm in late April. Due to their plastic construction, and their almost constant use as the sole way to perform any sanitization for all the men, they were all broken within weeks, requiring touching the nozzle to dispense the soap, a certainly unsanitary condition, and were frequently empty.

B-Wing was tested on April 29, A-Wing on May 5. While 14 men were tested positive in the B-wing and 9 in the A-Wing, Petitioners and Class members report dozens of men becoming sick with chills, fevers, sore throats, and other symptoms in the month leading up to the testing. Men did not know what would happen to them if they reported themselves sick. Cool towels applied to foreheads, or Tylenols to knock down a fever prior to temperature checks became the norm. The medical staff at the Camp used a cheap, scanning thermometer for the first few months of the pandemic. It was not unusual men to have the exact same temperature.

This was the first, last and only mass-testing that was done at the Camp during the first wave. Even with the vast undercount, 58 men were reported as testing positive. Twenty five percent. No follow up testing was done.

On May 19, inmates were allowed outside for the first time since March 13, even though the CDC had been suggesting that being in a poorly ventilated indoor room was the worst possible scenario for transmission of the virus.

An outside contractor came to the Camp to disinfect it on May 21. Due to the alternate lock downs and poor planning, the B-Wing inmates remained locked into their dormitory while the cleaning crew in full HazMat gear chemically cleaned the building. Several B-Wing men were overcome with the fumes and eventually staggered out of the dorm through the emergency exit doors to get fresh air. This was also the first time since April 3 that Ms. Bridges was at the Camp.

On Monday the 25th of May COs and Senior staff stopped wearing PPE. Simple masks were now acceptable. Temperature checks were now limited to alternating days. While the New York /

New Jersey corridor is the hottest spot for the virus in the country, the standards at Fort Dix Camp were getting more lax. The building is slowly deteriorating as inmates attempt to keep up with the conditions but have no access to the tools and materials necessary to maintain the facilities.

A rotating outdoor recreation schedule began on June 8, each dorm would get outside for an hour a day on Tuesday, Wednesday, and Thursday. On June 16, the extra census counts were discontinued and the standard schedule of 5 counts per day resumed.

Seventeen of the twenty one who tested positive from the 'eligible' group returned to the A-Wing on June 25. They had been in quarantine for 63 days. In that time, the staff at the Camp had still not processed all the men eligible for release.

On May 27, 2020, this Court dismissed the ACLU class action lawsuit primarily on the assurances of the Respondents that the BoP's 'Action Plan' was comprehensive and was getting results. The Respondents proved their success by pointing to the lack of cases in the Low Security facility. Respondents admit, however, that virtually no testing done at that facility. It would later be known that only 4 tests were performed on the population of almost 3000 at FCI Fort Dix between May 5 and September 28. In the Wragg case, Respondents assured the Court that they were receiving 250 new test kits per week.

Similarly, no testing was done at the Camp after May 5, 2020. It is impossible to know if anyone was sick since no one was tested. Three inmates in the Low were tested positive in July 2020, and one transfer from the US Marshalls Service tested positive on September 21, 2020.

### B. The Second Wave - The Low (September 28, 2020 - November 23, 2020)

Between September 28, 2020, and October 29, 2020 the BoP made a conscious and reckless decision to transfer scores of inmates from Covid-19 ravaged FCI Elkton (Ohio)("Elkton") where inmates died, to FCI Fort Dix. All of the transferred inmates had been exposed to the deadly virus, many were infected by it. Within weeks, Fort Dix was experiencing a severe Coronavirus outbreak that eventually produced 345 positive test results in the Low Security prison. Despite the outbreak, the BoP has effectively refused to test all inmates within the institution for the virus, fostering the spread of the very disease that it introduced to the institution. Notably, Members of Congress penned a letter to Michael Carvajal, Director of the Bureau of Prisons, decrying the reckless disregard for human life.

As a result of the conditions at FCI Fort Dix at the time, Robert Edward Whiteside filed a suit in this Court. The declaration of Kimberly Kodger, an Associate Warden at FCI Fort Dix, outlined the events. See Whiteside v. Ortiz, No. 20-5544-(NLH) (D NJ).

On September 29, 2020, a bus from Elkton with 64 inmates arrived at Fort Dix, 6 tested positive when stepping off the bus. On October 6, a bus of 65 inmates arrived, six of those were

positive. On October 21, 92 inmates arrived by bus, none were positive. On October 28, 2020 a bus of 77 arrived, five of whom were positive.

Four buses carrying a total of 298 inmates, 17 of whom were positive arrived at Fort Dix. After disembarking, the infected inmates were put into isolation in building 5703 in the East compound, the other men were placed on a quarantine floor in the same building. Every bus was treated identically.

The men in each of those buses travelled from Elkton, Ohio to Fort Dix, New Jersey confined for at least ten hours breathing the same air as the infected inmates. AW Kodger's declaration does not mention any additional testing beyond the test when each bus was unloaded. It is reasonable to assume, that when the men from the October 6 bus disembarked those that did not test positive were sent to the quarantine floor to be housed with the men already there from the September 29th bus. The same must have been true of the October 21st and October 28th bus.

The individual units in the Low generally are designed to hold less than 350 men. When the bus arrived on October 28 from Elkton, the total number of men held in that unit was 298. Seventy two men who had just spent more than ten hours on a bus with sealed windows and five sick men were sent to live in a practically full unit.

On October 22, 2020, the Warden requested a movement moratorium through November 23, 2020. The request was not made on September 30, after the first infected bus arrived, nor on October 6. He waited until after the third bus arrived. The BoP did not heed his request and sent a fourth bus six days later. On November 9, 2020, all members of Congress from the State of New Jersey penned a letter to Respondent Michael Carvajal urging him "to immediately test all FCI incarcerated individuals and staff for Covid-19" and "to halt all transfers to FCI Fort Dix until BoP institutes an effective and accurate testing strategy...and there are no active cases at the facility." Respondent Carvajal declined to answer.

Prior to these buses coming to Fort Dix, the facility reported only four positive test results since May 5. Shortly after the arrival of these busloads of men, a second wave of Covid-19 cases stormed through Fort Dix, eventually infecting hundreds of men. The Respondents deny a connection between the two claiming the sick men were effectively isolated before anyone else could have been infected.

AW Kodger notes in her declaration that "only one inmate has transferred out of unit 5703, and that inmate was placed in the Special Housing Unit for disciplinary reasons." See Whiteside, Kodger Declaration, para 13.

She later claims that "while there are a high number of Covid-19 positive inmates...there is no evidence of spread to other housing units throughout the institution." See Id para. 21

She also states, however, "[i]n addition to the five current Covid-positive inmates from FCI Elkton who arrived on October 28, 2020, the institution has 224 additional positive cases. Specifically, seven inmates tested positive in the Special Housing Unit ('SHU'). 218 inmates from housing unit 5812 also tested positive for Covid-19 after all 231 inmates in the housing unit were Covid tested in October."

There is only one SHU that is used for disciplinary housing. It is located in the West compound.

The two orderlies that worked in Receiving and Discharge, where all the arriving men from Elkton were processed, both lived in Unit 5812 where the virus infected fully 94% of the inmates. Parenthetically, after 94% of the inmates of that single unit tested positive, respondents did not decide to test the entire facility.

At the time of AW Kodger's Declaration in early November 2020, Fort Dix was reporting 224 inmate and 12 staff positives with 41 inmates and 6 staff recovered. By November 25, that number had grown to 255 inmate and 20 staff sick, and by the middle of December the number of sick dropped to 17 inmates and 18 staff and the number of recoveries was 356 inmates and 36 staff. Altogether, the second wave had exposed 373 inmates and 54 staff to the potentially deadly disease.

BoP spokesperson Emery Nelson laughably said on October 29, "The Bureau of Prisons has taken swift and effective action in response to the Coronavirus Disease 2019 (Covid-19), and has emerged as a correctional leader in the pandemic. Initially we were challenged by an upsurge in inmate positive cases, but as a result of our mitigation strategies and lessons learned, we were able to flatten the curve, both at our hotspots and in our institutions nationwide."

### C. The Third Wave - The Low (November 24 - Current)

The letter from all members of Congress from the State of New Jersey went unheeded, and the buses continued to arrive at Fort Dix after November 23, 2020. Since the BoP does not publicly provide answers regarding their abrogation of their own "Action Plan" without court intervention, there is no way to know how many buses arrived at Fort Dix between November 23 and now. There is also no way to know if the current, ongoing third wave is a result of those transfers, or poor PPE practices among the staff.

Since FCI Fort Dix has been closed to everyone but staff or transfers, the intrusion of the virus must have come from one of those two sources.

The number of sick men started climbing again by the end of December. From the 15th through the 22nd, the number of sick inmates hovered around 15, with 18 staff infected. Three Hundred and Fifty Six inmates had recovered and 36 staff. On Christmas Eve, the number of sick inmates jumped to 150, then 295 on the 29th. By January 4, 2021, more than Five Hundred inmates were ill.

As of January 7, FCI Fort Dix is currently reporting 724 inmates sick. Fourteen staff are ill. Five Hundred and twenty six inmates and forty five staff have recovered.

That means that 1250 incarcerated men have been infected with the Coronavirus within the last two months.

Once again, it is impossible to know how many men have been tested. Given the previous positive test percentage of 94% in one unit, it may be that the current number of sick men may represent a fraction of those who are actually infected. Since Respondents refuse to test everyone at the facility, it is impossible to gauge. Even if that 1250 was of the entire facility, it would still represent an almost 50% infection rate.

### D. The Third Wave - The Camp (December 20 - Current)

Petitioners do know the circumstances at the Camp. By mid-December, the population of the Camp had dropped to 136 as men finished their sentences, were placed in the SHU for disciplinary reasons, or were sent to halfway houses.

On December 22, 2020, one of the kitchen workers started to feel unwell, spending the entire day in bed, with a sore throat, fully clothed, and shivering. On the same day, an inmate was brought to the Camp from quarantine where he had been since self-surrendering on November 20.

On December 23rd, his supervisor, the CO in charge of the kitchen staff called out sick. He was known to not wear any PPE in the kitchen during food preparation and service. According to his co-workers, that man was tested positive for Covid-19. He has not returned to work. At this time, all food preparation and service was performed by men in the A-Wing.

A concerned inmate in the Camp sent an internal email, a 'Request to Staff' via the TRU-Links system, to Associate Warden Smith marking the existence of a sick inmate in his dorm. Another inmate, bunked 12 feet away from the sick man, reported to sick call reporting Coronavirus-like symptoms. He was told to "come back tomorrow." He, too, wrote to a different AW recounting that story.

Parenthetically, the reason these men did not write for help directly from the medical staff is that there is no way to do so.

On December 24, 2020, medical staff performed a 'temperature check' on all inmates in the A-Wing. Three men, including the two previously mentioned, had temperatures exceeding 101. Two additional men reported symptoms consistent with Covid-19. The A-Wing dormitory was locked. Due to the depletion of the staff at Fort Dix, the regular CO rotation of eight hour shifts has been changed to two 12 hour shifts. New COs are being rotated in as the assigned COs are calling out sick, further expanding the exposure vectors for the men at the Camp.

Men were told they would not even be allowed out to call their loved ones that Christmas Eve. Outdoor recreation, already a scant hour on Tuesdays, Wednesdays, and Thursdays was cancelled despite the CDC guidance that poorly ventilated indoor areas exacerbate the spread of the virus.

At that time no one from the B-Wing had their temperature checked, even though their food was prepared by two of the sick men.

No information was forthcoming for the duration of Christmas Eve, Christmas Day, or the Christmas weekend.

On Monday December 28, 2020, all men from the A-Wing were tested for Covid-19. In violation of all health protocols, the men stood in a line no more than 2 feet apart while waiting for the test. Class members were informed that the test results would be back by Thursday, December 31. According to the Nurse Practitioner, three of the men who left on Christmas Eve had tested positive for Covid-19. As usual, information regarding the well-being of every person housed at the Camp had to be elicited, rather than being provided.

Also on December 28, two more men were transferred into the B-Wing of the Camp. Both had self-surrendered; one on November 13, the other on November 23. Tragically, they were moved from the frying pan and into the fire.

At that time no one from B-Wing was tested, even though, prior to December 24, the doors to the dormitories were unlocked and the men frequently commingled with men from the A-Wing.

Temperature checks were again done to the A-Wing residents on December 31. One man registered a temperature of 102, but the staff accepted his explanation that he had been wearing a hat moments before. While he was the only man to register a high temperature, two other men felt so sick that they asked to be taken away to get care. We subsequently learned that all three of those men tested positive, perhaps the staff member was incorrect to accept the 'hat excuse.'

The test results from Monday were not divulged on New Year's Eve. Nor on New Year's Day, nor during weekend that followed.

On New Year's Day, two more men were transferred to the B-Wing of the Camp. Ironically, both had been transferred from facilities that had previously seemed dangerous: FCI Milan and FCI Elkton. Fort Dix was about to be much more virulent than either of those two. It would be horrible if those men who finally got to what they must have thought was safety were finally overcome by the virus now.

We have been left to die.

16

For two holiday weekends in a row, while Respondents and staff members were enjoying time with their families or celebrations with their loved ones, incarcerated men at Fort Dix Camp had been left locked in a room with a deadly disease.

Rather than test the entire Camp on December 24, when Respondents knew that their staff member reported sick, they did the least they could do. They checked temperatures for half the men. Once they determined that those men were infected, they did not immediately test the balance of the men: they waited until after the holiday weekend. Once staff tested the A-wing, they did not share the test results immediately and move to quarantine the sick men: they waited until after the holiday weekend.

On Monday January 4, 2021, 31 of the 66 men remaining in the A-Wing were informed that they were infected. They were moved that morning. No information has been forthcoming about their care and whereabouts.

Unbelievably, on the afternoon of January 4, Respondents moved three men into the A-Wing from the Low. One was returned from the SHU, one had self-surrendered to Fort Dix the day before and the third was from FCI Elkton.

Several men from the A-Wing and the B-Wing were scheduled to be moved to 'pre-release quarantine' on January 5, 2020. Any incarcerated person anticipating their move to either a halfway house or their home within the next two months was to be placed in a disused former chapel to await their date. Since A-Wing was contaminated, the five men who were supposed to be moved to 'pre-release quarantine' were no longer going to be leaving for at least a month.

The men on the B-Wing did not have the same issues. No one had been temperature checked and no one had been tested, so no one was sick. Until they were.

On the morning of Tuesday January 5, 2021, six men from the B-Wing who were intended to be moved were 'rapid-tested.' Two of the six were positive and immediately moved to quarantine. Moving with lightning speed, the balance of the B-Wing was tested on Wednesday January 6.

The A-Wing and the B-Wing are sharing the common areas on rotating schedules. While one side is out, the other is locked in their dorm. If A-Wing is out from breakfast at 6:30am until lunch at 10 am, B-Wing is locked in. Then B-Wing is out from 11 until dinner at 3. A-Wing would then be allowed in the common areas until 9 pm when they are recalled for the 9:30 pm count. Everyone is locked in after 9. The schedule alternates the next day.

Prior to January 4, incarcerated persons at the Camp had been permitted out until 11:45 pm. There does not seem to be a penological or medical rationale behind the early lockdown.

The tests for the B-Wing inmates were performed on Wednesday, January 6. Results have not come back as of January 10.

**4. Spread of the Disease Requires Actions Respondents Are Unwilling to Take**

**A. Executive and Legislative Action**

On March 13, 2020, the President declared Covid-19 a pandemic of sufficient severity and magnitude to warrant an emergency declaration pursuant to section 501 (b) of the Disaster relief and Emergency Assistance Act. In response, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act which the President signed into law on March 27, 2020. Among other things, the CARES Act included a provision giving the Attorney General and the BoP authority to expand the use of home confinement during the covered emergency period. Both the Executive and the Legislative branches of the Government declared their intent to reduce the federal prison population by expanding home confinement and allowing those who must remain incarcerated to be able to socially distance.

Attorney General William Barr penned two memoranda strongly encouraging Respondent Michael Carvajal, as Director of Prisons to "immediately maximize appropriate transfers to home confinement of all appropriate inmates held...[at] BoP facilities where Covid-19 is materially affecting operations." [emphasis omitted]

The Attorney General suggested a non-exhaustive list of discretionary factors.

Petitioners, Subclass members, and Class members, as inmates at the least restrictive of penal institutions, are 'appropriate inmates' within the list of discretionary factors outlined by the Attorney General.

During the almost ten months since the pandemic hit the Camp, Respondents have released only 98 men to home confinement from the total population of more than 2800. That number includes all the men who were due to be released this year for completing their sentences without reference to Covid-19.

Petitioners urge the Court to ask Respondents to provide the names. register numbers, statutory release date, and actual release date of the men it has "released to home confinement" from the Camp. Respondents should be proud to show that data to the Court as proof of their ongoing efforts to reduce the population of the Camp.

Further, while Respondents have on multiple occasions assured this Court of their criteria, including 'time-served' prioritizations, they are, in fact, using 'time-served' as an exclusionary factor. There are men still at the Camp who satisfy all the criteria that Respondent has asserted are used to determine who is suitable to go home. A number of men are serving more time as a result of Covid-19. In essence, Case Managers are acting as Judges. It is they who determine whether or not incarcerated persons deserve to go home, regardless of their medical condition, age, conduct in prison, security level, or assessment of any danger posed to the community.

**B. The Bureau of Prisons' Action Plan**

The Bureau prepared its Action Plan to handle the realities of the Coronavirus in January 2020.

Phase One, which began, in January "developed strategies and solicited guidance for managing the virus pandemic."

Phase Two started on March 13, 2020. The BoP suspended all legal and social visitation; entry screenings for staff and prisoners began; meals and recreation times would be staggered in order to maximize social distancing.

Phase Three took place on March 18. Facilities inventoried their supplies of cleaning, sanitation, and medical supplies.

Phase Four began on March 26 and strengthened quarantine and isolation procedures. Facilities also began to assess all inmates arriving at its facilities with a screening tool and temperature check.

Phase Five started on April 1. Mandatory facility-wide lock-downs in every BoP institution for a 14 day period. Inmates were to be secured in their cells where possible with limited exceptions for essential activities.

All subsequent Phases have simply extended Phase Five.

Phase One of the plan was to make a plan. Phase Three was to count the things acquired in Phase Two. Phase Four was a strengthening of Phase Two. The Ten Phase Action Plan is really two phases.

Of particular note is that Phase Five, while potentially useful in combating the Coronavirus in Medium and High Security prisons, is extremely harmful when applied to the Camp. Inmates at higher security institutions are held in one and two man cells and a lockdown therefore limits the threat to each inmate to exposure to his cellmate. In the Camp and other congregate environments, a lockdown makes you vulnerable to the entire population.

Rather than consider the actual requirements of the Camp, Respondents have applied high security solutions to a minimum security facility. Even now, a full year since the implementation of the Action Plan, when the virus has returned to the Camp, the first reaction was to lock all the doors and restrict movement. The staff are reacting as institutional jailers in an arbitrary and capricious manner with no regard to the safety and health of the men in their care.

Insofar as the Action Plan's efficacy, the proof is evident.

Fort Dix currently has 724 incarcerated men positive for the disease and 526 reported as recovered. At the Camp, there are currently 38 of 73 A-Wing inmates reported as positive and

B-Wing wasn't tested until two weeks after the first case, a staff member, was known to Respondents.

Fort Dix is not alone in the spread of the disease. Of the 137,015 incarcerated individuals currently in the care of the BoP, 6,775 are currently positive for Covid-19. 1750 staff out of the total of 36,000. 33,131 inmates are listed as recovered along with 2,913 staff. One hundred and eighty inmates and three staff have died.

The BoP and respondents have almost complete control over the movement and circumstances of the people in its control. As a result, one might expect the infection numbers to be significantly lower than those of the general population. The opposite is true.

The Action Plan is not effective in a congregate environment such as that at the Camp. The Respondents have had more than ten months to implement the decarceration mandated by the President, both Houses of Congress, and the Attorney General. The reticence of the BoP is now infecting hundreds of men in their care, causing catastrophic infection rates.

## ARGUMENT

Corrections officials have a constitutional obligation to protect incarcerated people from a substantial risk of serious harm. Farmer v. Brennan, 511 US 825, 828 (1994). Indeed, under the Eighth Amendment, prison officials "must provide humane conditions of confinement;...must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates[.]" Id. at 832 (internal quotation marks omitted). This obligation also requires correction officials to address prisoners' serious medical needs. See Estelle v. Gamble, 429 US 97, 104 (1976); Brown v. Plata, 563 US 493, 531-32 (2011); Hinojosa v. Livingston, 807 F. 3rd 657, 666 (5th Cir. 2015) (plaintiff stated an Eighth Amendment claim when Defendants subjected him to conditions "posing a substantial risk of serious harm" to his health).

This obligation requires corrections officials to protect incarcerated people from infectious diseases like Covid-19; officials may not wait until someone tests positive for the virus and an outbreak begins. Helling v. McKinney, 509 US 25, 33-34 (1993)("That the Eighth Amendment protects against future harm to inmates is a novel proposition...It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing had happened to them."); Gates v. Cook, 376 F. 3rd 323, 333 (5th Cir. 2004)("It is also important to note that [an] inmate need not show that death or serious illness has [already] occurred."); See also Farmer, 511 US at 833 ("[H]aving stripped ][prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course.") By then, however, it is too late. This is clearly what transpired when the staff at Fort Dix Camp, three weekends in succession, chose to leave inmates locked in poorly ventilated, over-crowded, indoor environment. Any infected person would have almost certainly infected untold numbers of people over that time.

Prison officials at Fort Dix violate this affirmative obligation by showing "deliberate indifference" to the substantial risk of serious harm. Farmer, 511 US at 828. With respect to infectious diseases like Covid-19, deliberate indifference is satisfied when prison officials "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week month or year," even when "the complaining inmate shows no current symptoms." Helling, 509 US at 33, 36 (holding that a prisoner "states a cause of action...by alleging that [correction officials] have, with deliberate indifference, exposed him to conditions that pose an unreasonable risk of serious damage to future health."); See also Ball v. LeBlanc, 792 F. 3d 584, 594 (5th Cir. 2015)(court "may conclude that a prison official knew of a substantial risk from eth very fact that the risk was obvious.")(citing Farmer, 511 US at 842); Hinojosa, 807 F. 3d at 667 ("open and obvious nature" of dangerous prison conditions supported an inference of deliberate indifference); Johnson v. Epps, 499 F. App'x 583, 589-92 (5th Cir. 2012)(allegations that prisoner was exposed to "serious, communicable disease" and that prison officials were aware of the risk and did nothing to prevent it were sufficient to state a claim for Eighth Amendment rights); Gates v. Collier, 501 F. 2d 1291, 1300-03 (5th Cir. 1974)(affirming district court's holding that allowing some "inmates with serious contagious diseases...to mingle with the general prison population," alongside maintaining a host of other unsanitary and inhumane conditions, "constitute[d] cruel and unusual punishment")(cited with approval in Rhodes v. Chapman, 452 US 337, 352 n. 17 (1981)).

Respondents have shown deliberate indifference by confining Class members in a locked dormitory with infected men, but have also by their actions and inactions, exacerbated the problem by their capricious refusal to follow the guidance of the President, the Congress of the United States, the Attorney General, and even internal BoP policies. BoP officials have testified before courts and the Congress about the criteria they are using in order to "immediately maximize appropriate transfers to home confinement of all appropriate inmates held...[at] BoP facilities where Covid-19 is materially affecting operations."

In this Court, James Reiser, Case Manager Coordinator of Fort Dix, has submitted testimony via Declaration in multiple cases that the "Attorney General issued a Memorandum for the Director of the Bureau of Prisons to ensure that, in light of the Covid-19 pandemic, BoP utilizes home confinement, where appropriate to protect the health and safety of BoP personnel and people in BoP's custody...BoP considers the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

> a. The age and vulnerability of the inmate to Covid-19, in accordance with the CDC guidelines;
> b. The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;
> c. The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BoP violation within the last year not receiving priority treatment;

d. The inmate's score under PATTERN (the Prisoner Assessment Tool Targeting Estimated Risk and Need), with inmates who have anything above a minimum score not receiving priority treatment;

e. Whether the inmate has demonstrated a verifiable reentry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined would present a lower risk of contracting Covid-19 than the inmate would face in his or her BoP facility; and

f. The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home confinement. Other serious offenses weigh heavily against home confinement." See Reiser Declaration at 11, Whiteside (D NJ).

Since the Camp is a Minimum Security facility, most of the incarcerated persons therein meet the above criteria by definition. A breakdown of the factors as relates to the Camp:

a. Age is no longer considered by the CDC, all Class members would qualify. All Subclass members would qualify as to vulnerability by definition;

b. All member of the Class would qualify as they are being held at a Minimum Security Facility;

c. All serious incident reports result in prisoners being removed from the Camp, therefore all members of the Class would qualify;

d. PATTERN Score, which was not designed for this use, would still qualify most members of the Class. All members of the Class would have a Minimum or Low PATTERN Score;

e. Case Managers have been requesting reentry plans since the start of the pandemic, this would not present a barrier for any member of the Class. Insofar as being safer at home versus at the Camp, that issue is self-evident;

f. Violent crimes, sex crimes, or serious offenses would disqualify an inmate from movement to the Camp, all members of the Camp would qualify.

As illustrated, almost all members of the Class, and all members of the Subclass would qualify to be sent to home confinement based on the BoP's own criteria.

Mr. Reiser, however, amends these criteria later in his Declaration. "In addition, and in order to prioritize its limited resources, BoP has generally prioritized for home confinement those inmates who have served a certain portion of their sentences, or who have only a relatively short amount of time remaining on their sentences. While these priority factors are subject to deviation in BoP's discretion in certain circumstances and are subject to revision as the situation progresses, BoP is at this time prioritizing for consideration those inmates who either (1) have served 50% or more of their sentences, or (2) have 18 months or less remaining on their sentences and have served more than 25% of their sentences." This unilateral modification of the criteria is not grounded in any public health policy having a cognizable nexus to the Covid-19 pandemic.

It is staggering how many times Mr. Reiser uses the word 'priority' while clearly having no idea what it means. It has been ten months since the lockdowns began. At that time there were 234 men at the Camp. Many have been moved to the SHU for disciplinary infractions (the most serious of which is possession of a cell phone), many more were released because their sentences were complete or very nearly complete, few were sent home due to the actions of the Case Managers and the pandemic. Mr. Reiser and his direct reports, the Case Managers at Fort Dix Camp, have been using and continue to use the percentage served as the sole exclusionary reason to block transfer to home confinement. The Respondents claim that 'priority consideration' is still an issue ten months into this pandemic.

Petitioners ask the Court to have Respondents prepare a report which delineates the reason each and every inmate at the Camp has been denied consideration for home confinement. Every man who is currently sick at the Camp is sick because the Respondents refused to decarcerate conditions there over the last ten months.

Also of interest is the addition of the phrase "these priority factors are subject to deviation in BoP's discretion" was added after Paul Manafort and Michael Cohen were famously released to home confinement far in advance of the 'priority time-served criteria.

Here, Covid-19 has already infected a significant portion of the prison population and further delay could be too long. As Respondent Ortiz admitted when he stated, "social distancing is impossible in this environment." See April 11, 2020 Warden Memorandum. The exponential rate of infection in the community is being magnified in the congregate environment of Fort Dix Camp.

The Writ of Habeas Corpus requested herein allows this court to order the release of inmates like Petitioners who are held "in violation of the Constitution." 28 USC 2241 (c)(3); Preiser v. Rodriguez, 411 US 475, 484 (1973)("It is clear not only from the language of 2241 (c)(3) and 2254 (a), but also from the common-law history of this writ, that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody."); Peyton v. Rowe, 391 US 54, 67 (1968)(Section 2241 (c)(3) can afford immediate release for claims other than those challenging the sentence itself).

Immediate release is the only medically and legally sound remedy, rather than the institution of useless mitigation and policies that have failed. The Eighth Amendment to the United States Constitution is not advisory, it is a mandate.

### THE IMPACT OF THE REMEDY

Courts have been concerned that granting a writ such as this will have significant negative impacts on the communities that must absorb the at-risk inmates, and on the BoP trying to enforce the courts' order.

As of January 10, due to quarantine, the A-Wing of the Camp currently has 37 inmates housed therein. On information and belief, the number of Subclass members would be approximately 25. This number would not represent an undue burden on the BoP, especially since they have been processing paperwork for those men since April of 2020.

The B-Wing is currently awaiting their Covid-19 test results. The current population is 63, and upon information and belief, the Subclass would comprise less than 50 of those. That number would of course be reduced by the number of men found to be positive.

Once the quarantined members of each wing are released from their quarantine, they could be processed for enlargement. It is worthwhile to note that the State of New Jersey released 2285 inmates from state prisons in the month of December alone.

## CLAIM FOR RELIEF

Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs with the same force and effect as if more fully set forth herein.

Respondents are holding Petitioners and all putative class members in violation of the Constitution by detaining them in the face of actual, present, and significant threats to their health and safety without taking any steps to prevent that harm. In fact, by admission, the Warden has said he cannot protect the inmates of the Camp.

Respondents' failure to provide adequate medical care in response to a widespread outbreak of a contagious disease constitutes deliberate indifference to the serious, known medical needs of detainees, thereby establishing a clear and present violation of the Eighth Amendment to the Constitution.

Due to the conditions at Fort Dix Camp, Petitioners are not able to take steps to protect themselves - such as social distancing, using hand sanitizer, washing their hands regularly, and disinfecting their surroundings - and the government has not provided adequate protections. Covid-19 has rapidly spread through the Camp twice so far, making the ability to protect oneself even more impossible.

Respondents' failure to adequately protect Petitioners from these punitive conditions, or release them from the conditions altogether, constitutes deliberate indifference to the serious known medical needs of the Petitioners and all members of the Class, hereby establishing a violation of the Eighth Amendment of the United States Constitution.

Respondents were aware of the medical needs of the population and the pervasiveness of prisoners and staff exhibiting Covid-19 symptoms throughout the prison.

Respondents knew of and disregarded an excessive risk to health and safety.

Respondents failed to act with reasonable care to mitigate these risks.

Because Respondents failed to act to remedy the Petitioners' and the Class' degrading and inhumane conditions of confinement in violation of their Eighth Amendment rights, Petitioners seek relief under this Writ of Habeas Corpus.

Due to the unlawful conduct of Respondents, Petitioners and the Class are threatened with imminent physical injury, pain and suffering, emotional distress, and death.

Petitioners have no adequate remedy at law and will suffer irreparable harm unless the Court acts immediately to grant the relief requested herein.

### THE NEED FOR ENLARGEMENT AS A PROVISIONAL REMEDY

Federal district courts have the authority, when habeas actions are pending, to "enlarge" the custody of petitioners. Enlargement is not release. Rather, it is a provisional remedy that modifies custody by expanding the site at which it takes place, upon order of the court, from a particular prison to another setting, as requested here, to home confinement. The enlargement power stems from Congress's authorization of federal judges under the habeas statutes to "summarily hear and determine the facts and dispose of the matter as laws and justice require" as well as the courts' inherent powers. See 28 USC 2243.

To qualify for the enlargement remedy, an individual must show "extraordinary circumstances" and that the underlying claim raises "substantial claims." See Mapp v. Reno, 241 F. 3d 221, 226 (2nd Cir 2001).

Petitioners and the putative Subclass members meet these requirements because of the extreme risk that Covid-19 poses, especially in light of their ages and medical conditions and because of the particular conditions of confinement at the Camp. If Petitioners and putative Subclass members remain incarcerated, there is a high risk that they will contract Covid-19 and as a result, suffer severe illness or death. Immediate release to permit Petitioners and putative Subclass members to serve their sentences on home confinement during the pendency of this action is the only way to effectuate the eventual habeas remedy.

### PRAYER FOR RELIEF

WHEREFORE. Petitioners and proposed class members respectfully request that this Court:

Certify the proposed Class and Subclass pursuant to Fed. R. Civ. Pro. 23 (B)(1) and (B)(2);

Pursuant to 28 USC 2243 and this Court's inherent powers, enlarge Petitioners and Subclass members pending disposition of the underlying petition;

Pursuant to 28 USC 2243 issue an Order to Show Cause forthwith requiring Respondents to identify within twenty four (24) hours of the Courts' order, and submit to the Court a list of, all Subclass members, and requiring Respondents to answer as to why the habeas petition and relief sought herein should not be granted;

Issue a Writ of Habeas Corpus and/or pursuant to Fed. R. Civ. Pro. 65, enter a temporary restraining order, preliminary injunction, and permanent injunction requiring Respondents to release from custody permanently or from custody to home confinement members of the Subclass and requiring Respondents to provide medically adequate social distancing and health care to the members of the Class who remain;

Enter an order pursuant to 28 USC 2201-2202 declaring that Respondents' policies and practices regarding Covid-19, specifically in a Camp setting, violate the Eighth Amendment of the United States Constitution;

Appoint a special master pursuant to Fed. R. Civ. 63 or an expert under Federal Rules of Evidence 706 to make recommendations to the Court regarding the number of incarcerated people that Fort Dix Camp can house consistent with CDC Guidance on best social distancing and hygiene practices to prevent the spread of Covid-19;

Retain jurisdiction in this case until Respondents have fully complied with the orders of this Court, and there is a reasonable assurance that they will continue to comply in the future, absent continuing jurisdiction, and;

Grant such other and further relief as the Court deems just, proper, and equitable.


Respectfully Submitted,


 /s/ Peter Goodchild
Peter Goodchild
FCI Fort Dix
PO Box 2000
JB MDL, NJ 08640
fortdixlegalhelp@gmail.com


Dated January 11, 2021

Exhibit A

EXIT
Steam room
Cooler
Freezer
Kitchen
Common fare
Library
Electrical
Rent room
Dental
A-Wing TV Room
Dining hall
B-Wing TV Room
Deep sink
Barber
Laundry
Chapel
Classroom
Gym
Rec Office
Laundry
Comm Room
EDU Office
A-Wing
B-Wing
Unit Officer
Medical
Unit Team
Visiting room

