RACHAEL A. HONIG
Acting United States Attorney
JOHN STINSON
JANE DATTILO
Assistant U.S. Attorneys
402 East State Street, Room 430
Trenton, NJ 08608
(609) 858-0305
john.stinson@usdoj.gov
*Counsel for Respondent*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

PETER GOODCHILD,
ELIEZER SOTO-CONCEPCION,
JOAN ABREU-FELIZ and
MICHAEL WINANS,

         *Petitioners,*

    v.

DAVID ORTIZ,

         *Respondent.*

Hon. Renée Marie Bumb, U.S.D.J

Civil Action No. 21-00790-RMB

## ANSWER TO THE PETITION FOR A
## WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241

On the Answer:

John Stinson
Jane Dattilo
Assistant U.S. Attorneys

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ......................................................................................... 2

    I.  Petitioners and Their Administrative and Litigation Histories ..... 2

        A.  Peter Goodchild ................................................................................ 3

        B.  Eliezer Soto-Concepcion .................................................................. 4

        C.  Joan Abreu-Feliz ............................................................................. 6

        D.  Michael Winans, Jr. ........................................................................ 8

    II. FCI Fort Dix and the BOP's Response to COVID-19 ......................... 10

        A.  FCI Fort Dix ................................................................................... 10

        B.  BOP's "Action Plan" to Combat the Spread of COVID-19 ...... 11

        C.  BOP's Enhanced Cleaning Protocols and Quarantine
            Units ................................................................................................ 13

        D.  Additional Measures to Address COVID-19 at FCI Fort
            Dix .................................................................................................. 17

        E.  FCI Fort Dix Testing Protocol, Current COVID-19 Cases, and
            Vaccine Program ........................................................................... 20

        F.  Management of the Camp from December 20, 2020 to
            Present ........................................................................................... 22

    III. BOP's Use of Home Confinement to Combat COVID-19 ................. 26

    IV. BOP's Administrative Process to Address Inmate Grievances &
        Petitioners' Administrative and Court Activities ............................ 29

ARGUMENT ............................................................................................................ 31

    I.  This Court Lacks Subject Matter Jurisdiction Over Petitioners'
        Conditions of Confinement Claim ..................................................... 31

i

**II. This Court Should Dismiss the Petition for Failure to Exhaust Administrative Remedies** ....................................................................... 38

**III. This Court Lacks Jurisdiction to Review the BOP's Home Confinement Decisions, Which are Committed to Agency Discretion by Statute** ......................................................... 41

**IV. Petitioners' Constitutional Claims Fail on the Merits** ................... 42

**V. Any Putative Relief Outside of Habeas Must Be Denied or Dismissed** ..................................................................................... 48

**CONCLUSION** ........................................................................................ 50

# TABLE OF AUTHORITIES

<u>Federal Cases</u>                                                                                          <u>Page(s)</u>

*Aigebkaen v. Warden,*
   Civ. No. 20-5732 (NLH), 2020 WL 6883438 (D.N.J. Nov. 24, 2020) ............... 33, 41

*Arias v. U.S. Parole Comm'n,*
   648 F.2d 196 (3d Cir. 1981) ..................................................................................... 39

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .................................................................................................. 50

*Baxter v. Pa. Dep't of Corr.,*
   661 F. App'x 754 (3d Cir. 2016) .............................................................................. 50

*Blackburn v. Noble,*
   2020 WL 4758358 (E.D. Ky. Aug. 17, 2020) ........................................................... 36

*Briley v. Warden Fort Dix FCI,*
   703 F. App'x 69 (3d Cir. 2017) ................................................................................ 39

*Brown v. Grondolsky,*
   Civ. No. 09-3290 (RMB), 2009 WL 2778437 (D.N.J. Aug. 31, 2009) ..................... 39

*Byrne v. Ortiz,*
   Civ. No. 20-12268 (RBK), 2020 WL 7022670 (D.N.J. Nov. 30, 2020)..................... 40

*Chaparro v. Ortiz,*
   Civ. No. 20-5272 (NLH), 2020 WL 4251479 (D.N.J. July 24, 2020)....................... 40

*Coplin v. Zickefoose,*
   Civ. No. 12-2882 (RBK), 2012 WL 1926421 (D.N.J. May 25, 2012) ............... 48, 49

*Eiland v. Hollingsworth,*
   Civ. No. 15-2995 (NLH), 2015 WL 3604141 (D.N.J. June 8, 2015)........................ 48

*Farmer v. Brennan,*
   511 U.S. 825 (1994) ..................................................................................... 43, 45, 47

*Fuentes v. Wagner,*
   206 F.3d 335 (3d Cir. 2000)...................................................................................... 36

*Furando v. Ortiz,*
  Civ. No. 20-3739, 2020 WL 1922357 (D.N.J. Apr. 21, 2020) ................................ 41

*Gambino v. Morris,*
  134 F.3d 156 (3d Cir. 1998).................................................................................... 39

*Gonzalez v. Ortiz,*
  Civ. No. 20-15805 (RMB), 2021 WL 308548 (D.N.J. Jan. 29, 2021) ............... 35, 45

*Harper v. Warden, FCI Fort Dix,*
  2020 U.S. Dist. LEXIS 162005, at *7-8 (D.N.J. Sept. 4, 2020).............................. 32

*Helling v. McKinney,*
  509 U.S. 25 (1993) ............................................................................................. 42, 48

*Hope v. Warden York Cty. Prison,*
  972 F.3d 310 (3d Cir. 2020)................................................................................ 33, 36

*Jeferson V.G. v. Decker,*
  2020 U.S. Dist. LEXIS 65905, at *15 n.5 (D.N.J. Apr. 15, 2020) .......................... 36

*Johnson v. Hoy,*
  227 U.S. 245 (1913) ................................................................................................ 34

*Johnson v. Zickefoose,*
  Civ. No. 12-2544 (RMB), 2012 WL 5880344 (D.N.J. Nov. 20, 2012) ..................... 41

*Jose D. M. v. Barr,*
  456 F. Supp. 3d 626 (D.N.J. 2020)........................................................................ 36

*Leamer v. Fauver,*
  288 F.3d 532 (3d Cir. 2002).................................................................................... 49

*Moscato v. Fed. Bureau of Prisons,*
  98 F.3d 757 (3d Cir. 1996)...................................................................................... 38

*Pearson v. Prison Health Serv.,*
  850 F.3d 526 (3d Cir. 2017).................................................................................... 46

*Preiser v. Rodriguez,*
  411 U.S. 475 (1973) ............................................................................................... 49

*Prows v. Fed. Bureau of Prisons,*
  981 F.2d 466 (10th Cir. 1992)................................................................................. 41

*Riley v. Kaye,*
  664 F. Supp. 926 (D.N.J. 1987).............................................................................. 49

*Steading v. Thompson,*
    941 F.2d 498 (7th Cir. 1991) ..................................................................... 43

*Thomas v. Tice,*
    948 F.3d 133 (3d Cir. 2020) ...................................................................... 42

*United States v. Ballenger,*
    Crim. No. 16-5535 (BHS), 2021 WL 308814 (W.D. Wash. Jan. 29, 2021) ....... 45, 46

*United States v. Bausch,*
    2021 WL 308945 (D. Nev. Jan. 29, 2021) ............................................... 45

*United States v. Raia,*
    954 F.3d 594 (3d Cir. 2020) ....................................................... 33, 40, 41

*United States v. White,*
    Crim. No. 5:09-053 (DCR), 2021 WL 310929 (E.D. Ky. Jan. 29, 2021) ................ 45

*Vasquez v. Strada,*
    684 F.3d 431 (3d Cir. 2012) ...................................................................... 38

*Velez v. Zickefoose,*
    Civ. No. 10-3992 (NLH), 2010 WL 5186158 (D.N.J. Dec. 15, 2010) .................... 39

*Wilson v. Williams,*
    961 F.3d 829 (6th Cir. 2020) .................................................................... 36

*Woodall v. Federal Bureau of Prisons,*
    432 F.3d 235 (3d Cir. 2005) .......................................................... 1, 31, 32

*Woodford v. Ngo,*
    548 U.S. 81 (2006) ........................................................................... 38, 39

*Wragg v. Ortiz,*
    462 F. Supp. 3d 476 (D.N.J. 2020) .............................. 1, 6, 10, 30, 31, 32, 34, 37, 47

*Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017) ............................................................................ 32

Federal Statutes

18 U.S.C. § 3553(a) .................................................................................. 34

18 U.S.C. § 3582.......................................................................... 2, 30, 45

18 U.S.C. § 3624(c)(2) ........................................................................... 41

28 U.S.C. § 1331 .................................................................................... 47

28 U.S.C. § 1651 .................................................................................... 47

28 U.S.C. § 1915(g) ............................................................................... 49

28 U.S.C. § 1915A ............................................................................ 49, 50

28 U.S.C. § 2201 .................................................................................... 47

28 U.S.C. § 2241 ............................................................................. passim

29 U.S.C. § 794 ................................................................................ 47, 50

State Statutes

N.J.S.A. 45:9-27.10 - 45:9-27.28 ......................................................... 23

Federal Regulations

28 C.F.R. § 542.10 ................................................................................. 29

28 C.F.R. § 542.13 ................................................................................. 29

28 C.F.R. § 542.14(a) ............................................................................. 29

28 C.F.R. § 542.15(a) ............................................................................. 29

28 C.F.R. § 542.18 ................................................................................. 30

## PRELIMINARY STATEMENT

Four inmates at the minimum security "Camp" at Federal Correctional Institution ("FCI") Fort Dix have filed a joint petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 (the "Petition" or "Pet."). They seek immediate release from federal incarceration[1] and declaratory and injunctive relief regarding their conditions of confinement. The Petitioners argue that the conditions of their confinement at the Camp during the COVID-19 pandemic generally, and during a recent surge of infections at the Camp more specifically, are unconstitutional and amount to deliberate indifference by the FCI Fort Dix Warden, David Ortiz ("Respondent"). This Court should dismiss the Petition for lack of subject matter jurisdiction and failure to exhaust administrative remedies. If the Court reaches the merits, it should deny relief because Respondent has not violated Petitioners' Eighth Amendment rights.

First, the Court should dismiss the Petition for lack of subject matter jurisdiction. In the prison context, Section 2241 provides jurisdiction over claims challenging the fact or duration of custody. *Woodall v. Federal Bureau of Prisons*, 432 F.3d 235, 241 (3d Cir. 2005). Habeas jurisdiction does not extend to claims like Petitioners', which challenge conditions of confinement in light of the COVID-19 pandemic. *Wragg*, 462 F. Supp. 3d 476. This is especially true because prisoners

---

[1] Petitioners characterize their request as one for "enlargement," which they define as transfer to home confinement. As this Court noted in *Wragg v. Ortiz*, 462 F. Supp. 3d 476, 484 (D.N.J. 2020), this is essentially a request for release from the confines of prison.

1

have access to alternative avenues of relief, such as possible release to home confinement by the BOP, or compassionate release under 18 U.S.C. § 3582. Alternatively, if this Court does not dismiss the Petition for lack of subject matter jurisdiction, it should stay the action pending the final disposition of Petitioners' compassionate release motions, two of which are currently pending.

Second, this Court should also dismiss the Petition for failure to exhaust administrative remedies, as not one of the four Petitioners has exhausted his administrative remedies with respect to the claims brought in this action, nor supplied any justification for the failure to do so.

Finally, the petition lacks merit. Petitioners' constitutional claim falls far short of the settled standard for relief of any kind. BOP is not deliberately indifferent to Petitioners' medical needs and is not imposing living conditions that violate the Eighth Amendment. On the contrary, the record demonstrates that Respondent and staff at FCI Fort Dix are actively addressing the worldwide coronavirus pandemic appropriately with the goal of limiting spread among inmates and staff and providing appropriate care to those infected.

Accordingly, the Court should dismiss this petition for lack of jurisdiction or deny the petition on the merits.

## STATEMENT OF FACTS

### I. Petitioners and Their Administrative and Litigation Histories

The Petitioners are all federal inmates placed at the minimum-security Camp at FCI Fort Dix. Petitioners' similarities end at their common placement, notwithstanding their insistence that they are all equally situated. As

2

demonstrated below, there are important differences in Petitioners' criminal

histories, health histories, and administrative/litigation histories.

### A. Peter Goodchild

Goodchild is a fifty-eight-year-old inmate serving a sentence of 102 months

for a 2019 conviction on forty-eight counts of wire fraud, ten counts of money

laundering, a count of aggravated identity theft, and six counts of tax fraud.

Declaration of Corrie Dobovich ("Dobovich Decl."), Attachment 1; *United States v.*

*Goodchild*, 17-cr-00549-GAM (E.D. Pa. Oct. 21, 2019), ECF No. 94 (criminal

judgment). Goodchild fraudulently embezzled almost $1.6 million from his former

employer over ten years.[2] Assuming he receives all good conduct time, Goodchild is

scheduled for release on March 27, 2027, and thus has served less than 15% of his

sentence. Dobovich Decl., Attachment 1.

BOP medical records for Goodchild note the following conditions:

hypertension, low back pain, unspecified leg and foot pain, and BMI above 35.

Declaration of John Stinson, Exhibit A.[3] Goodchild's BOP medical records do not

appear to support his allegations of possible congestive heart failure, though a note

proposes a "routine" cardiology consultation. *Id*. The records also indicate that BOP

informed Goodchild that such routine consults are delayed due to COVID-19. *Id*.

---

[2] Jeff Goldman, "Bookkeeper who embezzled $1.6M from employer using PayPal gets 8 years in prison," NJ Advance Media (Oct. 18, 2019), available at https://www.nj.com/news/2019/10/bookkeeper-who-embezzled-16m-from-employer-using-paypal-gets-8-years-in-prison.html (last visited Jan 29, 2021).

[3] Respondent filed this Declaration separately under seal because it contains confidential medical records. *See* ECF No. 4.

On December 24, 2020, BOP placed Goodchild and all other residents of A-Wing in the Camp in exposure quarantine after positive COVID-19 tests among other A-Wing inmates. Declaration of Dr. Nicolette Turner-Foster ("Turner-Foster Declaration") ¶ 7; Stinson Decl., Exhibit A. *Id*. In exposure quarantine, Goodchild received a daily COVID-19 screening and temperature check. Turner-Foster Decl. ¶ 14. BOP tested Goodchild twice for COVID-19, on May 6, 2020 and again on December 28, 2020, following the positive cases in A-Wing. *Id*. Both tests were negative. *Id*.

Since arriving in BOP custody, Goodchild has pursued no administrative remedies and has submitted no requests for compassionate release to BOP. Dobovich Decl. ¶ 5; Declaration of James Reiser ("Reiser Decl.") ¶ 19. Nor has he pursued compassionate release or any other reduction in sentence with his sentencing court. *See generally* Docket, *United States v. Goodchild*, 2:17-cr-00549-GAM (E.D. Pa.).

## B. Eliezer Soto-Concepcion

Soto-Concepcion is a thirty-eight-year-old inmate who participated in a large drug-trafficking operation. *See United States v. Soto-Concepcion*, 15-cr-00181-JEJ (M.D. Pa.), ECF No. 1 (indictment). On August 26, 2015, a grand jury sitting in the Middle District of Pennsylvania charged him and his co-defendants in a twelve-count indictment stemming from controlled buys of heroin, cocaine base, and cocaine hydrochloride, as well as the discovery of additional drugs, drug paraphernalia, and no less than nineteen firearms. *See id*., ECF No. 630 at 1-2 (sentencing memorandum).

Soto-Concepcion pled guilty to a drug-trafficking crime, and on November 17, 2017, received a 144-month sentence based on the sentencing court's finding that he was responsible for at least 10.219 kilograms of heroin, *i.e.*, at least 408,000 doses of an illegal, and potentially fatal, opioid. *See id*., ECF No. 650 (Judgment). Assuming that Soto-Concepcion receives all available good time credit, his projected release date is September 5, 2025. Dobovich Decl., Attachment 3. So far, Soto-Concepcion has served less than 50% of his sentence. *Id*.

Notwithstanding being housed at the Camp, based on his criminal history, Soto-Concepcion has a "low" PATTERN score under the First Step Act, rather than a "minimum" score, which is required for eligibility for transfer to home confinement. Reiser Decl. ¶ 22. Respondent denied Soto-Concepcion's April 2020 written request for compassionate release based on his medical condition. Reiser Decl. ¶ 17, Exhibit 9.

Soto-Concepcion alleges that he has "Coronary Artery Disease, Atherosclerosis, Hypertension, Obesity (BMI >30), and Hyperlipidemia." Pet. at 2. He asserts that his medications place him "in an immunocompromised state." *Id*. BOP medical records note hyperlipidemia, hypertension, atherosclerosis, GERD with esophagitis, gastritis, and BMI above 33. Stinson Decl., Exhibit B. The records also include a report of a coronary artery stent. *Id*.

BOP first tested Soto-Concepcion for COVID-19 on May 1, 2020, with negative results. *Id*. On December 24, 2020, BOP placed Soto-Concepcion and all other residents of A-Wing in the Camp in exposure quarantine after positive

COVID-19 tests among other A-Wing inmates. Turner-Foster Decl. ¶ 7. When BOP tested Soto-Concepcion on December 28, 2020, the results were positive for COVID-19. *Id*. ¶ 10; Stinson Decl., Exhibit B. BOP placed Soto-Concepcion in isolation/infection quarantine and under medical watch. Turner-Foster Decl. ¶ 14; Stinson Decl., Exhibit B. Fortunately, he never reported serious symptoms. Stinson Decl., Exhibit B. Soto-Concepcion long ago cleared the 10-day infection window under CDC guidance. *Id*.

Soto-Concepcion has never submitted an administrative remedy request during his time at FCI Fort Dix. Dobovich Decl. ¶ 5, Exhibit 3. Soto-Concepcion was a named petitioner/plaintiff in *Wragg v. Ortiz*, 20-cv-05496-RMB (D.N.J.), where this Court denied a petition and putative class action very similar to the instant matter. On January 4, 2021, just prior to filing the instant Petition, Soto-Concepcion filed a motion for reduction in sentence with his sentencing court, which is still pending. *See United States v. Soto-Concepcion*, 15-cr-00181-JEJ (M.D. Pa.), ECF No. 928 (motion to reduce sentence).

### C. <u>Joan Abreu-Feliz</u>

Abreu-Feliz is a thirty-eight-year-old inmate serving a ten-year sentence for trafficking heroin and methamphetamine. Dobovich Decl., Exhibit 2. In a case involving the interception of twenty-three pounds of methamphetamine and three kilos of heroin with a total street value of $2.2 million, Abreu-Feliz's sentencing court identified him as the ringleader of a drug gang who "chose to deal death" to

the Pennsylvania communities of Reading and Allentown.[4] Assuming he receives all good conduct time, Abreu-Feliz is scheduled for release on September 30, 2023. He has served more than 58% of his sentence. Dobovich Decl., Exhibit 2. Despite being housed at the Camp, based on his criminal history, Abreu-Feliz has a low PATTERN score under the First Step Act, rather than the minimum score required for home confinement eligibility. Reiser Decl. ¶ 23.

Abreu-Feliz alleges that he smoked for fifteen years and "suffers from Obesity (BMI of 35), Hypertension, and Meningioma" (a form of benign brain tumor). Pet. at 3. His BOP medical records do not mention these conditions, but do note a vision condition, allergic rhinitis, varying orthopedic pain, headaches, and a BMI above thirty-two. Stinson Decl., Exhibit C.

On December 24, 2020, BOP placed Abreu-Feliz and all other residents of A-Wing in the Camp in exposure quarantine after positive COVID-19 tests among other A-Wing inmates. Turner-Foster Decl. ¶ 7; Stinson decl., Exhibit C. *Id*. In exposure quarantine, Abreu-Feliz received daily COVID-19 screenings, including temperature checks. Turner-Foster Decl. ¶ 14. BOP tested Abreu-Feliz twice for COVID-19, on May 6, 2020 and again on December 28, 2020, following the positive cases in A-Wing. *Id*. His results were negative both times. *Id*.

---

[4] Manuel Gamiz, Jr., "'You chose to deal in death,' judge says during sentencing," The Morning Call (Apr. 20, 2018), *available at* https://www.mcall.com/news/breaking/mc-pol-california-to-allentown-meth-heroin-ring-20180420-story.html (last visited Jan. 29, 2020).

On January 21, 2021, BOP offered Abreu-Feliz one of the first COVID-19 vaccinations made available to inmates at FCI Fort Dix. Turner-Foster Decl. ¶ 26; Stinson Decl., Exhibit C. Remarkably, he declined the shot even after receiving counseling about it. *Id*.

Abreu-Feliz submitted a written request for compassionate release in May 2020 based on his medical condition and the needs of his family. Reiser Decl. ¶ 18, Exhibit 10. Respondent denied this request because the inmate failed to include a release plan. *Id*. While informed by BOP that he could resubmit the request with a release plan, Abreu-Feliz never did so. *Id*.

On June 3, 2020, Abreu-Feliz filed his first motion for compassionate release with his sentencing court. *See United States v. Abreu-Feliz*, 15-cr-00211-EGS-1 (E.D. Pa.), ECF No. 226 (emergency motion for compassionate release). His sentencing court denied relief. On January 5, 2021, just prior to filing the instant Petition, Abreu-Feliz filed a second compassionate release motion with his sentencing court, which is still pending. *United States v. Abreu-Feliz*, 15-cr-00211-EGS-1 (E.D. Pa.), ECF No. 234 (emergency motion for compassionate release).

### D. Michael Winans, Jr.

Winans is a thirty-eight-year-old inmate serving a 165-month sentence for wire fraud. Dobovich Decl., Exhibit 4. Winans, a member of a revered gospel music family in Detroit, bilked investors out of more than $8 million in a Ponzi scheme involving fraudulent oil bonds.[5] The sentencing judge in Detroit stated that Winans

---

[5] Niraj Warikoo, "Winans member gets 13 years in $8 million fraud scheme," Detroit Free Press (Feb. 28, 2013), available at

defrauded "good, decent, church-going people" and "used . . . churches to perpetuate this fraud."[6] Assuming he receives all good conduct time, Winans is scheduled for release on February 8, 2025, and has served more than 56% of his sentence. Winans has a minimum PATTERN score under the First Step Act. Reiser Decl. ¶ 24.

Winans pleads that he has had "severe, debilitating allergies since childhood." Pet. at 3. His BOP medical records note only that he is "overweight," but nonetheless below a BMI of 30 for obese. Stinson Decl., Exhibit D. BOP tested Winans twice for COVID-19: first on May 1, 2020 and then on January 6, 2021. *Id.* His results were negative both times. *Id.* Since January 6, 2021, BOP has performed multiple vitals checks on Winans every week in connection with the exposure quarantine of B-Wing Camp inmates. *Id.*; Turner-Foster Decl. ¶ 12.

Winans never submitted a qualifying administrative remedy request seeking transfer to home confinement. Reiser Decl. ¶ 19; Dobovich Decl. ¶ 6, Exhibit 4. His first and only attempt to seek such relief in August 2020 was rejected as improper, and he never corrected the error. Dobovich Decl. ¶ 6. Instead, Winans twice attempted to bypass the Warden and submit his home confinement request to the Northeast Regional Office, but these efforts were rejected as improper. *Id.*

Winans has not filed a compassionate release/reduction in sentence motion with his sentencing court. *See generally* Docket, *United States v. Winans*, 12-cr-20598-SFC (E.D. Mich.).

---

https://www.usatoday.com/story/news/nation/2013/02/28/grammy-nominee-winans-prison-fraud-scheme/1953165/ (last visited Jan. 30, 2021).

[6] *Id.*

II.     **FCI Fort Dix and the BOP's Response to COVID-19**

The Petitioners present a comprehensive (if inaccurate) summary history of the coronavirus pandemic at FCI Fort Dix over the last 10 months. Indeed, they reference (and challenge record facts from) earlier litigations, including *Wragg v. Ortiz*, 20-cv-05496-RMB (D.N.J.), and *Whiteside v. Fort Dix Federal Prison*, 20-cv-5544-NLH (D.N.J.), in which the government filed declarations, BOP records, and other factual material. Rather than rebut Petitioners' allegations point-by-point, Respondent will summarize the conditions at FCI Fort Dix, including conditions at the Camp in the past forty-five days, the primary time period on which Petitioners base their claims.

A.   **FCI Fort Dix**

FCI Fort Dix is a "low security federal correctional institution with an adjacent minimum security satellite camp." FCI Fort Dix Homepage, available at https://www.bop.gov/locations/institutions/ftd/ (last visited Feb. 5, 2021). "FCI Fort Dix Low is made up of buildings formerly used as military training and housing." Reiser Decl. ¶ 4. "The Low security institution has an East and West Compound, separated by razor wire fencing." *Id.* "Each individual housing unit is a dormitory-style military barrack." *Id.* Based on the FCI Fort Dix's modified operations, "inmates generally, with few exceptions discussed below applicable to the general population, do not leave their individual housing units at this time." *Id.* "There is also a minimum security Camp located outside of the fenced in Low facility." *Id.* ¶ 5. "The Camp is also subject to the modified operations and exceptions." *Id.* (Respondent discusses the Camp further *infra*.)

10

The Low facility, which has the capacity for approximately 4,700 inmates, currently houses just 2,600 inmates. Reiser Decl. ¶ 4. The Camp, with a capacity for 400, currently houses 133 inmates. *Id*. ¶ 6. This reduced population at the Camp – about one-third capacity – has allowed for better social distancing there as well as for flexibility in managing the inmate population during the pandemic.[7] *Id*. ¶ 5, 10; Turner-Foster Decl. ¶ 13.

### B.  BOP's "Action Plan" to Combat the Spread of COVID-19

Since January 2020, to combat the spread of COVID-19 at its institutions, the BOP has coordinated with subject matter experts at multiple organizations and agencies including the World Health Organization and the Centers for Disease Control ("CDC"). *See* BOP COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited Feb. 3, 2021). Because of these ongoing efforts, BOP implemented a multi-phased operational plan called the "Action Plan." *See* BOP Modified Operations, available at https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Feb. 3, 2021). The Action Plan seeks to "mitigate the spread of COVID-19" among inmates and staff, continue effective operations of the federal prison system, and ensure that staff remain healthy and available for duty. *Id*.

---

[7] In accordance with the Attorney General's CARES Act guidance memoranda dated March 26, 2020 and April 3, 2020, all inmates at FCI Fort Dix have been considered for transfer to home confinement under the CARES Act. *See* Reiser Decl. ¶ 20. These transfers have contributed to the reduced population at FCI Fort Dix.

In response to the COVID-19 pandemic, BOP implemented a number of measures to protect staff and inmates from infection.

"Beginning August 5, 2020, BOP implemented Phase 9 of the Action Plan, which currently governs operations." Reiser Decl. ¶ 3(a). Under Phase 9, "[o]nly limited group gathering is permitted, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access." *Id.* "Further, BOP has limited the movement of inmates and detainees among its facilities." *Id.*

All staff and inmates receive "an appropriate face covering and [are] mandated to wear the face covering when in public areas where social distancing cannot be achieved." *Id.* ¶ 3(b). "In areas with sustained community transmission, such as FCI Fort Dix, and at medical centers, all staff are screened for symptoms." *Id.* ¶ 3(d). "Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone." *Id.* "If a staff member does not register a temperature but exhibits symptoms consistent with COVID-19, he/she is referred to one of the medical providers at the institution to assess suitability for work that day." *Id.*

"Every newly admitted inmate, including inmates transferring between BOP institutions, is screened and tested for COVID-19 exposure and symptoms." *Id.* ¶ 3(c) and Exhibit 1 (COVID-19 Testing for Transferring Inmates). "The newly admitted inmates are placed in a 14-day quarantine and must test negative prior to releasing to general population." *Id.* "Symptomatic or positive inmates are placed in

12

isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation." *Id.* ¶ 3(c).

"Contractor access to BOP facilities is restricted to only those performing essential services (*e.g.*, medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems." *Id.* ¶ 3(e). "All volunteer visits are suspended absent authorization by the Deputy Director of BOP." *Id.* "Any contractor or volunteer who requires access will be screened for symptoms and risk factors." *Id.* "Any contractor who registers a temperature of 100.4 degrees Fahrenheit or higher will be barred from FCI Fort Dix on that basis alone." *Id.*

"Social and legal visits were stopped as of March 13, 2020, to limit the number of people entering the facility and interacting with inmates." *Id.* ¶ 3(f). "Legal visits have since commenced in a limited manner and only after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors." *Id.* Limited social visiting re-commenced on October 3, 2020, under certain limitations. *Id.* However, as discussed further below, all visitation has since ceased. *Id.*

## C. BOP's Enhanced Cleaning Protocols and Quarantine Units

In addition to the Action Plan, BOP adopted proactive cleaning protocols at FCI Fort Dix early in the pandemic, which were overseen in part by Adam Sassaman. Declaration of Adam Sassaman ("Sassaman Decl.") ¶ 5. Mr. Sassaman is the Safety and Occupational Health Administrator at FCI Fort Dix. *Id.* ¶ 1. He has worked for the BOP for more than ten years and began working in the field of Safety and Occupational Heath for the BOP in February 2010. *See id.* ¶ 3. Safety

13

and Occupational Health is a division in the BOP "that, in coordination with the separate Health Services division, implements programs and policies to promote a safe, healthy environment for staff and inmates." *Id.* ¶ 2. The following is a chronological summary of the enhanced cleaning protocols for which Mr. Sassaman is in part responsible.

"On March 13, 2020, FCI Fort Dix ordered 300 hand soap dispensers for inmate areas." *Id.* ¶ 8. "To provide for personal hygiene prior to receipt and installation of soap dispensers, FCI Fort Dix issued inmates, at no cost to them, all-in-one soap to shower and wash hands." *Id.* "During this period, inmates also had access weekly to commissary, where they could purchase additional hygiene products, including hand soap and hand sanitizer." *Id.* FCI Fort Dix also issued staff health screening guidance and began screening staff for COVID-19. *Id.* ¶¶ 10-11. "This screening is conducted by the separate Health Services division and involves temperature checks and a review of any recent symptoms that could be related to COVID-19." *Id.*

On March 18, 2020, Mr. Sassaman "prepared updated COVID-19 cleaning and disinfection procedures for FCI Fort Dix for review and approval by the Executive Staff, including the Warden." *Id.* ¶ 13. These procedures were approved two days later "and sent to all staff with instructions to train inmate orderlies on implementation." *Id.* ¶ 14. Mr. Sassaman also "sent cleaning and disinfection guidance to all inmates at FCI Fort Dix through the Trulincs electronic communications system." *Id.* ¶ 15 and Exhibit 3 (Memo to Inmate Population).

14

Additionally, BOP informed all inmates and staff on March 20, 2020 "that the facility was implementing Modified Operations, including identifying smaller groupings of inmates than previously used and adjusted 'move time' schedules for these smaller groups to help limit contact between inmates." *Id.* ¶ 16.

"During the week of March 22, 2020, FCI Fort Dix received hand soap and hand soap dispensers, and BOP staff installed this soap and dispensers in all inmate bathrooms." *Id.* ¶ 17. Since then, and contrary to the Petitioners' allegations, BOP has "continuously" supplied "[a]ll inmate bathrooms" with soap. *Id.* In addition, on March 24, 2020, staff at FCI Fort Dix distributed EPA-registered disinfectant to housing units. *Id.* ¶ 12. This disinfectant has "a 2-minute effectiveness time from contact with the virus." *Id.* The BOP instructed staff to "disinfect all frequently-touched surfaces" and "train orderlies on use of the product." *Id.*

On April 2, 2020, Mr. Sassaman "prepared updated COVID-19 cleaning and disinfection procedures for review and approval by executive management, which were approved the next day, April 3, 2020, and sent to all staff with instructions to train inmate orderlies on implementation." *Id.* ¶ 21 and Exhibit 4 (E-mail from Mr. Sassaman regarding updated cleaning procedures).

On April 6, 2020, Mr. Sassaman updated FCI Fort Dix's "institutional Housekeeping Plan to incorporate the April 3, 2020 updated procedures." *Id.* ¶ 22 and Exhibit 5. "Since this date, inmate orderlies have been assigned tasks under the Pandemic Disinfecting Procedures in the Housekeeping Plan." *Id.* "The

Pandemic Disinfecting Procedures outlined in the Housekeeping Plan indicate that telephones require sanitation after each use and other shared frequently touched surfaces require disinfection hourly." *Id*. BOP also "placed disinfection instructions and disinfectant for staff use in all BOP escort vehicles" on April 8, 2020. *Id*. ¶ 24.

On April 16, 2020, Mr. Sassaman "sent an email memorandum to all staff to remind them to verify and document all cleaning and disinfection efforts, consistent with BOP policy." *Id*. ¶ 25. He also informed staff that the Control Centers "would begin to conduct a twice-daily census 'during which all Department Heads, Supervisors, or their designees will call into control to verify the attached sanitation procedures are being undertaken in the housing units and all other areas of the Institution.'" *Id*. and Exhibit 6.

"On April 21, 2020, FCI Fort Dix installed dilution centers for the EPA-registered, 45-second disinfectant in the [Camp]." *Id*. ¶ 26. Mr. Sassaman "advised these facilities to begin using this disinfectant in backpack sprayers immediately with labeled spray bottle use to follow." *Id*. "Other EPA-registered disinfectants remain constantly available for routine cleaning and disinfecting." *Id*.

"On April 24, 2020, FCI Fort Dix modified the documentation requirements for cleaning and disinfection so that Department Heads report once daily to the Command Center that disinfection and cleaning in their area is completed as required." *Id*. ¶ 27. Staff at FCI Fort Dix also "installed dilution centers for the EPA-registered, 45-second disinfectant in Safety East and West Units." *Id*. ¶ 28. Mr. Sassaman "advised these facilities to begin using this disinfectant in backpack

16

sprayers immediately with labeled spray bottle use to follow." *Id.* "As noted above, other EPA-registered disinfectants remain constantly available for routine cleaning and disinfecting." *Id.*

Since implementing these cleaning and hygiene protocols in the March-April timeframe, "FCI Fort Dix has always maintained an adequate stock of sanitation supplies." *Id.* ¶ 31. Those supplies include various types of EPA-registered COVID disinfectants; multi-surface cleaner/disinfectants approved to eliminate COVID; and hand soap for inmate areas. *Id.* "These supplies are available to all inmate living quarters as needed," and "[t]here is no limit to the supply a housing unit may receive." *Id.* ¶ 32. Additionally, "FCI Fort Dix inmates have had continued access to institution-supplied hand soap, disinfectant, and towels, as well as sanitary items available for purchase from the Commissary." *Id.* ¶ 30. Respondent notes that if, as Petitioners allege, the Camp runs low on hygiene and sanitation supplies, inmates can informally complain to any staff member to have the problem remedied, and if conditions do not change, they can use BOP's administrative remedy program to lodge a formal grievance about any shortages. None of the Petitioners has lodged any such grievance regarding a lack of soap or cleaning supplies at the Camp. Dobovich Decl. ¶¶ 5-6.

### D. <u>Additional Measures to Address COVID-19 at FCI Fort Dix</u>

As described above and in the declarations, BOP and the staff at FCI Fort Dix began no later than February 2020 to prepare for the worldwide coronavirus pandemic and have continued to modify and update their operations. Their multifaceted efforts have not entirely prevented infections at the facility, but these

17

efforts have allowed BOP to manage positive cases and provide appropriate medical care when such cases arise.

FCI Fort Dix established quarantine units for different inmate groups, including self-surrender and transfer inmates, releasing or internal-transfer inmates, and symptomatic inmates. Sassaman Decl. ¶ 33; Reiser Decl. ¶ 9. "The guidance also requires the testing of inmates into and out of quarantine." Reiser Decl. ¶ 9 and Exhibit 2 (COVID Quarantine Guidance). "Therefore, any inmate entering FCI Fort Dix or releasing from the institution has been tested a minimum of two times." *Id.*

"FCI Fort Dix has numerous designated quarantine and isolation locations throughout the institution." *Id.* ¶ 10; *see* Sassaman Decl. ¶ 33. "Inmates releasing or transferring are placed into cohorts and are moved to quarantine spaces at least 21 days prior to their scheduled movement." Reiser Decl. ¶ 10. "Camp inmates (minimum security) transferring out of the institution are quarantined in another unit." *Id.* "There are also quarantine locations for voluntary surrender inmates and inmates transferring into the institution." *Id.*

Additionally, "[a]ny time an inmate tests positive for COVID-19 in a housing unit, the positive inmate is moved to an isolation unit, and the other inmates are housed as an 'exposure quarantine.'" Turner-Foster Decl. ¶ 8, Exhibit 1. "All exposure quarantine inmates are tested for the COVID-19 virus using send-out laboratory tests." *Id.* ¶ 10. "Before the housing unit is released from exposure status, all inmates are again tested." *Id.*

"[I]nmates in any quarantine or isolation location, do not leave their housing units." *Id.* ¶ 10. In keeping with such restriction on movement, food and other items are delivered to quarantine units. Sassaman Decl. ¶ 33. "To minimize the risk of contracting and spreading the virus, staff entering any quarantine/isolation building are required to wear proper Personal Protective Equipment ('PPE'), which they obtain from the Lieutenant's office." Turner-Foster Decl. ¶ 9. The PPE "includes an N-95 mask, face shield/goggles, a gown and gloves." *Id.* ¶ 9, Exhibit 2 (Personal Protective Equipment (PPE) for Quarantine or Isolation Instruction).

After the BOP entered Phase 9 of the Action Plan in August, the Warden at FCI Fort Dix "implemented additional modifications in the month of October that remain in place to date." Reiser Decl. ¶ 11. "These modifications are in addition to the restrictions set forth in Phase Nine of BOP's national Action Plan described above." *Id.*

"On October 15, 2020, the Warden canceled all visiting." *Id.* ¶ 12 and Exhibit 3 (Notice to Inmates Regarding Visiting). "The Warden also modified inmate movement within the institution in mid-October." *Id.* ¶ 17. "Now, general population inmates only leave their housing units to obtain grab-and-go meals, attend scheduled medical appointments, and/or attend General Education Degree (GED) classes and scheduled outdoor recreation." *Id.* "A minimal number of inmates are utilized for necessary job functions such as Food Service, Commissary, and Laundry." *Id.* "Any time an inmate moves, it is solely with inmates in his housing unit." *Id.*

"[O]n October 23, 2020, the Warden sought a movement moratorium which would cease incoming and outgoing inmate movement from FCI Fort Dix through November 23, 2020." *Id.* ¶ 13 and Exhibit 4 (Mem. from Warden Ortiz). BOP granted the moratorium for that period. *Id.* "The Warden sought additional movement moratoriums in December 2020 and January 2021, both of which were granted." *Id.* ¶ 14 and Exhibits. 5 and 6 (Moratoriums). "The January 2021 moratorium specifically ceased all movement until January 26, 2021, and was extended to cease all movement until February 17, 2021." *Id.* ¶ 14 and Exhibit 7.

"The extensive cleaning procedures put in place in March 2020 are still in place." *Id.* ¶ 15 and Exhibit 8 (Pandemic Cleaning Protocols); *see supra* § II.C. The Warden emphasizes these protocols by, among other things, sending "reminder emails to all staff and consistently discussing the cleaning protocols at staff meetings." Reiser Decl. ¶ 15. "To ensure that the pandemic-cleaning protocols at FCI Fort Dix are being followed, the institution duty office monitors the adherence to such protocols on a daily basis." *Id.*

### E. FCI Fort Dix Testing Protocol, Current COVID-19 Cases, and Vaccine Program

"As of February 2, 2021, FCI Fort Dix has a total of 175 COVID-19 positive inmates, all at the Low facility" (and there are no active infections at the Camp). Turner-Foster Decl. ¶ 18. "A COVID-19 positive inmate is defined as an inmate who has tested positive and has not yet recovered." *Id.* "FCI Fort Dix has an aggressive testing policy to test every inmate in quarantine, whether in Intake quarantine, Release quarantine, or Exposure quarantine." *Id.* ¶ 19. "Accordingly, thousands of

inmates assigned to the institution have been tested for COVID-19, even though the majority were asymptomatic." *Id.*

"To date, every general population inmate housed in the following housing units (at the time of possible COVID-19 exposure) has been tested under exposure quarantine: Units 5802, 5812, 5841, and 5852 (West Compound); Units 5702, 5703, 5711, 5751, 5741, and 5752 [(East Compound)]; and the Camp." *Id.* ¶ 20. "The only general population unit where every inmate has not been tested is Unit 5811 because no inmates assigned to that unit have met the testing categories[.]" *Id.* (As discussed below, inmates in Unit 5811 have now been offered a COVID-19 vaccine.)

"Any time an inmate tests positive in a particular housing unit, the positive inmate is removed and the other inmates remain in the unit as an 'Exposure quarantine.'" *Id.* Housing units 5803, 5851, and 5703 "are designated Intake or Transfer/ Release quarantine units." *Id.* "As noted above, inmates in those quarantine units are tested upon entrance and release." *Id.* "In all quarantine units, the inmates are medically monitored daily and tested for COVID-19." *Id.*

FCI Fort Dix staff have always had access to community-based COVID-19 testing, but during the week of November 16, 2020, the facility "commenced volunteer staff COVID-19 testing, on site at the institution, for asymptomatic staff." *Id.* ¶ 22 and Exhibits 3 and 4. "Symptomatic staff are prohibited from coming to work at the institution and are encouraged to seek treatment from their respective medical providers." *Id.* As of February 1, 2021, "107 staff have contracted COVID-19 and 104 have recovered." *Id.* ¶ 21.

In a very important development for pandemic management, FCI Fort Dix received its first shipment of the Pfizer COVID-19 vaccine on January 19, 2021. Turner-Foster Decl. ¶ 23. Pursuant to BOP Clinical Practice Guideline, BOP vaccinated staff at the facility on January 19 and 20, 2021. *Id*. ¶ 23 and Exhibit 5 (Clinical Practice Guideline). "Prior to that, a number of staff, including all Medical Department staff, received their first vaccination through outside sources." *Id*.

"After staff received the vaccine, FCI Fort Dix had 181 remaining vaccines." *Id*. ¶ 24. "As a result, inmates that met CDC priority level one (inmate healthcare workers) and CDC priority level two inmates in housing units 5811 and 5802, were offered the vaccine." *Id*. ¶ 25. "These two housing units were chosen as 5811 has never had a COVID-positive inmate, and 5802 had the second fewest cases[,]" making them a priority. *Id*. Two Camp inmates also received vaccine inoculations before the initial supply ran out. *Id*. ¶ 26. As noted above, Petitioner Abreu-Feliz was offered the vaccine but declined it. *Id*.

"Presently, there are no additional vaccines at FCI Fort Dix. Once the institution receives additional vaccines, priority level two inmates at the Camp will be vaccinated."[8] *Id*. ¶ 27.

### F. <u>Management of the Camp from December 20, 2020 to Present</u>

---

[8] Operation Warp Speed, a public-private partnership established by the federal government, determines when doses will be made available to inmates. *See* From the Factory to the Frontlines, The Operation Warp Speed Strategy for Distributing a COVID-19 Vaccine, available at https://www.hhs.gov/sites/default/files/strategy-for-distributing-covid-19-vaccine.pdf (last visited Feb. 5, 2021).

Petitioners have all resided at the minimum-security Camp for the duration of the COVID-19 pandemic and focus their arguments and prayers for relief on a period they call "The Third Wave – The Camp (December 20 – Current)." Pet. at 15-17. Respondent presents the following information regarding that period.

Since the advent of the pandemic, "inmates from the A-Wing and B-Wing were instructed to remain separated. Dining times and other scheduled activities were separated by Wing to reduce the possibility of transmission." Turner-Foster Decl. ¶ 3. Contrary to Petitioners' suggestion that the Camp lacks professional medical personnel,[9] a "Registered Nurse runs sick call sign-up at the Camp Monday through Friday." *Id*. ¶ 4. "The Nurse triages the complaints, and any priority cases are discussed with the Nurse Practitioner or [Dr. Turner-Foster], as the assigned Camp physician." *Id*. "All other routine sick call appointments are scheduled for a later date." *Id*. "This procedure is separate from daily vital checks required of inmates on exposure quarantine and isolation discussed below." *Id*.

Following an initial surge of COVID-19 cases at the Camp in Spring 2020, there were no positive COVID-19 tests at the Camp between May 2020 and December 24, 2020. Turner-Foster Decl. ¶ 5. At the start of this late-December 2020

---

[9] Petitioners allege that, following Sick Call, "an untrained Physician's Assistant (there is no Licensed Nurse or Doctor assigned to the Camp) determines whether the medical situation rises to the level necessary to see a nurse on the one or two days the nurse is present at the Camp[.]" Pet. at 2. Petitioners' allegations are wrong and refuted by Dr. Turner-Foster's Declaration. Further, even if a Physician Assistant staffed the Camp, the role of P.A. is a licensed and regulated medical profession in the State of New Jersey. *See* N.J.S.A. 45:9-27.10 - 45:9-27.28.

period, the Camp housed 73 inmates in A-Wing and 58 inmates in B-Wing. Reiser Decl. ¶ 5.

"On or about December 24, 2020, three inmates from the Camp's A-Wing complained of COVID-19 associated symptoms." *Id.* ¶ 6. BOP conducted rapid tests which returned positive results, so the three were placed in isolation in the Medical Building at the Low, and "the remainder of A-Wing inmates were placed on exposure quarantine." *Id.* ¶¶ 6-7. The exposure quarantine of A-Wing was subject to all the additional precautions outlined above. BOP also locked the doors connecting A-Wing and B-Wing. *Id.* ¶ 11.

After discovering the three initial infections, testing of all A-Wing inmates revealed thirty-two more COVID-19-positive inmates, a number which includes Petitioner Soto-Concepcion. *Id.* ¶ 10. BOP transferred the positive A-Wing inmates into isolation, while the negative inmates remained in exposure quarantine. *Id.*

Next, on or about January 5, 2021, "two inmates from the Camp's B-Wing reported COVID-19 symptoms." *Id.* ¶ 12. After both symptomatic inmates tested positive, BOP tested everyone in the B-Wing and found an additional twenty-five positive inmates. *Id.*

In response, BOP reorganized the Camp "[u]sing appropriate medical safety protocols." *Id.* ¶ 13. It "designated the B-Wing at the Camp as an isolation unit for positive inmates, and the A-Wing became the exposure quarantine for negative inmates." *Id.* Furthermore, "all inmates at the Camp were seen daily by a Nurse or

other licensed medical professional." *Id*. ¶ 14. "Any inmate requiring care that could not be provided at the institution is transported to the hospital." *Id*.

All told, "the Camp saw a total of sixty-two COVID-positive inmates in December 2020 and January 2021 between the A- and B-Wings." *Id*. ¶ 13. By mid-January 2021, "sixty-one inmates from the Camp were deemed recovered from COVID-19 in accordance with the CDC guidelines." *Id*. ¶ 15. Unfortunately, one of the COVID-positive inmates at the Camp transferred to the hospital on January 22, 2021 and died of complications from the virus. *Id*. ¶ 16. This is the only COVID-19 death at FCI Fort Dix to date. *Id*.

Lab results returned on January 29, 2021, showed that all inmates in the A-Wing exposure quarantine were negative for COVID-19. *Id*. ¶ 17. "As a result, the A-Wing was removed from exposure quarantine status." *Id*. "The B-Wing is slated to return to normal operation on February 5, 2021, which will be after a full isolation and recovery period." *Id*. "The A-Wing and B-Wing were still instructed to remain separated." *Id*.

Petitioners suggest that transfers into the Camp during this period were improper, but they do not explain why. "Four inmates moved to the B-Wing of the Camp between December 29, 2020, and January 2, 2021" – a period when there were no positive test results among B-Wing inmates. Reiser Decl. ¶ 7. In keeping with BOP protocols, "these four inmates had been quarantined in an incoming quarantine housing unit" prior to moving into B-Wing. *Id*. On January 5, 2021, two "incoming" inmates and a releasee from the Special Housing Unit moved into A-

25

Wing because (1) they were all minimum-security inmates; and (2) A-Wing became a quarantine unit on that date. *Id.* ¶ 8. These three inmates thus joined a quarantine unit in keeping with BOP protocols. *Id.* "As with all of the quarantined inmates, these three inmates tested into quarantine (requiring a negative test)" and have now tested out with a negative test. *Id.*; *see also* Turner-Foster Decl. ¶ 17 (stating that all A-Wing inmates tested out of exposure quarantine on Jan. 29).

As of the filing of this Answer, the Camp is free of COVID-19 infections and awaits the administration of vaccines when the next distribution arrives at FCI Fort Dix. Turner-Foster Decl. ¶¶ 18, 27. Petitioner Soto-Concepcion will be among the next group to receive the vaccine, *id.* ¶ 28, unless he declines it. Goodchild and Winans are in the priority group after that. *Id.*

### III.   BOP's Use of Home Confinement to Combat COVID-19

BOP is also addressing COVID-19 by prioritizing home confinement for "at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." United States Attorney General, Memorandum for the Director of BOP (Mar. 26, 2020).[10] In making this determination, BOP "consider[s] the totality of

---

[10] Available at https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf (last visited Feb. 4, 2021). Additional information regarding BOP's home confinement procedures and policies can be found in BOP Program Statement 7320.01, Home Confinement, available at https://www.bop.gov/policy/progstat/7320_001_CN-1.pdf (last visited Feb. 4, 2021).

circumstances for each individual inmate" based on the following non-exhaustive, discretionary factors:

- The age and vulnerability of the inmate to COVID-19, in accordance with [CDC] guidelines;

- The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

- The inmate's conduct in prison, with inmates who have engaged in violent or gang related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment[;]

- The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;

- Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety[;] and

- The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community[.]

*Id.* at 1-2.

While considering these factors, the Attorney General emphasized that BOP "cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19, or put the public at risk in other ways." *Id.* at 2. Accordingly, any inmate granted home confinement under this guidance was required to be "in a mandatory 14-day quarantine period" before being "discharged from a BOP facility." *Id.* "Inmates transferred to home confinement under this prioritized process should also be subject to location monitoring services and, where a court order is entered, be subject to supervised release." *Id.*

27

On April 3, 2020, the Attorney General updated his guidance to BOP and issued additional directives in light of the passage of the CARES Act. April 3, 2020 Memorandum, https://www.justice.gov/file/1266661/download (last visited Feb. 4, 2021). The CARES Act authorized the Attorney General "to expand the cohort of inmates who can be considered for home release upon [his] finding that emergency conditions are materially affecting the functioning of [BOP]." *Id.*

The CARES Act expanded the authority for BOP to review "all at-risk inmates -- not only those who were previously eligible for transfer." *Id.* at 2. But this expanded authority did not override BOP's obligation to protect public safety. *See id.* "That means [BOP] cannot simply release prison populations en masse onto the streets." *Id.* "Doing so would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses." *Id.* As the Attorney General explained, the "last thing" the public needs right now is the "indiscriminate release" of inmates without "careful, individualized determinations":

> The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates. Thus, while I am directing you to maximize the use of home confinement at affected institutions, it is essential that you continue making the careful, individualized determinations BOP makes in the typical case. Each inmate is unique and each requires the same individualized determinations we have always made in this context.

28

*Id.* at 3.

FCI Fort Dix has reviewed all of its inmates for eligibility for home confinement. Reiser Decl. ¶ 20. On a weekly basis, staff check to see if any additional inmates have become eligible for a transfer to home confinement. *Id.* As of February 1, 2021, the BOP has transferred 102 inmates from FCI Fort Dix to home confinement. *Id.*

The BOP decided not to transfer any of the Petitioners to early home confinement under the CARES Act. *Id.* ¶¶ 21-24. Both Soto-Concepcion and Abreu-Feliz are disqualified by their recidivism scores of low; a minimum risk score is required. *Id.* ¶¶ 22-23. Goodchild is ineligible because he has served only 14% of his 102-month sentence. *Id.* ¶ 21. Finally, while Winans met the basic criteria for CARES Act home confinement, the BOP denied his transfer "due the severity of the offense (eight million-dollar loss), time left to serve on his sentence, and minimal health risks." *Id.* ¶ 24.

## IV.   BOP's Administrative Process to Address Inmate Grievances & Petitioners' Administrative and Court Activities

The BOP has established a four-step process for federal inmates to pursue grievances regarding any aspect of their confinement or the execution of their sentences. *See* 28 C.F.R. § 542.10 *et seq.* To comply with this process, an inmate generally must first attempt to informally resolve his dispute with prison staff. *See* 28 C.F.R. § 542.13. If these efforts fail, the inmate must then submit a BP-9 administrative remedy request to the warden of his institution within twenty days of the event or decision underlying the request. *See* 28 C.F.R. § 542.14(a), (c). If the

administrative remedy request is denied, the inmate must then file a BP-10 appeal with the appropriate Regional Director within twenty days of the date of the warden's response. *See* 28 C.F.R. § 542.15(a). If the Regional Director denies the appeal, the inmate must then appeal that decision by filing a BP-11 appeal with the BOP's Central Office, General Counsel, within thirty days from the date of the Regional Director's response. *See id*. The General Counsel has forty days to respond. 28 C.F.R. § 542.18. If an issue raised by the inmate concerns "an emergency" that "threatens the inmate's immediate health or welfare, the Warden shall respond not later than the third calendar day after filing." *Id*.

None of the Petitioners has filed a proper administrative remedy request with the BOP for compassionate release or transfer from FCI Fort Dix. Soto-Concepcion and Abreu-Feliz each requested transfer to home confinement early in the pandemic, Reiser Decl. ¶¶ 17-18, but neither appealed his denial through an administrative remedy request. Dobovich Decl. ¶ 5. In fact, neither Goodchild, Abreu-Feliz, nor Soto-Concepcion has ever submitted an administrative remedy request of any kind to the BOP. Reiser Decl. ¶ 19. The BOP rejected Winans's home confinement administrative remedy request as having too many continuation pages. Dobovich Decl. ¶ 6 and Attachment 4 ("YOU CAN ONLY SUBMIT THE BP-9 AND ONE CONTINUATION"). Rather than re-file a proper administrative remedy request at the institutional level, Winans filed twice with the Regional Director, who rejected those filings. *Id*.

30

Petitioners' efforts to seek judicial relief likewise vary widely. This Court previously dismissed Soto-Concepcion's COVID-19 habeas petition for lack of subject matter jurisdiction in *Wragg*, 462 F. Supp. 3d 476. Both Soto-Concepcion and Abreu-Feliz have compassionate release motions pending before their sentencing courts. Neither Goodchild nor Winans has ever pursued compassionate release or a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(1)(A).

## ARGUMENT

For the reasons explained below, this Court should dismiss the Petition for lack of subject matter jurisdiction and failure to exhaust administrative remedies. To the extent this Court reaches them, Petitioners' claims are meritless; they establish neither objectively unconstitutional conditions nor the required subjective mental state of deliberate indifference in Respondent.

## I. This Court Lacks Subject Matter Jurisdiction Over Petitioners' Conditions of Confinement Claim

Petitioners argue that their conditions of confinement at the Camp at FCI Fort Dix violate their constitutional rights. Because district courts do not have jurisdiction over prisoners' claims challenging the conditions of their confinement, this Court should dismiss the Petition for lack of subject matter jurisdiction.

Under Section 2241, federal courts have jurisdiction over allegations that a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). In the Third Circuit, prisoners may seek habeas relief only "where the alleged deprivation of rights affects the length or

31

duration of imprisonment or where the BOP's execution of a prisoner's sentence somehow conflicts with a command or recommendation in the sentencing judgment." *Wragg*, 462 F. Supp. 3d at 500; *accord Woodall*, 432 F.3d at 241. Section 2241 does not provide jurisdiction to entertain challenges to conditions of confinement; instead, such claims must be pursued through a civil rights action. *Id.* at 499-501.

Accordingly, in *Wragg*, this Court determined that it lacked subject matter jurisdiction over habeas petitions by allegedly medically vulnerable inmates regarding COVID-19 risks because their claims challenged conditions of confinement rather than the fact or duration of custody. *Id.*; *accord Harper v. Warden, FCI Fort Dix*, Civ. No. 20-8345 (RBK), 2020 U.S. Dist. LEXIS 162005, at *7-8 (D.N.J. Sept. 4, 2020). This precept is especially applicable in cases like this one, where Petitioners bring "hybrid . . . claims for habeas corpus relief . . . and claims for civil rights relief (*i.e.* injunctive and/or declaratory relief)." *Carballo v. Barr*, --- F. Supp. 3d ---, Civ. No. 20-01315A, 2020 WL 5821001, at *5 (D. Nev. Sept. 30, 2020). Such claims ultimately "seek relief on account of [Petitioners'] conditions of confinement." *Id.*

As this Court noted in *Wragg*, in *Abbasi*, the Supreme Court left open the question whether petitioners "'might be able to challenge their confinement conditions via [the] writ'" in exceptional circumstances. 462 F. Supp. 3d at 500 (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862 (2017)). Nevertheless, that same case presented "a conditions of confinement claim involving outright alleged

physical abuse of prisoners who were not serving a sentence upon conviction of a crime," which the Supreme Court still did not identify as such an exceptional case. *Id.* at 505. Here, Petitioners' risk of contracting COVID-19 at Fort Dix is not so exceptional as to trigger habeas jurisdiction for their Eighth Amendment claims. This is especially true in light of the availability of "other avenues for an inmate to obtain release." *Id.*

*Hope v. Warden York Cty. Prison*, 972 F.3d 310 (3d Cir. 2020), does not alter the jurisdictional calculus. In *Hope*, the Third Circuit held that, under the extraordinary circumstances that existed in March 2020 stemming from the COVID-19 pandemic, civil immigration detainees could challenge their continued custody under Section 2241 where "'the only relief sought . . . is release." 972 F.3d at 323. *Hope* is distinguishable in two dispositive ways. First, the civil immigration detention context requires a different analysis than the imprisonment of those serving sentences for criminal violations. Second, even for civil detainees, *Hope* recognized Section 2241 jurisdiction over COVID-19 claims only where a petition contends that release from custody "is the only adequate relief." *Id.* at 323. The recent *Aigebkaen* decision did not grapple with these meaningful distinctions when it "assume[d] . . . that *Hope* extends to convicted prisoners" before dismissing a petition on exhaustion grounds. *Aigebkaen v. Warden*, Civ. No. 20-5732 (NLH), 2020 WL 6883438, at *4 (D.N.J. Nov. 24, 2020).

Unlike civil detainees, medically vulnerable federal prisoners serving criminal sentences can seek release through statutory and administrative

mechanisms. "The First Step Act empowers criminal defendants to request compassionate release [from the sentencing court] for 'extraordinary and compelling reasons.'" *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020) (citing 18 U.S.C. § 3582(c)(1)(A)(i)). The CARES Act expanded BOP authority to transfer inmates to home confinement in order to address risks posed by the COVID-19 pandemic. *See* United States Attorney General, "Memorandum for Director of Bureau of Prisons (April 3, 2020).[11] FCI Fort Dix has evaluated the home confinement eligibility of every inmate designated to the facility, and checks weekly "to determine if additional inmates are eligible after the initial reviews." Reiser Decl. ¶ 20.

The existence of these "orderly" processes diminishes the chance that an "exceptional circumstance" exists for a post-conviction inmate. *Cf. Johnson v. Hoy*, 227 U.S. 245, 247 (1913) ("[T]he orderly course of a trial must be pursued and the usual remedies exhausted, even where the petitioner attacks on habeas corpus the constitutionality of the statute under which he was indicted[.]"). Indeed, these "other avenues" available to criminal inmates impacted this Court's decision that the petitioners in *Wragg* did not present "exceptional" circumstances warranting habeas jurisdiction. *Wragg*, 462 F. Supp. 3d at 505 ("[T]here are other avenues for an inmate to obtain release. . . . Petitioner can request home confinement primarily under the CARES Act and compassionate release under 18 U.S.C. § 3582(c)(1).")

---

[11] Available at https://www.justice.gov/file/1266661/download (last visited Feb. 3, 2021).

Furthermore, these existing statutory and administrative processes are far better suited to the issues raised by a prisoner's request for release than the blunt instrument of Section 2241 habeas. A court considering a compassionate release motion—usually the sentencing court familiar with both the defendant and the crime of conviction—re-weighs the holistic factors set forth in 18 U.S.C. § 3553(a), including "the nature and circumstances of the offense and the history and characteristic of the defendant," and the needs for deterrence and to protect the public from further crimes of the defendant. Likewise, in implementing expanded home confinement under the CARES Act, the BOP must consider the totality of the circumstances for each inmate, including (1) his age and vulnerability; (2) the facility's security level; (3) the inmate's conduct in prison; (4) the inmate's PATTERN score; (5) the inmate's re-entry plan and prospects; and (6) the crime of conviction and danger posed to the community. Not only are these processes carefully engineered to address the thorny questions of whether and when to release a prisoner serving a duly-imposed criminal sentence, but they also provide an alternative avenue for medically vulnerable inmates to see transfer to home confinement from both the BOP and the federal courts. These administrative and statutory mechanisms for release, which are not available to civil detainees, distinguish this case from *Hope*.

In fact, in this case, two of the four Petitioners— Soto-Concepcion and Abreu-Feliz—have motions for compassionate release currently pending with their sentencing courts. *See Soto-Concepcion*, 15-cr-00181-JEJ, ECF No. 928; *Abreu-Feliz*,

15-cr-00211-EGS-1, ECF No. 234. Winans and Goodchild, on the other hand, have chosen not to avail themselves of this alternative remedy. To the extent that this Court decides that Section 2241 provides jurisdiction over Petitioners' claims (which Respondent disputes), Respondent respectfully asks that it stay this habeas petition pending the filing and final disposition of Petitioners' compassionate release motions. *See Gonzalez v. Ortiz*, Civ. No. 20-15805 (RMB), 2021 WL 308548, at *3 (D.N.J. Jan. 29, 2021) (staying habeas petition pending the outcome of petitioner's appeal of compassionate release denial).

Beyond the additional avenues afforded medically vulnerable prisoners, divergent constitutional standards further distinguish the prisoner from the immigration detainee and militate for dismissal of the Petition. Convicted criminals such as Petitioners have Eighth Amendment protections. By contrast, civil immigration detainees are protected by the Fifth Amendment, which may provide "heightened protections," *Jose D. M. v. Barr*, 456 F. Supp. 3d 626, 633 (D.N.J. 2020), providing for "more considerate treatment than convicted prisoners." *Jeferson V.G. v. Decker*, No. 20-3644, 2020 U.S. Dist. LEXIS 65905, at *15 n.5 (D.N.J. Apr. 15, 2020) (citing *Fuentes v. Wagner*, 206 F.3d 335, 344 (3d Cir. 2000)).

Even if *Hope* were to apply in the prisoner context, however, Section 2241 jurisdiction still would not extend to Petitioners' conditions-of-confinement claims to the extent that they seek to change conditions at FCI Fort Dix. The Third Circuit made clear that in immigration cases, habeas jurisdiction lies if and only if petitioners "do not seek to *modify* their conditions of confinement and the only relief

36

sought—the only adequate relief for the constitutional claims—is release." *Hope*, 972 F.3d at 343 (internal quotation, alterations omitted, emphasis in original). Similarly, the Sixth Circuit recognized jurisdiction over prisoners' COVID-19 claims only insofar as "a petitioner claims that no set of conditions would be constitutionally sufficient[.]" *Wilson v. Williams*, 961 F.3d 829, 838 (6th Cir. 2020); *accord Blackburn v. Noble*, --- F. Supp. 3d ---, Civ. No. 3:20-00046-GFVT, 2020 WL 4758358, at *4 (E.D. Ky. Aug. 17, 2020) (finding jurisdiction where petitioners alleged that no set of conditions could render their confinement constitutional, but ultimately denying claims). To be clear, the Third Circuit has never recognized this expanded jurisdiction in the prisoner context, and Respondent urges this Court not to do so here for the reasons stated above. Nevertheless, even if this Court were to determine that *Hope* applies to prisoner habeas petitions, it still would lack jurisdiction over the claims raised in this action.

Here, the Petitioners characterize their request for transfer to home confinement[12] as a "provisional remedy," Pet. at 25, and focus on "conditions at Fort Dix Camp," *id.* at 24, created by the BOP's alleged actions or failures to act. The Petition is a veritable laundry list of criticisms of the BOP's handling of the COVID-19 crisis. Petitioners ask this Court to "serve as a de facto super warden," by second-guessing the BOP's decisions over the course of the pandemic. *Wragg,* 462 F. Supp. 3d at 504 (internal quotation omitted). Their largely unsupported attacks on past

---

[12] Petitioners define their request for "enlargement," as a request for transfer to home confinement. Pet. at 25.

and present conditions of confinement—belied by the BOP's efforts to address the COVID-19 pandemic as it has developed and surged worldwide— exceed Section 2241 jurisdiction. Petitioners never argue that no set of custodial conditions could rectify their alleged constitutional deprivations. To the contrary, they effectively concede the possibility of constitutional conditions by asking the Court appoint a special master or other expert "to make recommendations to the Court regarding the number of incarcerated people that Fort Dix Camp can house consistent with CDC Guidance on best social distancing and hygiene practices to prevent the spread of COVID-19." Pet. at 26. Accordingly, even if *Hope* were to apply in the prisoner context, *Hope* does not grant Section 2241 jurisdiction over any claim advanced to change the conditions of confinement.[13]

## II.   This Court Should Dismiss the Petition for Failure to Exhaust Administrative Remedies

The Court should dismiss this action because Petitioners failed to exhaust their administrative remedies. Before a federal inmate can seek habeas relief in district court pursuant to 28 U.S.C. § 2241, he must first exhaust his administrative remedies. *See Vasquez v. Strada*, 684 F.3d 431, 433 (3d Cir. 2012); *Moscato v. Fed. Bureau of Prisons*, 98 F.3d 757, 760-62 (3d Cir. 1996). As the Supreme Court has recognized, the exhaustion requirement serves a number of critical interests:

> First, exhaustion protects administrative agency authority. Exhaustion gives an agency an opportunity to correct its own mistakes

---

[13] Even if *Hope* were to apply, it requires that courts assess petitioners "as individuals with their own unique medical histories, medical risks, healthcare access needs, detention conditions, and release circumstances." *Hope*, 972 F.3d at 331.

with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures.

Second, exhaustion promotes efficiency. Claims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court. In some cases, claims are settled at the administrative level, and in others, the proceedings before the agency convince the losing party not to pursue the matter in federal court. And even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration.

*Woodford v. Ngo*, 548 U.S. 81, 88-89 (2006) (internal citations and quotation marks omitted).

Courts within this Circuit therefore require an inmate to exhaust administrative remedies because exhaustion promotes these important interests. *See Arias v. U.S. Parole Comm'n*, 648 F.2d 196, 199 (3d Cir. 1981) (noting that Third Circuit has "adhered to the exhaustion doctrine for several reasons: (1) judicial review may be facilitated by allowing the appropriate agency to develop a factual record and apply its expertise, (2) judicial time may be conserved because the agency might grant the relief sought, and (3) administrative autonomy requires that an agency be given an opportunity to correct its own errors") (citation omitted); *see also Briley v. Warden Fort Dix FCI*, 703 F. App'x 69, 71 (3d Cir. 2017). Indeed, although *Woodford* concerned the exhaustion requirement imposed by the Prison Litigation Reform Act, the purposes of exhaustion identified by the Court— protecting agency authority and promoting efficiency—apply equally to habeas petitions. *See Woodford*, 548 U.S. at 93 ("In practical terms, the law of habeas, like administrative law, requires proper exhaustion[.]"); *Arias*, 648 F.2d at 199.

The exhaustion requirement may be excused in limited circumstances, such as when exhaustion would be futile. S*ee, e.g., Gambino v. Morris*, 134 F.3d 156, 171 (3d Cir. 1998). But such exceptions are narrowly construed, and require well-pleaded facts setting forth a compelling justification to excuse the petitioner's failure to exhaust. *See, e.g., Brown v. Grondolsky*, Civ. No. 09-3290 (RMB), 2009 WL 2778437, at *1-2 (D.N.J. Aug. 31, 2009) (exhaustion requirement "is diligently enforced by the federal courts" and futility exception applies only in "narrowly-defined circumstances") (citation omitted); *Velez v. Zickefoose*, Civ. No. 10-3992 (NLH), 2010 WL 5186158, at *3 (D.N.J. Dec. 15, 2010) ("[I]t has been long established that an inmate's unjustified failure to pursue administrative remedies results in procedural default warranting decline of judicial review.").

Petitioners do not explain their failure to exhaust, and the COVID-19 pandemic does not supply a justification. To the contrary, Petitioners' claims "fit[] squarely within the parameters of the purposes of exhaustion." *Byrne v. Ortiz*, Civ. No. 20-12268 (RBK), 2020 WL 7022670, at *4 (D.N.J. Nov. 30, 2020) (internal citation omitted) (dismissing COVID-19 claims for failure to exhaust); *accord Chaparro v. Ortiz*, Civ. No. 20-5272 (NLH), 2020 WL 4251479, at *5 (D.N.J. July 24, 2020) (same). Indeed, as the Third Circuit reflected in a compassionate release case, "[g]iven BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, 954 F.3d at 597 (denying a compassionate release motion by a medically vulnerable prisoner who did not comply with the

statutory requirement that he exhaust his remedies with the BOP).

Here, none of the Petitioners has exhausted administrative remedies. Three of the Petitioners—Goodchild, Abreu-Feliz, and Soto-Concepcion—have never filed any administrative remedy at all while incarcerated with the BOP. Dobovich Decl. ¶ 5. Winans did file an administrative remedy request for home confinement under the CARES Act in August 2020, but his BP-9 Form was rejected for having too many continuation pages. *Id.* ¶ 6 & Attachment 4 ("YOU CAN ONLY SUBMIT THE BP-9 AND ONE CONTINUATION"). Rather than re-file a proper administrative remedy request at the institutional level, Winans filed two appeals with the Regional Director, both of which were rejected. *Id.* Winans never properly filed an administrative remedy request. Because none of the Petitioners exhausted his administrative remedies, the Court should dismiss the Petition for failure to exhaust.

## III.    <u>This Court Lacks Jurisdiction to Review the BOP's Home Confinement Decisions, Which are Committed to Agency Discretion by Statute</u>

To the extent that Petitioners challenge them, the BOP's decisions not to transfer them to home confinement are judicially unreviewable. "Pre-release placement decisions, such as transfers to home confinement, are committed to the BOP's sole discretion." *Aigebkaen,* 2020 WL 6883438, at *4 (citing 18 U.S.C. § 3624(c)(2) & *Prows v. Fed. Bureau of Prisons*, 981 F.2d 466 (10th Cir. 1992)). Rather than circumscribing the BOP's discretion, the CARES Act expands it by increasing the number of inmates who qualify for home confinement under 18 U.S.C. § 3624(c)(2). *Id.* (citing *Furando v. Ortiz*, Civ. No. 20-3739, 2020 WL 1922357, at *2

41

(D.N.J. Apr. 21, 2020)); *cf. Johnson v. Zickefoose*, Civ. No. 12-2544 RMB, 2012 WL 5880344, at *7 (D.N.J. Nov. 20, 2012) (challenges to BOP transfer decisions, such as whether to transfer an inmate to an increased security level or whether to release an inmate from disciplinary segregation, are "not cognizable in habeas").

The BOP's decisions not to transfer Petitioners to home confinement are well supported and far from arbitrary. Reiser Decl. ¶¶ 21-24. Goodchild is ineligible for transfer because he has only served 14% of his sentence, *id.* ¶ 21, and both Soto-Concepcion and Abreu-Feliz have recidivism risk scores that are too high. *Id.* ¶¶ 22-23. While Winans technically meets BOP criteria for CARES Act home confinement, the BOP denied his transfer "due the severity of the offense ($8 million dollar loss), time left to serve on his sentence, and minimal health risks." *Id.* ¶ 24. (While BOP did not point to this specifically, Respondent further notes that Winans's fraud crimes involved exploiting his position of trust within faith communities.) These decisions are rational and thus not subject to judicial review.

## IV.     **Petitioners' Constitutional Claims Fail on the Merits**

Petitioners' continued incarceration does not violate the Constitution, so their Petition fails on the merits. There is no evidence that Respondent is acting with a reckless disregard for Petitioners' safety or out of deliberate indifference to their medical needs.

To demonstrate deliberate indifference regarding medical care, an inmate must show both: (1) alleged deficiencies in medical care that are "sufficiently serious" by objective measures; and (2) government officials who "have a sufficiently culpable state of mind" regarding these deficiencies, a subjective measure. *Thomas*

*v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020). The record does not demonstrate the kind of obdurate and abject failure to protect that is required to trigger a constitutional violation.

In the context of exposing inmates to risk of disease, a claim must be dismissed if it does not pose a threat that is so severe that it would be "contrary to current standards of decency for anyone to be so exposed." *Helling v. McKinney*, 509 U.S. 25, 35 (1993). The inmate must also show that BOP "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Stated differently, "neither negligence nor strict liability is the appropriate inquiry in prison-conditions cases." *Steading v. Thompson*, 941 F.2d 498, 499-500 (7th Cir. 1991). Finally, when facing a deliberate indifference claim, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

Respondent has taken continual, reasonable action pursuant to government and medical guidance regarding the COVID-19 pandemic—which has surged worldwide in recent months and proved uniquely difficult to contain.[14] The BOP is

---

[14] Medical experts worldwide continue to note how much remains to be known about COVID-19 even as it changes and mutates. *See, e.g.,* Kathy Katella, "5 Things Everyone Should Know About the Coronavirus Outbreak," Yale Medicine (Jan. 29, 2021), *available at* https://www.yalemedicine.org/news/2019-novel-coronavirus (last visited Feb. 1, 2021) ("While vaccines to prevent COVID-19 are bringing hope, experts

not disregarding the risks posed by COVID-19 to Petitioners or any other inmates at FCI Fort Dix. The BOP has made efforts to prevent COVID-19 infections at FCI Fort Dix and worked to address the pandemic, limit the spread of the virus within the facility, and provide medical care to inmates who are infected. The regrettable fact that COVID-19 took hold at the FCI Fort Dix Low this autumn, and more recently infected inmates in the Camp, is consistent with a nationwide surge of cases in the United States and does not constitute, *res ipsa loquitor*, proof of deliberate indifference.

Petitioners attempt to paint a portrait of clumsiness and stupidity by BOP — alleging slow actions and ill-conceived decisions on inmate transfers and inmate management at FCI Fort Dix. Petitioners argue, in essence, that BOP's measures have been too little, too late. On their face, Petitioners' accusations do not establish that the BOP was deliberately indifferent to Petitioners' health and safety.

Moreover, Petitioners' speculations about BOP's response to the COVID-19 pandemic are refuted by the declarations attached to this answer. Respondent and the staff at FCI Fort Dix have implemented (and continue to modify, as conditions change) comprehensive plans to protect inmates, mitigate spread, provide medical screening, address infections, and maximize cleanliness and sanitation. As discussed in the Reiser Declaration, Respondent reduced the overall population at FCI Fort Dix and implemented plans to increase social distancing and reduce

---

are tracking the emergence of new virus variants, while the conversation continues about other measures necessary to contain it.").

opportunities for the virus to spread between housing areas. As shown in the Turner-Foster Declaration, BOP acted quickly to address the recent surge of infections at the Camp, implementing changes to allow for proper quarantining and isolation of inmates to stem spread as well as increasing health monitoring. Turner-Foster Decl. ¶¶ 9-14.

Further, FCI Fort Dix received an initial distribution of the Pfizer COVID-19 vaccination on January 19, 2021 and promptly inoculated staff and many high priority inmates in accordance with the BOP Clinical Practice Guidelines. *Id.* ¶¶ 23-26, Exhibit 6. Medical staff at FCI Fort Dix stand ready to continue vaccinations in keeping with BOP prioritization plans as soon as additional shipments of vaccine arrive. *Id.*

The introduction of vaccines at FCI Fort Dix is significant. Federal courts reviewing compassionate release motions under 18 U.S.C. § 3582(c)(1)(A) recently have noted that a positive test for COVID-19 in an individual inmate, and the near-term likelihood of vaccination of federal inmates populations more broadly, each undercut any "extraordinary and compelling reasons" justifying release during the pandemic. *See, e.g., United States v. Ballenger*, Crim. No. 16-5535 BHS, 2021 WL 308814 (W.D. Wash. Jan. 29, 2021); *United States v. White*, Crim. No. 5:09-053-DCR, 2021 WL 310929 (E.D. Ky. Jan. 29, 2021). This Court has noted, in response to a different habeas petition, that "now that vaccinations may be available, a prisoner at higher risk for severe illness might seek priority in vaccination by administrative remedy request." *Gonzales*, 2021 WL 308548, at *2. This suggests

45

that "high risk" inmates, as these Petitioners claim to be, have a medical method to reduce risk as well as an administrative remedy to obtain it outside of habeas.

Recent factual developments have significantly altered the analysis of the claims of two of the Petitioners. First, Soto-Concepcion unfortunately tested positive for COVID-19 on December 28, 2020, but he recovered with few to no severe symptoms. Stinson Decl., Exhibit B. This reduces his chances of reinfection. *See United States v. Bausch*, Crim. No. 14-cr-00399-KJD, 2021 WL 308945, at *2 (D. Nev. Jan. 29, 2021) (citing a medical study and follow-on reporting regarding immunity); *Ballenger*, 2021 WL 308814 at *4 (discussing medical findings on re-infection risk). Second, Abreu-Feliz was offered the vaccine in the very earliest days of its availability at FCI Fort Dix, but he declined the opportunity. Stinson Decl., Exhibit C. He cannot be heard now to plead for release as his only avenue to avoid COVID-19 infection after declining a medical breakthrough found more-than 95% effective at stopping infection.

While Respondent cannot provide information today on when the BOP will offer Goodchild and Winans vaccine doses, BOP "made administration of the COVID-19 vaccine a top priority" and "leads all jurisdictions and Federal entities in its rate of vaccination utilization, having administered 97 percent of all COVID-19 vaccine doses received."[15] In short, BOP is acting quickly and efficiently to utilize vaccines as they are made available.

---

[15] Press Release, "COVID-19 Vaccination Efforts Commended," Federal Bureau of Prisons (Jan. 16, 2021), *available at*

Of equal importance, there is no evidence of any culpable mental state by Respondent or any other BOP staff member, a required element of the claim. The phrase "deliberate indifference" is not just "legalese," it represents a subjective state of mind which Petitioners here cannot show through evidence or testimony. *Pearson v. Prison Health Serv.,* 850 F.3d 526, 535 (3d Cir. 2017) (addressing the types of evidence necessary or sufficient for a plaintiff to prove deliberate indifference). Stripped of dramatic modifiers and conclusory statements, the pertinent section of Petitioners' fact section, "The Third Wave - The Camp (December 20 - Current)" describes BOP staff conducting medical screenings, performing COVID-19 tests, placing infected inmates into isolation, placing potentially exposed inmates into quarantine, reducing inmate movement and mixing, and addressing the needs of sick inmates. Pet. at 15-17. Such reasonable steps do not support an Eighth Amendment claim of deliberate indifference. Where, as here, prison officials "responded reasonably to the risk," an Eighth Amendment claim will fail, "even if the harm not ultimately averted." *Farmer*, 511 U.S. at 844.

This matter resembles the *Wragg* class action where this Court concluded that the "record simply does not support that the Respondent[] ha[s] been deliberately indifferent to the inmates' concerns." *Wragg*, 462 F. Supp. 3d at 509. Regrettably, there have been many infections at FCI Fort Dix, but the record here

---

https://www.bop.gov/resources/news/20210116_covid_vaccine_efforts_commended.jsp (last visited Feb. 1, 2021).

makes clear that those infections did not result from deliberate indifference by staff and officials at FCI Fort Dix.

## V.    Any Putative Relief Outside of Habeas Must Be Denied or Dismissed

The Petition here seeks habeas corpus relief under 28 U.S.C. § 2241. However, Petitioners also reference other federal statutes and appear to seek relief in the form of judicial declarations and equitable orders. These ancillary requests must be denied or dismissed for the reasons that follow.

In the jurisdictional section of the Petition, the Petitioners reference 28 U.S.C. § 1331 (federal question jurisdiction); 29 U.S.C. § 794 (a section of the federal Rehabilitation Act); 28 U.S.C. § 1651 (the All Writs Act); and 28 U.S.C. § 2201 (creating a declaratory remedy).[16] Pet. at 4. In addition to seeking release from FCI Fort Dix (or "enlargement of custody"), Petitioners request the following relief: (1) a judicial declaration that "that Respondents' policies and practices regarding Covid-19, specifically in a Camp setting, violate the Eighth Amendment"; (2) the appointment of a special master "to make recommendations to the Court regarding the number of incarcerated people that Fort Dix Camp can house consistent with CDC Guidance on best social distancing and hygiene practices to prevent the spread of Covid-19"; and (3) ongoing judicial monitoring. *Id*. at 25-26.

This pleading alone does not appear to make out any kind of civil claim for relief beyond Section 2241 habeas. Petitioners merely seek "add on" relief on top of release from custody. Courts in the District of New Jersey tend to summarily deny

---

[16] Petitioners also cite to Article 1, Section 9, clause 2 of the United States Constitution, which establishes a right to pursue habeas corpus.

48

civil claims and requests for relief other than habeas relief when inmates add such matter to a Section 2241 petition, in part because the filing fees for civil actions and the prerequisites for *in forma pauperis* ("IFP") status are different than in habeas. *See, e.g.*, *Eiland v. Hollingsworth*, Civ. No. 15-2995 NLH, 2015 WL 3604141, at *2 (D.N.J. June 8, 2015), *aff'd as modified sub nom.*, 634 F. App'x 87 (3d Cir. 2015); *Coplin v. Zickefoose*, Civ. No. 12-2882 RBK, 2012 WL 1926421, at *2 n.2 (D.N.J. May 25, 2012) (discussing the differences between habeas corpus and other civil actions for inmates). For example, civil actions by prisoners are subject to the "three strikes" rule in the Prison Litigation Reform Act that can eliminate grants of IFP to repeat-filers of frivolous litigation. 28 U.S.C. § 1915(g); *Coplin, supra*.

As importantly, it is long-settled that where a prisoner seeks release from custody, his path must be by writ of habeas corpus, not declaratory judgment or a civil rights action. *Riley v. Kaye*, 664 F. Supp. 926, 927 (D.N.J. 1987) (examining *Preiser v. Rodriguez,* 411 U.S. 475 (1973)). Habeas is a powerful, focused, and limited form of federal judicial action. *Leamer v. Fauver*, 288 F.3d 532, 540 (3d Cir. 2002). It is not amenable to the kinds of additional relief requested by the Petitioners.

Here, this Court appropriately construed the Petitioners' pleading as a habeas petition and directed them all to pay the $5 filing fee or submit IFP applications with respect to that fee. ECF 2. They are entitled to proceed on that basis. Petitioners did not pay the current $402 filing fee to initiate "any civil action or proceeding other than an application for writ of habeas corpus" (*see* Appendix K:

49

Schedule of Fees, Local Civil Rules, United States District Court for the District of New Jersey[17]), or submit an IFP application as plaintiffs to a civil action.

Finally, to the extent that this Court perceives that Petitioners are pursuing civil claims apart from habeas, any such claims are subject to judicial screening under 28 U.S.C. § 1915A. Under 1915A screening, any putative claims in the Petition must be dismissed for failure to state a claim upon which relief can be granted. 28 U.S.C. § 1915A(b)(1); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For example, Petitioners reference the Rehabilitation Act, a federal disability discrimination law, but make no attempt whatsoever to plead a claim under this statute. Claims under 29 U.S.C. § 794 require pleading that the plaintiff has a disability; is qualified for a benefit as part of a federally-funded program; and was denied that benefit by reason of his disability. *Baxter v. Pa. Dep't of Corr.*, 661 F. App'x 754, 757 (3d Cir. 2016). No such pleading exists here.

## CONCLUSION

For the foregoing reasons, Respondent asks that this Court dismiss the Petition or, alternatively, deny it on the merits.

Respectfully submitted,

RACHAEL A. HONIG
Acting United States Attorney

By:    *s/John Stinson*
JOHN STINSON
JANE DATTILO
Assistant U.S. Attorneys

---

[17] Available at: https://www.njd.uscourts.gov/sites/njd/files/APPKRevised.pdf (last visited Feb. 5, 2021).

Date: February 5, 2021