UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

PETER GOODCHILD,          `     :
ELIEZER SOTO CONCEPCION,    :
JOAN ABREU-FELIZ and        :     CIVIL ACTION  NO. 21-790 (RMB)
MICHAEL WINANS, individually  :
and on behalf of all others     :
similarly situated,          :     **OPINION (REDACTED)**
                             :
         Petitioners    :
                             :
     v.                     :
                             :
DAVID E. ORTIZ,             :
                             :
         Respondent    :
_____   :

Appearances:

Peter Goodchild
Eliezer Soto Concepcion
Joan Abreu-Feliz
Michael Winans
Fort Dix Federal Correctional Institution
P.O. Box 2000
Joint Base MDL, NJ 08640
      Petitioners pro se

John T. Stinson, Jr.
Jane Dattilo
John Andrew Ruymann
Assistant United States Attorneys
United States Department of Justice
Office of the U.S. Attorney
401 Market Street
P.O. Box 2098
Camden, New Jersey 08101
      Attorneys for Respondent

Bumb, United States District Judge:

This matter comes before the Court upon Petitioners Peter Goodchild, Eliezer Soto-Concepcion, Joan Abreu-Feliz, and Michael Winans' (collectively "Petitioners") petition for writ of habeas corpus under 28 U.S.C. § 2241[1] (Pet., Dkt. No. 1), filed as a putative class action. Respondent filed an answer to the petition (Answer, Dkt. No. 7), and Petitioners filed a reply brief. (Reply Brief, Dkt. No. 17.) On May 4, 2021, Petitioners filed an emergency supplement to the petition ("Petrs' Emergency Suppl. Pet.," Dkt. No. 22), and Respondent filed supplemental briefing in opposition to habeas relief under 28 U.S.C. § 2241. ("Respt's Suppl. Brief," Dkt. No. 24.) For the reasons discussed below, the Court will dismiss the petition in part for lack of jurisdiction[2] and deny the petition in part on the merits.

---

[1] Petitioners also assert jurisdiction under 28 U.S.C. § 1331, 29 U.S.C. § 794, 28 U.S.C. § 1651 (All Writs Act), the Suspension Clause of the United States Constitution, and 28 U.S.C. § 2201 (Declaratory Judgment Act). (Pet., Dkt. No. 1 at 4.) The Court addresses jurisdiction under 28 U.S.C. § 1331 in Section IV(B) below. Petitioners do not allege the elements of a cause of action under 28 U.S.C. § 794, which requires a plaintiff to allege "that he is a qualified individual with a disability, who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, by reason of his disability." Furgess v. Pennsylvania Dep't of Corr., 933 F.3d 285, 288–89 (3d Cir. 2019). Neither the Declaratory Judgment Act nor the Suspension Clause of the United States Constitution provides an independent basis for jurisdiction. See Allen v. DeBello, 861 F.3d 433, 444 (3d Cir. 2017) (Declaratory Judgment Act); see Boumediene v. Bush, 553 U.S. 723, 831–32 (2008) ("The Suspension Clause of the Constitution provides: 'The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it") (citing Art. I, § 9, cl. 2.) Finally, '[t]he All Writs Act does not itself confer any subject matter jurisdiction, but rather only allows a federal court to issue writs 'in aid of' its existing jurisdiction." United States v. Apple MacPro Computer, 851 F.3d 238, 244 (3d Cir. 2017).

[2] A court may dismiss an action for lack of subject-matter jurisdiction at "any time[.]" Fed. R. Civ. P. 12(h)(3).

I.      PETITIONERS' CLAIMS

Petitioners Peter Goodchild ("Goodchild"), Eliezer Soto-Concepcion ("Soto-Concepcion"), Joan Abreu-Feliz ("Abreu-Feliz") and Michael Winans ("Winans") are federal prisoners who are confined in the minimum security camp ("the Camp") within the Federal Correctional Institution in Fort Dix, New Jersey ("FCI Fort Dix") who were present during outbreaks of COVID-19 in the facility in 2020 and 2021. (Pet, Dkt. No. 1.) In summary of the petition, reply brief, and emergency supplemental petition, Petitioners allege that Respondent was deliberately indifferent to their health because maintaining six feet social distance was impossible in the Camp, inmates did not have enough soap or masks during the first outbreak, BOP did not use all available buildings to provide for social distancing of inmates, outdoor recreation was suspended even though being outdoors was the safest environment to avoid transmission of the virus, lack of testing and timely quarantining of COVID-19 positive inmates allowed the virus to spread, all nonemergent medical care was delayed and emergency care was not readily available, infected inmates were transferred from FCI Elkton to FCI Fort Dix and caused a second wave of infections in the low security compound, staff violated PPE and mask mandates, and delays or mistakes caused by understaffing over the holidays in December 2020 and January 2021, caused another wave of infections in the Camp.

Petitioners seek to represent a class of similarly situated individuals in the Camp who are at heightened risk, based on their ages and/or medical conditions, to a severe case of the virus or death, and that release from confinement under 28 U.S.C. § 2241 is the only remedy to the Eighth Amendment violation caused by Defendants' deliberate indifference to the

spread of COVID-19 in the Camp.[3] They further allege that the arbitrary decision to release to home confinement only those inmates who served at least fifty percent of their sentences, or have eighteen months or less remaining on their sentences and have served more than 25% of their sentences, constitutes deliberate indifference to their health, and relies on an unreasonable statutory interpretation of the CARES Act. In addition, Petitioners seek declaratory judgment that their Eighth Amendment right to be free of cruel and unusual punishment was violated by their conditions of confinement,[4] and they seek appointment of a special master[5] to determine the number of inmates the Camp can accommodate with social distancing in place to protect against the spread of the virus. Finally, they seek to enlarge their custody to home confinement pending final resolution of their claims.

## II.    THE ANSWER

Respondent, in its Answer, challenges subject matter jurisdiction under 28 U.S.C. § 2241, and alternatively argues that Petitioners' claims fail on the merits. Respondent presented a counterstatement of facts rather than admitting or denying each allegation in the petition, (Answer, Dkt. No. 7) and submitted a number of BOP documents that demonstrate the actions taken by the BOP to prevent spread of COVID-19 in BOP facilities.

---

[3] The petition is similar to a case filed in the United States District Court for the Central District of California, Torres v. Milusnic, 472 F. Supp. 3d 713 (C.D. Cal. 2020). Another court within the Central District of California declined to follow the ruling in Torres that habeas jurisdiction was appropriate. Bruno v. Warden, No. CV 20-6390 JFW, 2021 WL 2323941, at *5 (C.D. Cal. May 14, 2021), report and recommendation adopted, No. CV 20-6390 JFW (PVC), 2021 WL 2313657 (C.D. Cal. June 7, 2021).

[4] See 28 U.S.C. § 2201.

[5] Petitioners invoke 28 U.S.C. § 1331 for jurisdiction.

summarized here. In their reply brief, Petitioners do not contest the existence of these

policies, but allege inadequacies and violation of the policies. (Reply Brief, Dkt. No. 16.)

The BOP action plan to reduce transmission of COVID-19 in BOP facilities provides:

> Phase 1: In January 2020, the Bureau established a task force to begin strategic planning for COVID-19, and to build on the Bureau's already existing procedures for pandemics.

> Phase 2: On March 13, 2020, the agency issued directives suspending social and legal visits, curtailing movement, cancelling staff travel and training, limiting access for contractors and volunteers, and established enhanced screening for staff and inmates for locations with sustained community transmission and at all medical centers.

> All facilities were placed on modified operations to maximize social distancing in our facilities, as much as practicable. This modification includes staggered meal times and staggered recreation times, for example, in order to limit congregate gatherings.

> Additionally, the Bureau established quarantine and isolation procedures to mitigate the spread of COVID-19.

> Phase 3: On March 18, 2020, the Bureau implemented an action plan for Bureau locations that perform administrative services, which followed DOJ, OMB and OPM guidance for maximizing telework. Additionally, as part of the Pandemic Influenza contingency plan, all cleaning, sanitation, and medical supplies have been inventoried. Ample supplies are on hand and ready to be distributed or moved to any facility as deemed necessary. As we continue to respond, the Bureau has placed additional orders for these supplies, in case of a protracted event.[6]

> Phase 4: On March 26, 2020, the BOP implemented revised preventative measures for all institutions. The agency updated its quarantine and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and

---

[6] Available at
https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_COVID19_update.pdf (last visited Aug. 26, 2021).

temperature check. This includes all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival. Asymptomatic inmates are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.[7]

Between Phases 3 and 4 of the BOP Action Plan, the CDC, on March 23, 2020, issued "Interim Guidance on Management of Coronavirus Disease 2019 in Correctional and Detention Facilities … based on what is currently known about the transmission and severity of coronavirus disease 2019 (COVID-19) as of March 23, 2020." (Declaration of Adam Sassaman ("Sassaman Decl.") Attachment 2, Dkt. No. 8-3 at 68-94.) This guidance includes "detailed recommendations on the following topics related to COVID-19 in correctional and detention settings:"

- Operational and communications preparations for COVID-19

- Enhanced cleaning/ disinfecting and hygiene practices

- Social distancing strategies to increase space between individuals in the facility[8]

---

[7] Background on Phases 1-4, available at
https://www.bop.gov/resources/news/20200331_COVID19_action_plan_5.jsp (last visited Aug. 26, 2021).

[8] The CDC recommended, in part:

Implement social distancing strategies to increase the physical space between incarcerated/ detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms). Strategies will need to be tailored to the individual space in the facility and the needs of the population and staff. Not all strategies will be feasible in all facilities.
. . .
Housing:

- How to limit transmission from visitors

- Infection control, including recommended personal
  protective equipment (PPE) and potential alternatives
  during PPE shortages
- Verbal screening and temperature check protocols for
  incoming incarcerated/detained individuals, staff, and
  visitors

- Medical isolation of confirmed and suspected cases and
  quarantine of contacts, including considerations for
  cohorting[9] when individual spaces are limited

- Healthcare evaluation for suspected cases, including
  testing for COVID-19

- Clinical care for confirmed and suspected cases

- Considerations for persons at higher risk of severe
  disease from COVID-19

(Sassaman Decl., Attachment 2, Dkt. No. 8-3 at 71.) The CDC continues to update this

guidance.[10] Adam Sassaman, the Safety and Occupational Health Administrator at FCI Fort

---

- If space allows, reassign bunks to provide more space between individuals, ideally 6
  feet or more in all directions. (Ensure that bunks are cleaned thoroughly if assigned
  to a new occupant.)

- Arrange bunks so that individuals sleep head to foot to increase the distance between
  them

- Rearrange scheduled movements to minimize mixing of individuals from different
  housing areas

(Sassaman Decl., Attachment 2, Dkt. No. 8-3 at 79.)

[9] "Cohorting refers to housing inmates together rather than in single cells." (Turner-Foster
Decl., Ex. 1, Dkt. No. 8-1 at 11.)

[10] Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in
Correctional and Detention Facilities, available at https://www.cdc.gov/coronavirus/2019-

Dix, assisted "in implementing the March 23, 2020 CDC Guidance on Management of COVID-19 in Correctional and Detention Facilities, as well as the updated guidance disseminated to BOP by the Centers for Disease Control and Prevention…." (Id. ¶ 5, Dkt. No. 8-3.) On April 3, 2020, FCI Fort Dix management approved and disseminated updated COVID-19 cleaning and disinfection procedures drafted by Sassaman, instructed staff to train inmate orderlies on implementation and incorporated these procedures into the housekeeping plan. (Sassaman Decl. ¶¶ 21, 22 and Attachments 4 and 5, Dkt. No. 8-3 at 101-113.)[11]

Phase 5 of the BOP Action Plan, effective April 1, 2020, provides:

> In response to a growing number of quarantine and isolation cases in our facilities, the BOP will take the following actions immediately to further mitigate the exposure and spread of COVID-19.
>
> - For a 14-day period, inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus. This modification to our action plan is based on health concerns, not disruptive inmate behavior.
>
> - During this time, to the extent practicable, inmates should still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.
>
> - In addition, the Bureau is coordinating with the United States Marshals Service (USMS) to significantly decrease incoming movement during this time.
>
> - After 14 days, this decision will be reevaluated and a decision made as to whether or not to return to modified operations.

ncov/community/correction-detention/guidance-correctional-detention.html (last visited Aug. 27, 2021).

[11] Page citations to docketed filings refer to the page assigned by the Court's electronic case management filing system, CM/ECF.

- Limited group gathering will be afforded to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access.[12] On June 19, 2020, the BOP issued Version 2.1 of "COVID-19 Guidance For Inmates Who Are Transferring or Releasing From a BOP Facility"

(Reiser Decl., Ex. 1, Dkt. No. 8-2 at 14-18.)

A brief summary of the detailed quarantine guidance provides:

Whenever possible, specific inmates who will be transferring or releasing from BOP custody need to be identified at least 21 days prior to their movement date.

- An inmate who is currently in or meets the criteria for COVID-19 medical isolation should not be transferred or released from BOP custody unless absolutely necessary (e.g. immediate release).

- Personal Protective Equipment (PPE) appropriate for each setting should be worn by staff in accordance with established procedures for isolation, quarantine, testing, and transport.

- Direct travel to the receiving facility or location without mixing with other inmate populations should be accomplished whenever possible.

A roster of inmates who are in quarantine that includes cell assignment, date of placement in quarantine and projected end date of quarantine, date of placement in that specific cell along with cellmate or members of a cohort, and designated facility may be helpful in managing this type of quarantine.

All inmates who are transferring to another location/correctional jurisdiction or are releasing from BOP custody will be managed in one of the following three categories: 1) quarantine with symptom screens, temperature

---

[12] Available at https://www.bop.gov/resources/news/20200331_COVID19_action_plan_5.jsp (last visited).

> checks, and a test in / test out strategy for inmates who have
> not previously tested positive for COVID-19, 2) testing of
> previously COVID-19 positive inmate cases who have since
> recovered and have been released from isolation, 3) Immediate
> releases. Consultation with the Regional Medical Director,
> Regional Health Services Administrator, and Regional
> Infection Prevention Consultant is recommended for
> management of inmates who are not in one of these three
> categories.

(Reiser Decl., Ex. 1, Dkt. No. 8-2 at 14-18.)

Phases 6 through 8 extended Phase 5 of the BOP Action Plan to include enhanced

modified operations until July 31, 2020.[13] Phase Nine of the BOP Action plan, instituted on

August 5, 2020, provided guidance in access to counsel/legal materials, programming,

compliance reviews,  court trips and intakes.[14]

---

[13] Phase Six available at
https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEw
jN4dWC2b_yAhWDF1kFHbgcDXAQFnoECAMQAQ&url=https%3A%2F%2Fwww.bop
.gov%2Fresources%2Fnews%2Fpdfs%2F20200414_press_release_action_plan_6.pdf&usg=
AOvVaw1EC5Ktih9D9KOImL02ik71 (last visited Aug. 26, 2021).

Phase Seven available at
https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=
8&ved=2ahUKEwjIioKt2b_yAhUUGFkFHVCCBn4QFnoECAkQAw&url=https%3A%2F
%2Fwww.bop.gov%2Fresources%2Fnews%2F20200520_COVID-
19_phase_seven.jsp&usg=AOvVaw3yRKruzfeaocuB8KDwUmah (last visited Aug. 26,
2021).

Phase 8 available at
https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=
8&ved=2ahUKEwjg-
dbE2b_yAhUUUzUKHalfDfkQFnoECAQQAQ&url=https%3A%2F%2Fwww.bop.gov%2
Ffoia%2Fdocs%2F%2FCOVIDPhase8June30.pdf&usg=AOvVaw34rFceciguVGe2yVzgsfN
W (last visited Aug. 26, 2021).

[14]  Phase 9 available at https://www.bop.gov/foia/docs/COVIDphase9_08052020.pdf.
(last visited Aug. 26, 2021).

On August 7, 2020, the BOP issued version 2.0 of the "BOP Quarantine Guidance: New Admits, Contacts Of COVID-19, and Pending Release." Primary features of the guidance include:

The following inmates should be placed in quarantine:

- Close contacts of a suspected or confirmed case of COVID-19 – Exposure quarantine

- New admissions to a BOP facility – Intake quarantine

- Inmates returning from the community to a BOP facility (e.g. an extended time in an emergency department or crowded waiting area, residing overnight in the community or alternative setting including hospitalization, furlough, writ return, etc.…)

Intake quarantine

- Inmates being released back into the community (residential reentry center, home confinement, or full-term release), prior to their release

Release/transfer quarantine

- Inmates being transferred to another BOP facility or correctional jurisdiction

Exception to quarantine requirements:

- Inmates previously diagnosed with COVID-19 do not need to be quarantined within 90 days of their initial symptom onset (symptomatic cases) or initial COVID-19 positive test (asymptomatic cases) if they have met the current CDC release from isolation criteria.

DURATION OF QUARANTINE is 14 days.

Each type of quarantine utilizes a test in/test out strategy.

RECOMMENDED PPE FOR STAFF interacting with asymptomatic inmates in quarantine:

- FACE COVERINGS or MASKS FOR INMATES:

11

- inmates in Exposure Quarantine should be screened at least once daily for COVID-19 symptoms and signs to include a temperature reading. Twice daily screening is preferred when feasible.

- MEALS: Meals should be provided to quarantined individuals in their quarantine spaces.

- RESTRICTIONS ON MOVEMENT: To the extent possible, quarantined inmates should be restricted from being transferred, having visits, or mixing with the general population.

(Turner-Foster Decl., Ex. 1, Dkt. No. 8-1 at 10-18.)

The BOP provided PPE guidance:

- Staff assigned to work in a quarantine or isolated area will obtain their PPE from the Lieutenant's office. Staff will don and doff their PPE at the entrance of their assigned post.

- The appropriate PPE for staff working in an isolation area includes an N-95 mask, face shield/goggles, a gown and gloves.

- The appropriate PPE for staff working in quarantine areas is a surgical mask, face shield/goggles, a gown and gloves.

- SHU staff should don the appropriate PPE for quarantine areas when:

  - Entering the cell of an inmate on quarantine

  - When escorting an inmate on quarantine to and from showers

- Note: As staff move from one cell to the next in the SHU, the only PPE that must be doffed and replaced are your gloves. If PPE becomes soiled, then doff all PPE.

- Staff and inmates in all other areas of the institution should wear surgical masks.

12

(Id., Ex. 2, Dkt. No. 8-1 at 20.)

On January 22, 2021, the BOP provided vaccine guidance. (Id., Ex. 5, Dkt. No. 8-1 at 25-57.) The guidance created priority levels for staff and inmates to be offered the vaccine. (Id.)

III.    SUPPLEMENTAL BRIEFING

A.    Petitioners' Emergency Supplemental Petition

Petitioners filed an emergency supplemental petition in April 2021, because inmates were suddenly crowded into the A-wing of the Camp. (Petrs' Emergency Suppl. Pet., Dkt. No. 22.) Petitioners assert there was no reason to crowd 153 inmates into one wing, sharing only six showers. They allege that less than 50% of staff had been vaccinated and less than 30% of inmates had received both doses of the vaccine. Petitioners renewed their request for the Court to order the BOP to release all those in the Camp who are eligible for release to home confinement under the CARES Act, absent the time-served requirement imposed by the BOP in contradiction to the Attorney General's guidance.

B.    Respondent's Response to Petitioners' Emergency Supplemental Petition

In response to Petitioners' emergency supplemental petition, Respondent describes the latest conditions in the Camp, including the reason for movement of inmates into the A-wing on April 28, 2021. The BOP policy that resulted in the movement of inmates on April 28, 2021, "Module 6 Inmate Movement" was implemented on November 3, 2020. (Respt's Suppl. Brief, Dkt. No. 24; Supplemental Declaration of James Reiser ("Suppl. Reiser Decl.") ¶ 6, Dkt. No. 24-1; Ex. 1, Dkt. No. 24-2 at 2-12.) Pursuant to Module 6, on April 28, 2021, the B-wing was designated "as a quarantine cohort used for minimum-security voluntary-surrender inmates and transfer quarantine and inmates transferring into the

13

institution." (Id. ¶¶ 13-16.) The arriving inmates, who tested negative and were asymptomatic, would enter this quarantine and would eventually test out. (Id. ¶ 9(b)). On May 19, 2021, the B-wing cohort concluded, and it was expected that the Camp would soon revert back to approximately 45% capacity in each wing. (Id. ¶¶ 13-16.)  At that time, there were no infections in the A-wing, and the vaccine had been offered to all eligible inmates and staff. (Id. ¶¶ 17-21.) In April 2021, legal and social visits and outdoor recreation resumed, with restrictions including physical distancing, sanitation, COVID-19 screening and mask requirements. (Suppl. Reiser Decl. ¶¶ 28-34, Dkt. No. 24-1; Exs. 8 and 9, Dkt. No. 24-2 at 27-33.) As of May 2021, of the four petitioners, ███████████████

███████ (Id. ¶¶ 23-26.)

        Respondent argues that the vaccine obviates the need for home confinement. (Respt's Suppl. Brief, Dkt. No. 24 at 11.) Furthermore, Respondent contends this Court lacks jurisdiction to consider Petitioners' CARES Act claims, which Respondent asserts falls under the Administrative Procedures Act ("APA"), where judicial review is unavailable for decisions committed to agency discretion under 5 U.S.C. § 701(a)(2). (Id. at 12-13.)

IV.    FINDINGS OF FACT

        As noted, Respondent, rather than admit or deny each allegation in the petition, presented a statement of counterfacts, identifying certain allegations that are in dispute. Petitioners also identified disputed facts in their reply brief. "In reviewing a factual attack [on jurisdiction], the court may consider evidence outside the pleadings." Gould Elecs. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000), holding modified by Simon v. United States, 341 F.3d 193 (3d Cir. 2003) (citation omitted). The plaintiff must be permitted to respond with evidence supporting jurisdiction. Id. at 177 (citing International Ass'n of

Machinists & Aerospace Workers v. Northwest Airlines, Inc., 673 F.2d at 712). "The court may then determine jurisdiction by weighing the evidence presented by the parties." Id. If the Court must determine disputed material facts to determine jurisdiction, a trial is required. Id.

The Court makes the following finding of facts that are material to the jurisdictional question of whether the circumstances in the FCI Fort Dix Camp violated the Eighth Amendment and are so extraordinary that the Court should extend habeas jurisdiction over a conditions of confinement claim. The Court also identifies those facts disputed by the parties that are not material to the determination of jurisdiction, because even if Petitioners' allegations are accepted as true, the Court would not find extraordinary circumstances that require habeas jurisdiction.

A.    Facilities in the FCI Fort Dix Minimum Security Camp

Petitioners' claims are based on the undisputed fact that while housed in the Fort Dix minimum security camp ("the Camp"), they are unable to maintain six feet social distance, as recommended by the CDC as a best practice to avoid transmission of COVID-19. (Pet., Dkt. No. 1 at 7.) The Camp has two open-air dormitories, A-wing and B-wing, each holding approximately 100 bunks, positioned two deep, for a capacity of approximately 200 inmates, typically sleeping head to head. (Id. at 7-8; Declaration of Nicolleta Turner- Foster, M.D.[15] ("Turner-Foster Decl.") ¶ 3, Dkt. No. 8-1; Declaration of James Reiser[16] ("Reiser Decl.") ¶ 5, Dkt. No. 8-2.) Both dormitory-style wings of the Camp

---

[15] Dr. Turner-Foster is the Clinical Director at FCI Fort Dix. (Turner-Foster Decl., ¶ 1.)

[16] James Reiser is a Case Management Coordinator at FCI Fort Dix, whose office provides coordination and oversight of many programs with FCI Fort Dix. (Reiser Decl., ¶¶ 1, 2.)

have communal bathrooms with six urinals, ten toilets, sixteen sinks, and eight showers, directly adjacent to the next. (Pet., Dkt. No. 1 at 7.) Many of these were not functioning during the lockdown, and were only repaired after Petitioners filed this action. (Id.; see also Reply Brief, Dkt. No. 16 at 5-8.) The common areas of the Camp include a recreation area, two TV/computer rooms, a chapel, two laundry rooms, and the cafeteria/kitchen. (Pet., Dkt. No. 1 at 7.) The administrative area of the building has six offices and there is a small two-room medical office. (Id. at 8.) Contractor access at FCI Fort Dix was restricted during the lockdown to those performing essential services or performing necessary maintenance on essential services. (Reiser Decl., ¶ 3e, Dkt. No. 8-2.)

B.    The First COVID-19 Outbreak at FCI Fort Dix and the BOP's  Response

Petitioners describe the first wave of COVID-19 in the Camp as the period from March 13, 2020 through September 27, 2020. (Pet., Dkt. No. 1 at 8.) During this wave, 58 Camp inmates tested positive, and they all recovered. (Id.; Turner-Foster Decl., ¶ 5, Dkt. No. 8-1.) Specifically, fourteen inmates tested positive in the B-wing on April 29, and nine inmates tested positive in the A-wing on May 5, 2020. (Pet., Dkt. No. 1 at 10-11.) This was the only mass testing done at the Camp during the first wave. (Id. at 11.)

Petitioners complain that the following conditions during the first wave of COVID-19 in the Camp put them at risk. "Town Hall" meetings concerning the virus were held indoors with 115 inmates and 20 staff in one room. (Id. at 8.) An inmate who reported to sick call  with COVID-19 symptoms on a weekend was told to return to his bunk until Monday. (Pet., Dkt. No. 1 at 9.)  Between April 6, 2020 and January 2021, Camp inmates received only four disposable masks and 5 cloth masks. (Id.) Inmates were not permitted outside until May 19, 2020, although poorly ventilated indoor spaces were known to spread

the virus. (Id. at 11.) In March and April 2020, inmates in the Camp did not have enough

soap, although this is disputed by Respondent. (Id. at 9-11.) COVID-19 positive inmates

who were quarantined were subject to a "revolving door" where each newly admitted

COVID-19 positive inmate reset the time for all in quarantine, including those who should

already have been released.  (Id. at 10.)  On May 25, 2020, senior staff and correctional

officers stopped wearing PPE and wore only masks, and temperature checks of inmates

were performed only on alternating days. (Id. at 11.) Only four tests were performed on the

population of almost 3,000 inmates at FCI Fort Dix between May 5 and September 28,

2020. (Id. at 12.)

  Respondent describes the actions taken by the BOP to stop the spread of COVID-19

during the timeframe Petitioners have labeled the first wave. See supra Section II.A.

Inmates are quarantined when: (1) symptoms warrant; (2) an inmate newly arrives to FCI

Fort Dix; (3) an inmate is to be released from FCI Fort Dix to the community; or (4) an

inmate is transferring to or from another institution. (Sassaman Decl. ¶ 33, Dkt. No. 8-3.)

Inmates from the quarantine unit are not ordinarily permitted to leave the unit and have

their food delivered to them, and to the extent practicable, staff members also limit going

between the quarantine unit and the general population in order to avoid possible

contamination; furthermore, staff entering the quarantine or isolation units must wear PPE.

(Turner-Foster Decl. ¶ 9, Dkt. No. 8-1; Ex. 2, Dkt. No. 8-1 at 19-20.) This includes an N-95

mask, face shield/goggles, a gown and gloves. (Id.) The Health Services Division began

screening staff for COVID-19 symptoms as of March 16, 2020. (Sassaman Decl. ¶ 11, Dkt.

No. 8-3.)

New cleaning protocols and social distancing measures were put in place and updated between March 13, 2020 through May 19, 2020. According to Respondent, FCI Fort Dix has always maintained an adequate stock of sanitation supplies. (Id. ¶¶ 31, 32.) None of the petitioners lodged any grievance regarding a lack of soap or cleaning supplies at the Camp. (Dobovich Decl. ¶¶ 5-6, Dkt. No. 8.)  When quarantine of the Camp ended on May 19, 2020, a contractor was brought in to commercially disinfect and sanitize the Camp, including inmate sleeping areas, bathrooms, Food Service areas, and all other common areas. (Sassaman Decl. ¶ 29, Dkt. No. 8-3.) At this point, FCI Fort Dix was subject to Phase 7 of the BOP Action Plan.[17]

C.      The Second COVID-19 Outbreak at FCI Fort Dix and the BOP's Response

After the BOP transferred inmates from FCI Elkton who had been exposed to COVID-19, there was a second wave of COVID-19 in the low security compound at FCI Fort Dix from September 28, 2020 through October 29, 2020. (Pet. Dkt. No. 1 at 12-14.) No Camp inmates were infected. (Id.) Four buses carrying a total of 298 inmates, 17 of whom were positive for the virus, arrived at Fort Dix. (Id. at 13.) After disembarking, the infected inmates were put in isolation in Unit 5703; those who tested negative were placed on a quarantine floor in the same building. (Id.) Every bus was treated identically. (Id.) Within a few weeks of the arrival of the Elkton inmates, 345 Fort Dix inmates in the low security compound tested positive for COVID-19. (Id. at 12.) Of those infected, after all 231 inmates in Unit 5812 were tested in October 2020, 218 inmates were positive for COVID-19. (Pet. Dkt. No. 1 at 13.) Two orderlies who worked in Receiving and Discharge, where all the

_____

[17] Phase Seven available at https://www.bop.gov/resources/news/20200520_COVID-19_phase_seven.jsp (last visited Aug. 26, 2021).

arriving men from Elkton were processed, lived in Unit 5812. (Id. at 14.) After 94% of the inmates of that single unit tested positive, the BOP did not test the entire facility. (Id.)

Warden Ortiz instituted additional safeguards in October 2020. (Reiser Decl. ¶ 12, Dkt. No. 8-2.) He cancelled all visiting and limited general population inmate movement to obtaining grab and go meals, attending scheduled medical appointments, attending GED classes and attending scheduled outdoor recreation. (Id. ¶¶ 12-15, Dkt. No. 8-2.) A minimal number of inmates were permitted to work in Food Services, Commissary and Laundry. (Id.) Inmates in quarantine or isolation did not leave their units. (Id.)

During the week of November 16, 2020, FCI Fort Dix commenced COVID-19 testing for asymptomatic staff, onsite and on a voluntary basis. (Turner-Foster Decl., Ex. 3, Dkt. No. 8-1 at 21-22.) Symptomatic staff were prohibited from coming to work. (Id. ¶ 22, Dkt. No. 8-1.) Warden Ortiz obtained a movement moratorium for BOP inmate transfers from October 23 through November 23, 2020, and additional moratoriums between December 2020 and February 17, 2021. (Reiser Decl. ¶¶ 13, 14, Dkt. No. 8-2.)

D.    The Third COVID-19 outbreak at FCI Fort Dix and the BOP's response

A third outbreak of COVID-19 occurred in the Camp beginning in December 2020. (Pet., Dkt. No. 1 at 14-17.) Petitioners theorize that the third wave must have been caused either by transfer of sick inmates or failures of staff to follow PPE requirements, exacerbated by the failure to rapidly test and quarantine everyone exposed, particularly over the winter holidays. (Id. at 14-18.) Petitioners also blame the BOP for failing to expand the use of home confinement under the CARES Act prior to the third wave. (Id. at 18.) Instead, BOP released only 98 out of 2800 men at Fort Dix in ten months. (Pet., Dkt. No. 1 at 18.) BOP prioritized for release inmates who had served longer portions of their sentence, and denied

release to otherwise eligible inmates who had served shorter percentages of their sentences, even after there was no longer any need for prioritization because all inmates had been reviewed for release. (Id.)

During the third wave of the COVID-19 outbreak, the Camp population on December 22, 2020, was 131 inmates, 73 in A-wing and 58 in B-wing. (Reiser Decl. ¶ 5, Dkt. No. 8-2.) Petitioners allege that one of the kitchen workers became ill on December 22, 2020. (Pet., Dkt. No. 1 at 15.) On December 23, 2020, the correctional officer in charge of the kitchen, who was known by inmates not to wear PPE, called out sick. (Id.) He tested positive for COVID-19. (Id.) During this outbreak, one inmate used TRU LINCS, the internal email system, to send Associate Warden Smith an email about his concern over a sick inmate in his dorm. (Id.) Another inmate reported to sick call with symptoms and was told to come back the next day. (Id.) Due to staff shortages, the correctional officers had to work 12-hour shifts. (Id.) Outdoor recreation was cancelled. (Id. at 16.)  All men from the A-wing were tested for COVID-19 on December 28, 2020. (Id. at 16-17.) Staff did not share the test results immediately or move the sick men to quarantine; they waited until after the holiday weekend. (Id.) On Monday, January 4, 2021, 31 of the 66 men in the A-wing were informed that they were infected. (Id.) They were moved that morning. (Id.)

Petitioners allege that none of the B-wing inmates were checked for fevers, although the same two sick men had prepared their food, and there had been commingling between the wings leading up to the A-wing lockdown. (Id.) On January 5, 2021, six inmates from B-wing who were slated to be moved were rapid tested and confirmed positive. (Id.) The next day, the remainder of B-wing was rapid tested and Petitioners were unaware of the results at the time of filing the petition. (Pet., Dkt. No. 1 at 17.)

Respondent describes the "third wave" from the BOP perspective. On or about December 24, 2020, three inmates from the Camp's A-wing complained of COVID-19 symptoms. (Turner-Foster Decl. ¶ 6, Dkt. No. 8-1.) Because they were symptomatic, the inmates were rapid tested using the Abbott machine. (Id.) Their rapid tests were positive, and the inmates were moved to isolation cells in the medical building of the low security compound for isolation. (Id.) Based on the discovery of positive inmates in A-wing, on December 24, 2020, the remainder of A-wing inmates were placed on exposure quarantine. (Id. ¶ 7.) All exposure quarantine inmates are tested for COVID-19 using send-out laboratory tests [which accounts for the delay in test results and inmate transfers]. (Id. ¶ 10.) Before the housing unit is released from exposure status, all inmates are tested again. (Id.) As a result of the exposure quarantine testing, a total of thirty-two additional inmates from the Camp's A-wing tested positive. (Id.) ██████████████████████████ ██████████████████████████ (Id. and Declaration of John Stinson[18] ("Stinson Decl.") Ex. B, Dkt. No. 4-2.)

The positive inmates were all placed in isolation, while the negative inmates remained in an exposure quarantine. (Id. ¶ 11.) Based on the positive cases in the A-wing, Dr. Turner Foster advised the administration to lock the doors between the A-wing and B-wing. (Id.) On or about January 5, 2021, two inmates from the Camp's B-wing reported COVID-19 symptoms. (Id. ¶ 12.) They were rapid tested and confirmed positive. (Id.) Similar to the A-wing, the inmates who tested negative were placed in exposure quarantine and were tested using send-out laboratory tests. (Turner-Foster Decl. ¶ 12, Dkt. No. 8-1.) As a result of the laboratory tests, an additional 25 B-wing inmates tested positive. (Id.) Thus,

---

[18] Petitioners' medical records were filed under seal. (Stinson Decl., Dkt. No. 4.)

the Camp saw a total of 62 positive inmates in December 2020 and January 2021. (Id. ¶ 13.) Based on this number of infections, and the need for inmates who were not sick to remain in exposure quarantine, the BOP designated the B-wing as an isolation unit for positive inmates, and the A-wing became the exposure quarantine for negative inmates. (Id. ¶ 13, Dkt. No. 8-1.) Using medical safety protocols, BOP implemented this reorganization. (Id.)

According to Dr. Turner-Foster but disputed by Petitioners, all inmates in isolation quarantine have their vitals assessed daily, and inmates in exposure quarantine are screened for COVID-19 symptoms and have their temperature taken daily. (Id. ¶ 14.) If an inmate required additional medical care or treatment, it would be addressed at that time. (Id.) Petitioners contest that these policies were enforced during the third wave of COVID at FCI Fort Dix. (Reply Brief, Dkt. No. 16 at 3, 4, 7,  10-12.)

On or about January 15, 2021, sixty-one inmates from the Camp were deemed recovered from COVID-19, in accordance with the CDC guidelines. (Id. ¶ 15.) The recovered inmates remained separated from the A-wing. (Id.) Staff were required to wear a mask that covers their mouths and noses. (Id.) On January 22, 2021, a Camp inmate who had transferred to an outside hospital earlier in the month passed away. (Id. ¶ 16.) This was the first COVID-19 related-death from FCI Fort Dix. (Id.) On January 29, 2021, all A-wing quarantined inmates' test results were negative, and the A-wing was removed from exposure quarantine. (Id.  ¶ 17.) The B-wing was slated to return to normal operation on February 5, 2021, after a full isolation and recovery period. (Id.) The A-wing and B-wings were still instructed to remain separated. (Id.) As of February 2, 2021, FCI Fort Dix had a total of 175 COVID-19 positive inmates, all in the low security facility. (Turner-Foster Decl. ¶ 18, Dkt.

No. 8-1.) A COVID-19 positive inmate is defined as an inmate who has tested positive and has not yet recovered. (Id.)

Dr. Turner Foster described a testing policy to test every inmate in quarantine, whether in intake quarantine, release quarantine, or exposure quarantine. (Id. ¶ 19, Dkt. No. 8-1.) As of February 2, 2021 [the date of Dr. Turner-Foster's declaration], every general population inmate housed in the following housing units had been tested under exposure quarantine [after a symptomatic inmate was confirmed positive]:  Units 5802, 5812, 5841, and 5852 (West Compound); Units 5702, 5703, 5711, 5751, 5741, and 5752; and the Camp. (Id. ¶ 20.) The only general population unit where every inmate had not been tested was Unit 5811, because no inmates assigned to that unit met the testing categories (i.e., symptomatic, transfers, etc.) (Id.) In all quarantine units, the inmates are medically monitored daily and tested for COVID-19. (Id.)

As of February 2, 2021, 107 staff members had contracted COVID-19 and 104 had recovered. (Id. ¶ 21.)  FCI Fort Dix received the first Pfizer COVID-19 vaccines on January 19, 2021. (Id. ¶ 23.) In accordance with the BOP Clinical Practice Guideline, staff were vaccinated on January 19 and 20, 2021. (Id.; Ex. 5, Dkt. No. 8-1 at 25-57.) Prior to that a number of staff, including all those in the medical department, received their first vaccination through outside sources. (Id. ¶ 24.) After staff received the vaccine, FCI Fort Dix had 182 remaining vaccines. (Id. ¶ 25.) Inmates that met CDC priority level one (inmate healthcare workers) and CDC priority level two inmates in Units 5811 and 5802 were offered the vaccine. (Id.) Two Camp inmates were vaccinated with remaining vaccines. (Turner-Foster Decl. ¶ 26, Dkt. No. 8-1.) ███████████████████

████████████████████████████ (Id.)

In response to Petitioners allegations that transferred inmates were recklessly introduced into the COVID-19 outbreak in the Camp between December 29, 2020, and January 5, 2021, Respondent submits that seven inmates were transferred to the Camp in accordance with quarantine guidance. (Reiser Decl. ¶ 7, Dkt. No. 8-2.) At that time, there were no COVID cases in the B-wing, and four inmates who transferred in between December 29, 2020, and January 2, 2021, had been quarantined prior to transfer. (Id.) However, the Court notes the B-wing inmates had not been tested until several inmates were symptomatic on January 5, 2021, in accordance with the policy. (Turner-Foster Decl. ¶ 12, Dkt. No. 8-1.) On January 5, 2021, the A-wing became a quarantine unit for inmates who had been exposed but tested negative, and this allowed for the transfer of two new incoming inmates and one inmate released from the SHU. (Reiser Decl. ¶ 8, Dkt. No. 8-2.) These inmates tested into exposure quarantine with a negative test and out of quarantine with a negative test, as do all inmates under the COVID quarantine guidance procedure. (Id.)

     E.    <u>Post-Petition Changes at FCI Fort Dix</u>

Petitioners filed a reply brief, received on March 18, 2021. (Reply Brief, Dkt. No. 16.) They assert that this case is not just about the conditions in FCI Fort Dix, it is about the BOP's misinterpretation and misapplication of the CARES Act. (Id. at 2.) Petitioners, however, reallege that the conditions are so extreme as to violate the Eighth Amendment and that the following occurred after submission of their petition. (Id.)

As to the third wave of COVID-19 at FCI Fort Dix, Petitioners allege, based on what appears to be a fax transmission, that Dr. Turner-Foster received the COVID-19 test results for the A-wing from Quest Diagnostics on December 31, 2020, but it wasn't until January 4,

2021, that the sick inmates were removed to Unit 5851. (Reply Brief, Dkt 16 at 3 and Ex. 1, Dkt No. 17 at 2-3.) Further, according to Petitioners, the sick men were allowed to speak to quarantined men who were awaiting transfer to the Camp. (Id. at 3.) After the first week in isolation, only the men with severe symptoms continued to receive twice daily medical checks. (Id.) B-wing test results were returned on January 11, 2021, and 23 inmates were positive. (Id. at 4.) Thus, the B-wing became the recovery quarantine and the A-wing became exposure quarantine. (Id.) The sick inmates remained in B-wing, together with those transferred back from Unit 5851. (Id.) An error was soon discovered that five positive inmates had been transferred to the A-wing, where they spent 24 hours before transfer back to the B-wing. (Id.)

On January 20, 2021, the number of sick inmates at FCI Fort Dix was 797. (Id.) When the corrections officer who had previously worked in the kitchen returned from sick leave on January 20, 2021, he continued not to wear a mask. (Id.) Also on that day, four inmates were vaccinated. (Id.) ███████████████████████████████ ████████████████████████████████████████. (Id.) On January 23, 2021, a series of inspections began in the Camp, and the broken faucets were replaced for the first time in a year, and new washing machines were delivered. (Id. at 5.)

On February 1, 2021, 175 of 192 inmates in Unit 5703 in the low security facility tested positive. (Id. at 6.) Also in February 2021, the Camp barbershop opened and A-wing inmates cut hair for all Camp inmates. (Id.) More hand sanitizers were installed and superficial maintenance measures, like covering mold, were taken before the new warden did an inspection on February 12, 2021. (Reply Brief, Dkt. No. 16 at 7.) Unit 5851, where fifteen men had lived for one month, had only one shower, one telephone, one sink and one

toilet. (Id.) On February 25, 2021, the number of COVID-19 positive inmates increased to

197. (Id.) On February 27, 2021, the Camp lockdown ended. (Id.)

On March 4, 2021, at a town hall meeting, inmates were strongly encouraged to take

the vaccine. (Id. at 9.) Petitioners allege that only one third of the staff had been vaccinated.

(Id.) Respondent explained that those numbers did not include staff who were vaccinated

offsite, but Respondent did not indicate how many more were vaccinated. (Suppl. Reiser

Decl. ¶ 18, Dkt. No. 24-1.) Petitioners also complained of the lack of medical care for Camp

inmates, alleging that Dr. Turner-Foster visited the Camp barely once a month, chronic care

protocols were delayed by more than a year, and basic care was "a fantasy." (Id. at 18.)  In

response to the original petition, Dr. Turner-Foster stated:

> [a] Registered Nurse runs sick call sign-up at the Camp
> Monday through Friday. The Nurse triages the complaints, and
> any priority cases are discussed with the Nurse Practitioner or
> me, as the assigned Camp physician. All other routine sick call
> appointments are scheduled for a later date. This procedure is
> separate from daily checks required of inmates on exposure
> quarantine and isolation….

(Turner-Foster Decl. ¶ 4, Dkt. No. 8-1.)

F.     The Petitioners' Characteristics

1.     *Goodchild*

Based on the submissions of the parties, and taking judicial notice[19] of the dockets in

Petitioners' sentencing courts, the Court makes the following findings of fact concerning

---

[19] Federal Rule of Evidence 201(b)(2) provides "[t]he court may judicially notice a fact that
is not subject to reasonable dispute because it: … can be accurately and readily determined
from sources whose accuracy cannot reasonably be questioned." See e.g. S. Cross Overseas
Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd., 181 F.3d 410, 426 (3d Cir. 1999) ("we
may take judicial notice of another court's opinion—not for the truth of the facts recited
therein, but for the existence of the opinion, which is not subject to reasonable dispute over
its authenticity.")

Petitioners' characteristics, relevant to their claims for relief. Goodchild, at the time of filing the petition, was a 58-year-old ██████████████████████████ (Pet, Dkt. No. 1 at 2; Stinson Decl., Ex. A, Dkt. No. 4-1.) He is serving a 102-month sentence for a non-violent crime, a 2019 conviction on forty-eight counts of wire fraud, ten counts of money laundering, a count of aggravated identity theft, and six counts of tax fraud. (Id. at 2; Declaration of Corrie Dobovich ("Dobovich Decl."), Ex. 1, Dkt. No. 8 at 8-9); United States v. Goodchild, 17-cr-00549-GAM (E.D. Pa. Oct. 21, 2019)  (ECF No. 94).[20] ██████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████ The parties dispute whether Goodchild received daily medical screenings and temperature checks while in exposure quarantine between December 24, 2020, and January 26, 2021. (Turner-Foster Decl. ¶ 14; Reply Brief, Dkt. No. 16 at 10; Ex. 3, Dkt. No. 17 at 9-13.)

Respondent submits that since Goodchild arrived in BOP custody, he has not pursued any administrative remedies, nor has he submitted any requests for compassionate release to the BOP. (Dobovich Decl. ¶ 5, Dkt. No. 8; Reiser Decl. ¶ 19, Dkt. No. 8-2.) Goodchild, however, submitted to the Court copies of the following: (1) a letter to Warden Ortiz dated April 17, 2020, seeking release to home confinement due to his increased health risks to infection with COVID-19, and across this letter was written "you have served 3.8% of your sentence, your release date is 3-27-2022," which Goodchild alleges was written by his case manager; (2) a typed, undated note "Please see your Case Manager regarding your

---

[20]  Available at www.pacer.gov.

eligibility for Home Confinement under the CARES Act."; (3) a letter dated April 29, 2020, from Goodchild to Warden Ortiz, seeking release under the CARES Act; (4) a letter dated May 14, 2020, from Goodchild to Warden Ortiz, seeking compassionate release under 18 U.S.C. § 3582(c)(1)(a)(i); and (5) an "Inmate Request to Staff Response" dated May 22, 2020, directing Goodchild to specify one of the circumstances for compassionate release under BOP Program Statement 5050.50 that would permit his compassionate release. (Reply Brief, Ex. 4, Dkt. No. 17 at 14-31.) Goodchild also submitted a handwritten note that says "Are you serious?" which he alleges was Case Manager Wright's response to his request for release to home confinement. (Id., Dkt. No. 17 at 15.) Goodchild did not seek a reduction in sentence under the First Step Act in his sentencing court. See United States v. Goodchild, 17-cr-00549-GAM (E.D. Pa.)[21]

> 2.   *Soto-Concepcion*

Soto-Concepcion was a 38-year-old man at the time of filing the petition, ███████

████████████████████████████████████████████████████████

██████████████ (Pet., Dkt. No. 1 at 2; Stinson Decl., Ex. B, Dkt. No. 4-2.) His imprisonment arose out of his participation in a large drug-trafficking operation. See United States v. Soto-Concepcion, 15-cr-00181-JEJ (M.D. Pa.) (Dkt. No. 1.)[22] He pled guilty and on November 17, 2017, he was sentenced to a 144-month term of imprisonment. See id. (Dkt. No. 650.) Assuming that Soto-Concepcion receives all available good time credit, his projected release date is September 5, 2025. (Dobovich Decl., Ex. 3, Dkt. No. 8 at 20.)

---

[21] Available at www.pacer.gov.

[22]  Available at www.pacer.gov.

Respondent contends Soto-Concepcion has a "Low" PATTERN score, but Petitioners submit that this calculation is wrong, his PATTERN score is "Minimum," making him eligible for home confinement under the CARES Act. (Reiser Decl. ¶ 22, Ex. 11, Dkt. No. 8-2 at 56-60; Reply Brief, Dkt. No. 16 at 10; Ex. 5, Dkt. No. 17 at 44-45.) Because Petitioners' calculation of Soto-Concepcion's PATTERN score was submitted with their reply brief, Respondent did not have an opportunity to explain why it differs from the BOP's calculation.



On December 24, 2020, he was placed in exposure quarantine after other A-wing inmates tested positive. (Turner-Foster Decl. ¶ ¶ 7, 10, Dkt. No. 8-1; Stinson Decl., Ex. B at 4-2.)

(Turner-Foster Decl. ¶ 14; Stinson Decl., Ex. B, Dkt. No. 4-2.)

Respondent maintains that Soto-Concepcion has never submitted an administrative remedy request during his time at FCI Fort Dix (Dobovich Decl. ¶ 5, Dkt. No. 8; Ex. 3, Dkt. No. 8 at 16-20), but Petitioners correctly note that James Reiser, in his declaration in support of Respondent's Answer, stated "Eliezer Soto-Concepcion … submitted a request [to Warden Ortiz and others] on or about April 13, 2020…." (Reiser Decl. ¶ 17, Dkt. No. 8-2.) This was a request for reduction in sentence pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A). (Id., Ex. 9, Dkt. No. 8-2 at 47-52.) Warden Ortiz denied the request on May 25, 2020, stating, in part:

> [m]edical staff at FCI Fort Dix advised, based upon the guidelines for the Center for Disease Control and Prevention, you are at higher risk for severe COVID-19 illness due to your medical issues. However, your medical issues are properly managed by medication and your overall medical condition is stable. Furthermore, you do not have a terminal illness and you are both, fully ambulatory and capable of carrying out your institutional daily life activities without assistance.

(Reiser Decl., Ex. 9, Dkt. No. 8-2 at 52.) On January 4, 2021, Soto-Concepcion filed a motion for reduction in sentence with his sentencing court. United States v. Soto-Concepcion, 15-cr-00181-JEJ (M.D. Pa.) ( Dkt. No. 928). Petitioner was appointed counsel, and his motion remains pending as of August 26, 2021. Id. (Dkt. No. 961.)

       3.    *Abreu-Feliz*

Abreu-Feliz alleges that, at the time of filing the petition, he was a 38-year-old



(Pet., Dkt. No. 1 at 3.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Stinson Decl., Ex. C, Dkt. No. 4-3.) Abreu-Feliz is serving a ten-year sentence for trafficking heroin and methamphetamine. (Dobovich Decl., Ex. 2, Dkt. No. 8 at 11-15.) Assuming he receives all good conduct time, he is scheduled for release on September 30, 2023. (Id.) He has served more than 58% of his sentence and has a "Low" PATTERN score that precludes his eligibility for release to home confinement under the CARES Act. (Reiser Decl. ¶ 23, Dkt. No. 8-2 at 61-63.)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Stinson Decl., Ex. C, Dkt. No. 4-3.)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ (Turner-Foster Decl. ¶ 26; Stinson Decl., Ex. C, Dkt. No. 4-3.)

███████████████████████. (Id., see also Reply Brief, Dkt No. 16 at 4, 30-31.) ███████

███████████████████████████████████████████████

██████████████ (Suppl. Reiser Decl. ¶ 23, Dkt. No. 24-1; Ex. 4, Dkt. No. 25 at 1-3.)

Abreu-Feliz submitted a written request for compassionate release to Warden Ortiz in May 2020. (Reiser Decl. ¶ 18, Dkt. No. 8-2; Exs. 9 and 10, Dkt. No. 8-2 at 47-55.) Respondent denied this request because Abreu-Feliz failed to include a release plan. (Id.) He never resubmitted his request with a release plan. (Id.) On June 3, 2020, Abreu-Feliz filed his first motion for compassionate release/RIS with his sentencing court. United States v. Abreu-Feliz, 15-cr-00211-EGS-1 (E.D. Pa.) (Dkt. No. 226). His sentencing court denied relief. Id. (Dkt. No. 232). On January 5, 2021, Abreu-Feliz filed a second compassionate release/RIS motion with his sentencing court. Id. (Dkt. No. 234). On June 14, 2021, his sentencing court denied relief. Id., (Dkt. No. 256).

### 4.  *Winans*

Winans was a 38 year-old-man at the time the petition was filed, ██████████

███████████████████████████████████████████

███████████████████████ (Pet., Dkt. No. 1 at 3; Stinson Decl., Ex. D, Dkt No. 4-4.)  He is serving a 165-month term of imprisonment for wire fraud, imposed on February 27, 2013. (Dobovich Decl., Ex. 4, Dkt. No. 8 at 25.) Assuming he receives all good conduct time, he is scheduled for release on February 8, 2025, and has served more than 56% of his sentence. (Id.; Reply Brief, Dkt. No. 16 at 24.) Winans has a minimum PATTERN score. (Reiser Decl. ¶ 24, Dkt. No. 8-2. )

████████████████████████████████████████████

███████████████████████ (Answer, Dkt. No. 7 at 16; Stinson Decl., Ex. D,

Dkt. No. 4-4.) Winans never submitted a qualifying administrative remedy request seeking transfer to home confinement. (Reiser Decl. ¶ 19, Dkt. No. 8-2; Dobovich Decl. ¶ 6, Ex. 4, Dkt. No. 8 at 21-23.) His only attempt to seek such relief was rejected as procedurally improper, and he never corrected the error. (Dobovich Decl. ¶ 6, Dkt. No. 8.) Instead, he tried to bypass the Warden and submit his home confinement request to the Northeast Regional Office, but it was rejected as improper. (Id.) Petitioners submit that Winans filed an administrative remedy request on December 24, 2020, and never received a response. (Reply Brief, Dkt. No. 16 at 12.) Winans filed a compassionate release/RIS motion with his sentencing court on May 12, 2021. United States v. Winans, 12-cr-20598-SFC (E.D. Mich., Dkt. No. 46.) The motion was denied by Order dated July 20, 2021. Id. (Dkt. No. 55).

V.     DISCUSSION

A.     Habeas Jurisdiction Under 28 U.S.C. § 2241

Petitioners assert jurisdiction under 28 U.S.C. § 2241 for two types of claims; first, conditions of confinement in the FCI Fort Dix Camp violate the Eighth Amendment, and the only adequate remedy is release; and second, that the BOP misinterpreted the CARES Act by denying their early release to home confinement based on percentage of time-served. "The plaintiff has the burden of persuasion to convince the court it has jurisdiction." Gould, 220 F.3d at 178 (citing Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)). "A claim may be dismissed under Rule 12(b)(1) only if it 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction'" Id. (internal quotations omitted in Gould).[23]

_____

[23] In habeas cases, the Federal Rules of Civil Procedure are applicable when they do not conflict with the habeas statutes or rules. Mayle v. Felix, 545 U.S. 644, 654 (2005).

1.    *Eighth Amendment conditions of confinement claim*

a.    <u>*The parties' arguments*</u>

In support of their petition, Petitioners argue that Respondent has been deliberately indifferent to their health by confining them in a locked dormitory with other inmates infected with COVID-19, despite Respondent's ability to release them to home confinement under the CARES Act. (Pet., Dkt. No. 1 at 21-23.)  Petitioners contend that their immediate release is the only remedy for the Eighth Amendment violation because Respondent's mitigation policies have failed, and, therefore, habeas jurisdiction is appropriate. (<u>Id.</u> at 23.) Specifically, they argue

> [d]ue to the conditions at Fort Dix Camp, Petitioners are not able to take steps to protect themselves - such as social distancing, using hand sanitizer, washing their hands regularly, and disinfecting their surroundings - and the government has not provided adequate protections. Covid-19 has rapidly spread through the Camp twice so far, making the ability to protect oneself even more impossible.

(Pet., Dkt. No. 1 at 24.) Based on the alleged extreme risk from COVID-19 based on Petitioners' ages and medical conditions, they seek enlargement of custody pending determination of their claims. (<u>Id.</u> at 25.)

Respondent maintains that jurisdiction under § 2241 is appropriate only when a petitioner challenges the fact or duration of custody. (Answer, Dkt. No. 7 at 38-39.) Recognizing that the Supreme Court has left open the possibility of habeas jurisdiction over a conditions of confinement claim, and the Third Circuit has found jurisdiction over such a claim by civil immigration detainees subjected to the risk of COVID-19 infection, Respondent contends that such jurisdiction should not extend to convicted prisoners, primarily because they have other avenues for relief, such as reduction of sentence under the

33

First Step Act, and release to home confinement under the CARES Act. (Id. at 40-43.) Further, Respondent contends that habeas relief is not appropriate because injunctive relief could alter Petitioners' conditions of confinement and preclude the necessity of release to remedy the alleged (but not conceded) Eighth Amendment violation. (Id. at 44-45.)

In their reply brief, Petitioners argue that the distinction between civil immigration detainees and convicted prisoners is meaningless, and, therefore, habeas jurisdiction should extend to their conditions of confinement claims. (Reply Brief, Dkt. No. 16 at 20.) Petitioners submit they should not be required to seek individual relief through other extensive procedures during a pandemic. (Id.) They allege Respondent was deliberately indifferent to their health during the first wave of infections by overcrowding one dormitory when alternatives existed, by not performing any mass testing of inmates until three weeks after the first inmate tested positive, by holding inmates in prerelease quarantine longer than they would have been incarcerated absent the quarantine, by conducting only four COVID tests at FCI Fort Dix between May 7, 2020, and September 28, 2020, and, during the third wave of outbreak, by delaying testing over the winter holidays for half of the inmates in the Camp, and throughout the pandemic, by not releasing eligible prisoners under the CARES Act. (Reply Brief, Dkt. No. 16 at 22-24.) In their emergency supplement to the petition, Petitioners assert that Respondent was again deliberately indifferent to their health by housing all 153 Camp inmates in the A-wing on April 28, 2021, while housing very few new inmates in the B-wing. (Petrs' Emergency Suppl. Pet., Dkt. No. 22 at 1-2.)

Respondent denies deliberate indifference to Petitioners' health, noting that every inmate has been offered a vaccine at this point, and the BOP has implemented

34

comprehensive health and safety protocols to address the Covid-19 pandemic. (Respt's
Suppl. Brief, Dkt. No. 24 at 8-10.)

b.    <u>*Standard of law*</u>

The Third Circuit has not yet determined whether habeas jurisdiction under 28
U.S.C. § 2241 extends to an Eighth Amendment conditions of confinement claim by
convicted prisoners based on the threat of COVID-19 infection. Recently, the Third Circuit
held that civil immigration detainees could challenge the constitutionality of their
conditions of confinement in a habeas petition under § 2241 based on the extraordinary
circumstances of the COVID-19 pandemic. <u>Hope v. Warden York Cty. Prison</u>, 972 F.3d
310, 324 (3d Cir. 2020). The Third Circuit noted habeas jurisdiction over conditions of
confinement claims are limited to "extreme cases" or "extraordinary circumstances." <u>Id.</u>
(quoting  <u>Ali v. Gibson</u>, 572 F.2d 971, 975 n. 8 (3d Cir. 1978), <u>superseded by statute on
other grounds as recognized in</u> <u>Callwood v. Enos</u>, 230 F.3d 627, 633 (3d Cir. 2000). The
Third Circuit stated,

> as the Supreme Court has instructed: "habeas corpus is an
> extraordinary remedy whose operation is to a large extent
> uninhibited by traditional rules of finality and federalism, its
> use has been limited to cases of special urgency, leaving more
> conventional remedies for cases in which the restraints on
> liberty are neither severe nor immediate." *Hensley v. Mun. Court,
> San Jose Milpitas Judicial Dist.*, 411 U.S. 345, 351, 93 S.Ct. 1571,
> 36 L.Ed.2d 294 (1973).

c.    <u>*Analysis*</u>

It is clear that Petitioners have alternatives to the extraordinary remedy of releasing
convicted prisoners before expiration of their sentences, based solely on their conditions of
confinement. Here, Petitioners blame the spread of the virus in the Fort Dix Camp on (1)
the slow implementation of mitigation policies, such as having inadequate supplies of soap

at the beginning of the first outbreak; (2) the lack of six feet social distance; (3) inadequate testing policies; and (4) instances where staff failed to wear masks as required. Although six feet social distance is not possible in the Camp, there was other injunctive relief that could have reduced the spread of COVID-19, including more expansive testing requirements, strict enforcement of the mask requirement, and use of empty buildings for greater social distancing (not sought by Petitioners here). Further, insofar as Petitioners alleged they received inadequate medical care, prospective injunctive relief is available to prisoners. See Farmer v. Brennan, 511 U.S. 825, 845 (1994) (quoting Helling v. McKinney, 509 U.S. 25, 33–34 (1993) ("a subjective approach to deliberate indifference does not require a prisoner seeking 'a remedy for unsafe conditions [to] await a tragic event [such as an] actua[l] assaul[t] before obtaining relief.'") Thus, in addition to the mitigation efforts already in place, injunctive relief could have remedied the alleged Eighth Amendment violation. See Wragg v. Ortiz, 462 F. Supp. 3d 476, 505 (D.N.J. 2020) (holding court lacked jurisdiction under § 2241 over conditions of confinement claim related to spread of COVID-19 because alternative relief was available); Whiteside v. Fort Dix Fed. Prison, No. CV 20-5544 (NLH), 2021 WL 2935363, at *4 (D.N.J. July 13, 2021) (same). As of June 2020, "seven of the ten circuits that have addressed [habeas jurisdiction over a prisoner's conditions of confinement claim] in a published decision have concluded that claims challenging conditions of confinement cannot be brought in a habeas petition.'") Hallinan v. Scarantino, 466 F. Supp. 3d 587, 601 (E.D.N.C. 2020) (quoting Wilborn v. Mansukhani, 795 F. App'x 157, 163 (4th Cir. 2019) (collecting cases)). Further, conditions have changed in the Camp since the petition was filed, all Camp inmates have been offered a vaccine and there are currently no

inmates with COVID-19, but five staff who are positive.[24] See Hope, 972 F.3d at 330 (noting the district court, in addressing conditions of confinement, failed to consider recent efforts in the prison to reduce spread of COVID-19).

Unlike the situation faced by civil immigration detainees confined during the pandemic, convicted prisoners may seek compassionate release via a reduction in sentence from their sentencing courts, based on extraordinary circumstances. See 18 U.S.C. § 3582(c)(1)(A)(i). Further, although Petitioners challenge the manner in which the BOP has exercised its discretion under the CARES Act, it remains another avenue for release from alleged unconstitutional conditions. These alternative remedies address important public safety and rehabilitation factors that do not come into play when a court grants habeas relief based solely on conditions of confinement. Release of convicted prisoners without consideration of these factors should be limited to extraordinary situations where no other remedy is available. See Hope, 972 F.3d at 333 (noting "the Petitioners' quest for nothing short of release appeared to leave little room for a remedy short of the most extreme one[.]") For these reasons, this Court does not find jurisdiction under § 2241 under the circumstances presented here. The Court will, in the alternative, address the merits of Petitioners Eighth Amendment habeas claims in Section IV(C ) below.

   2.    *Challenge to the BOP's Statutory Interpretation of the CARES Act*

      a.    *The parties' arguments*

Petitioners challenge the BOP's statutory interpretation of the CARES Act, asserting the BOP's time-served eligibility requirement is contrary to the Attorney General's

---

[24] Available at https://www.bop.gov/coronavirus/ (last visited Aug. 27, 2021).

memoranda providing guidance for extended release to home confinement under 18 U.S.C.

§ 3624(c)(2). This Court has previously stated,

> [b]efore the CARES Act was passed, 18 U.S.C. § 3624(c)(2) provided the BOP with the authority to "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." 18 U.S.C. § 3624(c)(2) (effective July 19, 2019). As part of the CARES Act, Congress sought to address the spread of the coronavirus in prisons by permitting BOP to expand the use of home confinement under § 3624(c)(2). See Pub. L. No. 116-36, § 12003(b)(2). Upon direction of the Attorney General, Section 12003(b)(2) of the CARES Act temporarily suspends the limitation of home confinement to the shorter of 10 percent of the inmate's sentence or 6 months.
>
> By memorandum dated March 26, 2020, the Attorney General directed the BOP to "prioritize the use of [its] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic." The Attorney General specifically directed the BOP to consider the totality of the circumstances of each inmate, the statutory requirements for home confinement, and a non-exhaustive list of discretionary factors including: the age and vulnerability of the inmate; the security level of the facility holding the inmate; the inmate's conduct while incarcerated; the inmate's score under the Prisoner Assessment Tool Targeting Estimated Risk and Needs ("PATTERN"); whether the inmate has a demonstrated and verifiable reentry plan that will prevent recidivism and ensure public safety (including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face at their current facility); and the inmate's crime of conviction.
>
> On April 3, 2020, the Attorney General exercised authority under the CARES Act to further increase home confinement. The Attorney General authorized the Director of the BOP to immediately maximize transfers to home confinement of all appropriate inmates held at FCI Oakdale, FCI Danbury, FCI Elton, and other similarly situated Bureau facilities where COVID-19 was materially affecting operations.
>
> On April 5, 2020, the BOP gave the following guidance on COVID-19 and home confinement:

> Inmates do not need to apply to be considered for home confinement. Case management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General. The Department has also increased resources to review and make appropriate determinations as soon as possible. While all inmates are being reviewed for suitability, any inmate who believes they are [sic] eligible may request to be referred to Home Confinement and provide a release plan to their Case Manager. The BOP may contact family members to gather needed information when making decisions concerning Home Confinement placement.

> Importantly, on April 15, 2020, the BOP issued additional guidance regarding home confinement under the CARES Act, removing the requirement that the inmate serve up to two-thirds of the sentence imposed before eligibility for home confinement. The new criteria include the following:

>> a. Primary or Prior Offense is not violent;
>> b. Primary or Prior Offense is not a sex offense;
>> c. Primary or Prior Offense is not terrorism;
>> d. No detainer;
>> e. Mental Health Care Level is less than IV;
>> f. PATTERN (First Step Act tool used to determine risk of recidivism) is Minimum;
>> g. No incident reports in past 12 months;
>> h. U.S. Citizen; and
>> i. Viable Release Plan.

>> An inmate's Unit Team evaluates an inmate to make a recommendation as to whether release to home confinement is appropriate. If an inmate is deemed appropriate for home confinement, the Unit Team will forward its recommendation to the Warden and then to the Residential Reentry Manger for a home confinement date in the inmate's release district. If an inmate is granted home confinement, he or she will be quarantined for a 14-day period prior to transfer, based on the Attorney General's guidance.

Gallo v. Ortiz, No. CV 20-16416(RMB), 2021 WL 571600, at *2–3 (D.N.J. Feb. 16, 2021)

(quoting Furando v. Ortiz, No. CV 20-3739(RMB), 2020 WL 1922357, at *2–3 (D.N.J. Apr.

21, 2020), <u>reconsideration denied</u>, No. CV 20-3739(RMB), 2020 WL 3264161 (D.N.J. June

17, 2020) (internal docket citations and footnotes omitted); <u>see also</u> United States Attorney

General, Memorandum for the Director of BOP (Mar. 26, 2020);[25] April 3, 2020

Memorandum.[26]

Respondent contends that the protection from the vaccine obviates the need for

transfer to home confinement under the CARES Act. (Respt's Suppl. Brief, Dkt. No. 24 at

11.)  Moreover, courts lack jurisdiction to review BOP's discretionary decisions regarding

home confinement. (<u>Id.</u> at 12.) The Administrative Procedure Act, pursuant to 5 U.S.C. §

701(a)(2), does not provide a basis for review of BOP determinations under the CARES Act

because CARES Act determinations are committed to agency discretion. (<u>Id.</u>)

        b.    *Analysis*

Courts have jurisdiction under § 2241 to address claims that a prisoner is in custody

in violation of a federal statute based on misinterpretation of a federal statute.[27] <u>Gallo v.

Ortiz</u>, No. CV 20-16416(RMB), 2021 WL 571600, at *2 (D.N.J. Feb. 16, 2021) (citing

<u>Cheek v. Warden of Fed. Med. Ctr.</u>, No. 20-10712, 2020 WL 6938364, at *2–3 (5th Cir.

Nov. 24, 2020) ("A challenge to the BOP's or Attorney General's interpretation of the

---

[25] Available at
https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf (last visited
Aug. 27, 2021).

[26] Available at https://www.justice.gov/file/1266661/download (last visited Aug. 27,
2021).

[27] Respondent argues that Petitioners have failed to exhaust administrative remedies for
their CARES Act claims. ("[E]xhaustion is not required with regard to claims which turn
only on statutory construction") <u>Coleman v. U.S. Parole Comm'n</u>, 644 F. App'x 159, 162
(3d Cir. 2016) (citing <u>Harris v. Marti</u>n, 792 F.2d 52, 54 n. 2 (3d Cir. 1986.))

[CARES Act] would make judicial review appropriate"); Valenta v. Ortiz, No. CV 20-3688 (NLH), 2020 WL 2124944, at *2 (D.N.J. May 5, 2020) ("Petitioner's argument that he is in custody of the United States in violation of the CARES Act fits within th[e] definition [of 28 U.S.C. § 2241(c)(1), (3)."] ) Courts must interpret the words in a statute "consistent with their 'ordinary meaning ... at the time Congress enacted the statute.'" Wisconsin Cent. Ltd. v. United States, 138 S. Ct. 2067, 2070 (2018)  (quoting Perrin v. United States, 444 U.S. 37, 42 (1979)). If there is no ambiguity in the statutory term, the analysis ends. See Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1630 (2018)  ("deference [to an agency's interpretation of a statute] is not due unless a 'court, employing traditional tools of statutory construction,' is left with an unresolved ambiguity") (quoting Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843, n. 9 (1984)).

The relevant language in the CARES Act, PL 116-136, 134 Stat 281, SEC. 12003(b)(2), provides:

> (2) HOME CONFINEMENT AUTHORITY.—During the covered emergency period,[28] if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate.

---

[28]  The CARES Act, PL 116-136, March 27, 2020, 134 Stat 281 provides:

> the term "covered emergency period" means the period beginning on the date on which the President declared a national emergency under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the Coronavirus Disease 2019 (COVID–19) and ending on the date that is 30 days after the date on which the national emergency declaration terminates.

The Attorney General, in his April 3, 2020 memorandum, found that emergency conditions related to the COVID-19 pandemic materially affected the functioning of the Bureau of Prisons, thus triggering the home confinement authority in the CARES Act. See Cheek, 835 F. App'x at 740 (discussing the CARES Act).

The Attorney General provided eligibility guidance for the BOP, but the statute unambiguously places discretion to determine when it is appropriate to exceed a federal prisoner's maximum term of home confinement with the Director of the Bureau of Prisons, not the Attorney General. Accord Coburn v. Spaulding, No. 3:20-CV-01389, 2021 WL 3026851, at *3 (M.D. Pa. June 15, 2021), report and recommendation adopted sub nom. Coburn v. Spaulding, No. CV 3:20-1389, 2021 WL 2678706 (M.D. Pa. June 30, 2021) (collecting cases). Moreover, in his March 26, 2020 memorandum, the Attorney General stated the list of factors to consider was non-exhaustive and discretionary. In the April 3, 2020 memorandum, the Attorney General urged the BOP to maximize transfers to home confinement for appropriate prisoners, but did not alter the previous guidance on eligibility, leaving discretion with the BOP. For these reasons, Petitioners' challenge to the BOP's statutory interpretation fails, and the Court denies habeas relief on this basis.

B.   Additional Assertions of Jurisdiction

The Court liberally construes the petition as raising claims under the APA, challenging the BOP's denial of extended home confinement to Petitioners under the CARES Act as arbitrary and capricious. The Supreme Court has succinctly explained,

> [t]he Administrative Procedure Act embodies a "basic presumption of judicial review," *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and instructs reviewing courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). Review is not

> available, however, "to the extent that" a relevant statute precludes it, § 701(a)(1), or the agency action is "committed to agency discretion by law," § 701(a)(2).

Dep't of Com. v. New York, 139 S. Ct. 2551, 2567 (2019). In this case § 701(a) precludes judicial review. "[T]he plain language of [18 U.S.C. § 3625] specifies that the judicial review provisions of the APA, 5 U.S.C. §§ 701-706, do not apply to 'any determination, decision, or order' made pursuant to 18 U.S.C. §§ 3621-3624." Reeb v. Thomas, 636 F.3d 1224, 1227 (9th Cir. 2011). Extended home confinement under the CARES Act falls under § 3624(c), and is thus exempted from judicial review. Furthermore, the determination of when extended home confinement is appropriate is committed to the discretion of the Director of the Bureau of Prisons by the express language of the CARES Act. Therefore, judicial review under the Administrative Procedure Act is unavailable for this additional reason. Accord, Coburn, No. 3:20-CV-01389, 2021 WL 3026851, at *5 (M.D. Pa. June 15, 2021), report and recommendation adopted sub nom. Coburn v. Spaulding, No. CV 3:20-1389, 2021 WL 2678706 (M.D. Pa. June 30, 2021). In any event, the BOP's determination was not arbitrary, the BOP considered Petitioners for CARES Act early release based on their individual characteristics, and exercised the discretion afforded to the Director of the BOP to prioritize for release those who had served greater percentages of their sentences.

Petitioners also assert jurisdiction under 28 U.S.C. § 1331, solely for the purpose of seeking appointment of a special master to determine how many inmates FCI Fort Dix can house in the Camp while maintaining six feet social distance between inmates during the pandemic. Because the Court concludes below, in the alternative merits discussion of Petitioners' Eighth Amendment claim, that the Eighth Amendment does not require FCI Fort Dix to provide six feet distance between inmates, the Court need not split this claim

from the habeas petition to open a civil rights action under 28 U.S.C. § 1331. See e.g. Ponds v. Pennsylvania Bd. of Prob. & Parole, No. 1:20-CV-15, 2020 WL 497144, at *4 (M.D. Pa. Jan. 7, 2020), report and recommendation adopted sub nom. Ponds v. Pa. Bd. of Prob. & Parole, No. 4:20-CV-00015, 2020 WL 489014 (M.D. Pa. Jan. 30, 2020) (discussing improprieties of hybrid habeas/civil rights action).

      C.   Alternative Merits Analysis of Eighth Amendment Claim

The Court will address the merits of the Eighth Amendment conditions of confinement claims in the alternative to dismissal for lack of jurisdiction. Petitioners allege Respondent was deliberately indifferent to their health, in violation of the Eighth Amendment, based on the failure to prevent the spread of COVID-19 in the FCI Fort Dix Camp, and based on BOP's failure to transfer them to extended home confinement under the CARES Act.

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment" because the Government, by depriving prisoners of their liberty, must provide for their basic human needs, including medical care and safety. Helling, 509 U.S. at 31. A violation of the Eighth Amendment, however, requires a showing that the Government knew of and disregarded an excessive risk to prisoners' health and safety. Hope, 972 F.3d at 329 (citing Nicini v. Morra, 212 F.3d 798, 811 (3d Cir. 2000) (citing Farmer, 511 U.S. at 837). Eighth Amendment protection extends to risks to a prisoner's future health. Id. (citing Palakovic v. Wetzel, 854 F.3d 209, 218 (3d Cir. 2017)).

"Deliberate indifference 'is a 'subjective standard of liability consistent with recklessness as that term is defined in the criminal law.'" Id. at 330 (quoting Natale v.

44

Camden County Correctional Facility, 318 F.3d 575, 582 (3d Cir. 2003) (quoting Nicini,

212 F.3d at 811)). "The context of the Government's conduct is essential," and courts must

afford some deference to prison administrators. Id. The response to COVID-19 must be

considered in the context of the unique circumstances of the pandemic that rapidly altered

our world. Id. The constitutional standard does not require elimination of the risk that

prisoners will contract COVID-19. Id. "[P]rison officials who actually knew of a substantial

risk to inmate health or safety may be found free from liability if they responded reasonably

to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844.

Because context is essential and deference must be afforded to prison administrators,

it is appropriate to consider whether Respondent followed the CDC guidance for detention

facilities. See Hope, 972 F.3d at 330 (noting the district court failed to address the CDC

guidance for detention facilities). Here, FCI Fort Dix implemented the CDC guidance for

detention facilities through the BOP Action Plan and other policies such as detailed

quarantine and PPE guidance. (See Reiser, Turner-Foster, and Sassaman Declarations, Dkt.

Nos. 8-1, 8-2 and 8-3.) The CDC never urged mass testing of asymptomatic inmates, and

suggested testing of inmates in various types of quarantine, including asymptomatic inmates

in exposure quarantine. (Sassaman Decl., Ex. 2 and BOP Action Plan.) Although the CDC

recognized that six feet social distance between inmates was ideal for prevention of spread

of the virus (Id., Ex. 2, Dkt. No. 8-3 at 72, 79, 81), it also recognized that not all detention

facilities would be capable of providing ideal conditions. (Id., Dkt. No. 8-3 at 72.) Thus,

CDC guidance allowed for housing inmates in dormitories by isolating the units from each

other, sleeping head to foot, using good hygiene and sanitation practices, staggering use of

common areas with sanitation between uses, use of PPE by staff and masks by inmates, and

quarantine with a test-in, test-out requirement. (Id., Ex. 2, Dkt. No. 8-3 at 68-94.) As discussed above, FCI Fort Dix enacted these protections. The failure to eliminate all risk does not constitute deliberate indifference to inmate health in the context of a rapidly evolving pandemic, and the difficulties associated with quickly adapting to the changes in a minimum security camp environment. See e.g. Massey v. Estock, No. 1:20-CV-271, 2021 WL 195264, at *2 (W.D. Pa. Jan. 20, 2021); see United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020) (in context of compassionate release motion, noting "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.")

Petitioners point to various instances where BOP policies were not enforced, for instance inadequate soap supplies early in the pandemic, staff not wearing PPE, and understaffing over the winter holidays that slowed identification and isolation of sick inmates. These alleged instances were not so widespread as to constitute deliberate indifference by Respondent. Additionally, this Court takes judicial notice that the third outbreak at FCI Fort Dix occurred during the highest rates of COVID-19 infection in New Jersey overall.[29] Context matters, and includes the quick introduction of the vaccine at FCI Fort Dix when it became available in mid-January 2021. See United States v. Ugbah, 4 F.4th 595, 597 (7th Cir. 2021)  (denying compassionate release because "vaccines provide a much better defense against infection than any judicial order could do.") This Court cannot conclude that Respondent was deliberately indifferent to Petitioners' health risks because

---

[29] See NJ COVID-19 Dashboard (available at https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml (last visited Aug. 27, 2021).

FCI Fort Dix adopted and implemented, albeit imperfectly during difficult times, the CDC guidance for managing the spread of COVID-19 in a detention facility that housed inmates in a dormitory-style setting.

Petitioners raise a second Eighth Amendment claim. Given the inability to provide the ideal conditions for preventing spread of COVID-19 in the FCI Fort Dix Camp, Respondent was deliberately indifferent by refusing to release them to extended home confinement under the CARES Act, based on considerations other than public safety, such as percentage of their sentences served. The unfettered discretion afforded by Congress to the BOP Director to determine when it is appropriate to release a prisoner to extended home confinement under the CARES Act precludes a finding of deliberate indifference. Each petitioner was reviewed for release, and according to the Declaration of James Reiser, BOP continues to review inmates after completion of the initial review for all federal inmates. (Reiser Decl. ¶ 20, Dkt. No. 8-2.)

The Court takes judicial notice of this recent post on the BOP's website concerning the CARES Act:

> Case management staff continue to review all inmates to determine which ones meet the criteria established by the Attorney General on March 26, 2020 and April 3, 2020. The Department has also increased resources to review and make appropriate determinations as soon as possible. All inmates are being reviewed for suitability, however, any inmate who believes they are eligible may request to be referred to Home Confinement and provide a release plan to their Case Manager.[30]

---

[30] Available at
https://www.bop.gov/resources/news/20210823_home_confinement_milestone.jsp (last visited August 26, 2021.) Respondent asserts the vaccine obviates the need for extended home confinement. (Respt's Suppl. Brief, Dkt. No. 4 at 11.) However, Respondent also recognized the uncertainty of the virus and submits that BOP continues to take all necessary and foreseeable precautions. (Suppl. Reiser Decl., ¶ 34, Dkt. No. 24-1.) In this respect, the CARES Act presciently extended the "covered period" to extend home confinement until the national emergency ends.

As Respondent acknowledged in answer to the petition (Answer, Dkt. No. 7 at 35), the Attorney General's April 3, 2020 memorandum calls for discretionary and individualized determinations of eligibility. The individual and discretionary nature of review for eligibility implies that inmates will not be categorically excluded based on the amount of time-served as the BOP continues to review inmates for eligibility. Although courts cannot review the BOP's discretionary CARES Act determinations, administrative review is available to inmates through the BOP's administrative remedy program. (See Dobovich Decl. ¶ 3, Dkt. No. 8 (describing administrative remedy procedure)).

VI.   CONCLUSION

For the reasons discussed above, the Court finds that it lacks jurisdiction under 28 U.S.C. § 2241 to provide habeas relief on Petitioners' Eighth Amendment conditions of confinement claim, and dismisses the claim under Federal Rule of Civil procedure 12(b)(1). Alternatively, the Court finds that Respondent was not deliberately indifferent to Petitioners' health in violation of the Eighth Amendment. The Court also lacks jurisdiction over Petitioners' APA claims, and alternatively finds that Respondent's denial of early release under the CARES Act was not arbitrary and capricious. The Court finds jurisdiction over Petitioners' § 2241 habeas claim that Respondent misinterpreted the CARES Act, but denies the claim on the merits.

An appropriate Order follows.

Dated:  **September 1, 2021**

s/Renée Marie Bumb
**RENÉE MARIE BUMB**
**United States District Judge**